## Table of Unreported Cases
(in alphabetical order)

*Andrews v. Va. Union Univ.*, No. 3:07cv447, 2007 U.S. Dist. LEXIS 85273 (E.D. Va. Nov. 16, 2007).

*Cretella v. Kuzminski*, No. 3:08-CV-109, 2008 U.S. Dist. LEXIS 42152 (E.D. Va. May 29, 2008).

*Curran v. Amazon.com, Inc.*, No. 2:07-0354, 2008 U.S. Dist. LEXIS 12479 (S.D. W. Va. Feb. 19, 2008).

*Doctor's Assocs., Inc. v. QIP Holders LLC*, No. 3:06-cv-1710 (JCH), 2007 U.S. Dist. LEXIS 28811 (D. Conn. Apr. 18, 2007).

*Harrington v. Sprint Nextel Corp.*, No. 1:08cv336 (JCC), 2008 U.S. Dist. LEXIS 42071 (E.D. Va. May 29, 2008).

*Signature Flight Support Corp. v. Landow Aviation L.P.*, No. 1:08cv955 (JCC), 2009 U.S. Dist. LEXIS 1938 (E.D. Va. Jan. 13, 2009).

*Verrinder v. Rite Aid Corp.*, No. 3:06-CV-00024, 2006 U.S. Dist. LEXIS 53385 (W.D. Va. Aug. 2, 2006).

*Wuchenich v. Shenandoah Mem. Hosp.*, 215 F.3d 1324 (4th Cir. 2000) (unpublished), *full op. at* No. 99-1273, 2000 U.S. App. LEXIS 11557.





Analysis
As of: Oct 10, 2011

## GWENDOLYN V. ANDREWS, Plaintiff, v. VIRGINIA UNION UNIVERSITY, MILLICENT J. CARVALHO, Defendants.

### Civil Action No. 3:07cv447

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION

### 2007 U.S. Dist. LEXIS 85273; 102 Fair Empl. Prac. Cas. (BNA) 580

### November 16, 2007, Decided
### November 19, 2007, Filed

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by *Andrews v. Va. Union Univ., 2008 U.S. Dist. LEXIS 40001 (E.D. Va., May 15, 2008)*

**COUNSEL:** [*1] For Gwendolyn V. Andrews, Rev., Plaintiff: Richard F. Hawkins, III, LEAD ATTORNEY, The Hawkins Law Firm PC, Richmond, VA.

For Virginia Union University, Millicent J. Carvalho, Ph.D., Defendants: Frederick Hope Marsh, LEAD ATTORNEY, Hill Tucker & Marsh PLLC, Richmond, VA.

**JUDGES:** Robert E. Payne, Senior United States District Judge.

**OPINION BY:** Robert E. Payne

**OPINION**

**MEMORANDUM OPINION**

This action arises from allegedly discriminatory actions by Defendants, Virginia Union University ("VUU") and one of its employees, Dr. Millicent Carvalho ("Carvalho") (collectively "Defendants"), against Plaintiff, Rev. Gwendolyn Andrews ("Andrews"). Andrews' Complaint identifies four counts, three under Title VII of the Civil Rights Act of 1964 (religious discrimination, failure to accommodate, and retaliation) and one under Virginia common law (defamation). All four counts are asserted against VUU. Carvalho is a defendant only as to Count IV, defamation.

This matter is presently before the Court on Defendants' Motion To Dismiss Plaintiff's Claim Pursuant To Federal *Rule 12(b)(6)*

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

(Docket No. 4). For the reasons set forth below, the Motion is denied as to all counts.

## BACKGROUND

Andrews is an ordained minister with a masters of divinity [*2] degree. Consequently, she uses the title, "Reverend," personally and professionally. Andrews also has an additional masters degree in social work but does not hold a doctorate -- a so-called "terminal degree."

VUU is a historically black private university located in Richmond, Virginia. Andrews joined the faculty of VUU in 2001 as an Assistant Professor of Social Work and as Chairperson of the Department of Social Work. The facts alleged in the Complaint demonstrate that Andrews was effective in her role as Chairperson. Indeed, during Andrews' tenure, VUU's Department of Social Work obtained accreditation and tripled its enrollment. In 2005, Andrews received the "Outstanding Faculty of the Year Award" at VUU. Throughout this time, Andrews was addressed as "Reverend" by students, faculty, and administration at VUU. VUU's website and printed faculty directory, as well as Andrews' employment contract, referred to her as "Rev. Gwendolyn Andrews."

On October 18, 2005, VUU's Interim Provost and Vice President for Academic Affairs, Dr. Gloria James, sent an email to several members of the faculty. The email stated, in part:

> This note is to inform you that the only academic titles that are acceptable [*3] at the undergraduate level are: Dr. (Ph.D./Ed.D.); Professor, Ms., Mrs, Mr, Dean, Chair,) [sic]. We will no longer have students address faculty as Reverend. This is totally inappropriate for our academic setting. Please inform faculty.

(Docket no. 1, Exhibit C.)

The next day Andrews lodged an informal verbal complaint with her supervisor, Dr. Emmanuel Onyedike. Andrews complained to Onyedike that she believed that the email discriminated against her for expressing her religious beliefs, to wit: using the title, "Reverend." Andrews' sentiments were echoed shortly thereafter in a student-written "Letter to the Editor" that appeared in VUU's student newspaper. [1]

> 1   Referring to James' email, the letter stated, "This blew my mind! How can anyone tell students how to address their faculty members, especially those who have been called to minister? . . . I am a student, and I will always refer to each of the named faculty members [including Andrews] as Reverend."

Andrews contends that her complaint to Onyedike and the student letter angered VUU's administration. On November 1, 2005, several days after the student's letter was published, James convened a meeting of VUU Deans and Chairs. In what [*4] is said to be a reference to Andrews, James stated that she was "pissed" that a faculty member without a terminal degree would cause problems by insisting on being called "Reverend."

Three months after the meeting, Andrews learned informally that her appointment as the Chair of the Department of Social Work would not be renewed. While Andrews was still serving as Chair, VUU posted a notice on its website seeking applications for the position occupied by Andrews. Soon thereafter, VUU informed Andrews that her demotion was necessitated by the accreditation standards which the university must meet which purportedly required that all department chairpersons hold terminal degrees. Andrews contends that this excuse was pretextual because the accrediting

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

body, the Southern Association of Colleges and Schools, had no such requirement.

Andrews proceeded to lodge several complaints with the university administration. By letter to James and VUU's President, Dr. Belinda Anderson, Andrews stated that her removal -- which occurred without input from the Department of Social Work -- violated the accreditation standards. Andrews sent a second letter to Anderson and James complaining that she believed [*5] that she was being discriminated against on the basis of religious expression.

On June 9, 2006, roughly six months after Andrews' use of Reverend became an issue, VUU officially notified Andrews that she would not be renewed as Chair of the Social Work Department. Notwithstanding the fact that Andrews would retain her position as Assistant Professor of Social Work, the loss of the Chairmanship would result in a significant reduction in Andrews' annual salary. Andrews subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

Andrews asserts that the EEOC complaint prompted Defendants to engage in several retaliatory acts. Andrews claims that another member of the faculty told her that her replacement as Chair of the Social Work Department, Carvalho, was tasked with being a "headhunter" -- a role that involved "making . . . Andrews' life so miserable that she would quit her employment." Compl. P 59. According to the Complaint, Carvalho did just that.

Andrews also alleges that Carvalho made false and defamatory statements about Andrews to the parents of several students and wrongfully accused Andrews of violating professional ethics by withholding [*6] files that were necessary for the Social Work Department to maintain accreditation. Finally, Andrews alleges that her teaching load was increased above the norm.

Andrews initiated this action on July 30, 2007. The Complaint was filed within ninety days of Andrews' receipt of a right-to-sue letter from the EEOC as prescribed by *29 C.F.R. § 1601.28(e)(1)*.

## DISCUSSION

Defendants bring this motion under *Rule 12(b)(6)* claiming that Andrews has not alleged adequate facts to support a plausible claim for relief. The primary purpose of a Rule 12(b)(6) motion is to "provide a defendant with a mechanism for testing the legal sufficiency of the complaint." *United Mine Workers of Am., Inc., v. Wellmore Coal Corp., 609 F.2d 1083, 1086 (4th Cir. 1979)*. Accordingly, the court's focus is on the allegations in the complaint and their relationship to the elements of the claims. [2]

> 2   Defendants urge this Court to dismiss the Complaint because VUU is a "religious educational institution" exempted from Title VII discrimination claims by *42 U.S.C. § 2000e-1(a)*. To determine whether VUU is a religious educational institution, it is necessary to have far more information than can be ascertained from the Complaint [*7] and documents attached thereto. *See EEOC v. Kamehameha Schools, 990 F.2d 458, 460 (9th Cir. 1993)* ("[I]n determining whether an institution falls within the limited exemption for religious institutions under § 2000e-1, 'each case must turn on its own facts. All significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious.'" (citations omitted)). Moreover, Defendants' argument on this point is more properly characterized as an affirmative defense. The issue cannot be resolved at this stage of the action. *See Republican Party of*

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 5 of 97 PageID# 111

Page 4

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

*N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).*

In order to survive Rule 12(b)(6) motion to dismiss, a complaint must aver "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).* In evaluating plausibility, the Court may not rely on mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id. at 1965.* The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id. at 1965,* and critical elements of a claim **[*8]** must be, at a minimum, "suggested by the facts," *id. at 1973.* However, in testing the sufficiency of the complaint, the Court also must "accept[] all well-pleaded allegations in the plaintiff's complaint as true and draw[] all reasonable inferences from those facts in the plaintiff's favor." *Chao v. Rivendell Woods, Inc., 415 F.3d 342, 346 (4th Cir. 2005); see also Structural Concrete Products, LLC v. Clarendon American Insurance Co., 2007 U.S. Dist. LEXIS 61714, *7 (E.D. Va. Aug. 22, 2007)* (maintaining inference standard in light of *Twombly*).

## I. Religious Discrimination

In Count I of the Complaint, Andrews alleges that VUU unlawfully discriminated against her in violation of *42 U.S.C. § 2000e-2(a).* [3] There are two generally recognized methods by which a Title VII plaintiff may prevail on a religious discrimination claim: disparate treatment and failure to accommodate. *See Chalmers v. Tulon, 101 F.3d 1012, 1017 (4th Cir. 1996).*

> 3   The relevant provision states, "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." *42 U.S.C. § 2000e-2(a).*

Count II **[*9]** is characterized as a failure to accommodate claim. Thus, it is logical to believe that Andrews intends to present a disparate treatment claim under Count I. This was also how plaintiff characterized it in her brief and at oral argument. Count I will be assessed accordingly.

The thrust of a disparate treatment religious discrimination claim is that an employee "was treated differently because of her religious beliefs." *McIntyre-Handy v. West Telemarketing Corp., 97 F. Supp. 2d 718, 730 (E.D. Va. 2000).* Plaintiffs making disparate treatment claims may utilize the burden-shifting framework of *McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* [4]

> 4   There are several alternate methods available to plaintiffs to prove disparate treatment religious discrimination claims. In the direct evidence method, a plaintiff must (1) prove that she adequately performed her employment functions and (2) offer direct or indirect evidence that proves that discrimination was more likely than not the cause of the adverse employment action. *See Chalmers, 101 F.3d 1017.* This functions like a traditional civil case.
>
> Plaintiffs lacking sufficient direct evidence may attempt to prove discrimination inferentially. Such **[*10]** plaintiffs may proceed under a theory that the defendant employer's allegedly discriminatory actions were the product of mixed motives, *see 42 U.S.C. § 2000e-1(m),* or that they were justified by an excuse that was only a pretext to obscure discriminatory intent, *see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* Under either of these methods the employee must present a prima facie case from which unlawful discrimination can be inferred. *See Desert Palace, Inc. v. Cos-*

*ta, 539 U.S. 90, 101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003); Chalmers, 101 F.ed at 1017-18* (citing *McDonnell Douglas, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668*). Because prima facie cases can be predicated on indirect evidence, the initial burden on the plaintiff making a prima facie case is typically lower than the burden placed on a plaintiff in a direct evidence case. This is because Title VII plaintiffs rarely have the "good luck to have direct evidence of discriminatory intent." *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 534, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)* (Souter, J., dissenting).

For the purpose of adjudicating Defendants' Motion to Dismiss Plaintiffs' Claim Pursuant To Federal Rule 12(b)(6) (Docket No. 4), it is not necessary to determine if Andrews has alleged enough facts to support **[*11]** a direct evidence employment discrimination case. As long as the Complaint establishes a prima facie case under any mode of proof, Andrews has met her burden of production and Count I will not be dismissed for failure to state a claim. That, of course, does not foreclose Andrews from prosecuting her case on any available theory.

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of production to present a prima facie case of discrimination. [5] *See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. This burden requires the plaintiff to allege sufficient facts to give rise to the inference that there is a causal connection between the plaintiff's religious status and an adverse employment action. *See McIntyre-Handy, 97 F. Supp. 2d at 730*. There is no one way to set forth a prima facie case; what must be alleged to prove a prima facie case of discrimination will vary based on the facts of case. *See Tex. Dep't of Community Affairs v. Burdine,*

*450 U.S. 248, 253 n.6, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. Thus, the necessary elements of a prima facie case of disparate treatment are "flexible." *Kafu v. Kelly Servs., 2007 U.S. Dist. LEXIS 10444, *7 fn.6 (D.S.C. Jan. 24, 2007)*.

5   Although **[*12]** some courts have questioned the continuing validity of *McDonnell Douglas*'s burden-shifting framework in light of *Desert Palace, see e.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987 (D. Minn. 2003)*, the framework is still utilized in the Fourth Circuit. *See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 317-18 (4th Cir. 2005)*.

To assess prima facie cases of discrimination, courts typically rely on the factors cited in *St. Mary's Honor Center* to arrive at a four-part test. The wording of the tests often vary subtly, based on the factual circumstances of the case. In *Brinkley v. Harbour Recreation Club, 180 F.3d 598 (4th Cir. 1999)*, the Fourth Circuit stated the familiar four-element test in terms that are particularly appropriate to the facts of this action:

To establish a prima facie case of discrimination under Title VII, [the Plaintiff] must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants **[*13]** outside the protected class.

*Id. at 607.*

Case 2:11-cv-00480-RGD -DEM Document 10-2 Filed 10/17/11 Page 7 of 97 PageID# 113

Page 6

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

Assuming, as must be done, that Andrews' allegations are true, *see Chao, 415 F.3d at 346*, sufficient facts have been alleged in the complaint to present a prima facie case of disparate treatment. Therefore, Andrews' "claim to relief [] is plausible on its face," *Twombly, 127 S. Ct. at 1974*, and the motion to dismiss the religious discrimination claim in Count I will be denied.

Andrews has stated that she is an ordained minister of the Baptist faith. Section 2000e-2's prohibition on religious discrimination does not differentiate between religions that qualify as protected classes and those that do not. Thus, Andrews' status as an adherent to the Baptist faith is sufficient to designate her as a member of a protected class for the purposes of this action. [6]

> 6 Some courts have suggested that in order to support a religious discrimination claim, a plaintiff must be of a different religion from the defendant, *see e.g., Richardson v. JM Smith Corp., 473 F. Supp. 2d 1317, 1331 (M.D. Ga. 2007)*, or the plaintiff must show that her replacement was of a different religion, *see e.g., Rabinovitz v. Pena, 89 F.3d 482, 486 (7th Cir. 1997); Breech v. Alabama Power Co., 962 F. Supp. 1447, 1457 (S.D. Ala. 1997).* [*14] That view has no backing in § 2000e-2, which makes it unlawful for an employer to discriminate "because of such individual's . . . religion." There is no statutory requirement that the employer adhere to a different faith than the plaintiff. Reading such a requirement into the statute is akin to saying that an African-American employer could not violate Title VII if he refused to hire African-American workers. *Cf. Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)* (holding that a heterosexual man can bring a Title VII claim for discrimination "because of sex" against other heterosexual men). Thus,

Andrews' claims are not precluded by the fact that VUU is a Baptist-affiliated institution.

Andrews also has alleged several facts that demonstrate that she was well-qualified for the position as Chair of the Social Work Department at VUU: she possessed a masters degree in social work and had fifteen years of experience as a clinical social worker; VUU's Social Work Department first attained accreditation during Andrews' tenure as Chair; and the number of VUU social work graduates matriculating in masters degree programs increased. Further, Andrews was recognized for her job performance [*15] when she was granted the Outstanding Faculty of the Year Award for the year immediately preceding her loss of the Chair position. Notwithstanding these qualifications, Andrews was demoted from the position as Chair of the Social Work Department -- an adverse employment action -- and replaced by Carvalho.

Andrews has not, however, alleged that Carvalho is outside of her protected class - adherents of the Baptist faith. Carvalho's religious affiliation, if any, is not identified in the Complaint. Assuming that Carvalho is Baptist, this action would fall within the "categor[y] of cases that call for an exception" to the fourth part of the prima facie test. *See Miles v. Dell, Inc., 429 F.3d 480, 487-88 (4th Cir. 2005).* The purpose of the fourth element - that the plaintiff's replacement be from outside the relevant protected class - is to "eliminate the inference of non-discrimination" that would flow from an employer's decision to replace the plaintiff with an employee of the same race, color, religion, or national origin. *Id. at 488.* There are, of course, circumstances where the inference of non-discrimination is not warranted. *See id. 488-89* (listing examples). For example, a situation [*16] in which a restaurant owner fires an Hispanic employee who "looks ethnic," however one would define that, and replaces her with an Hispanic employee who "looks

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 8 of 97 PageID# 114

Page 7

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

white" would not give rise to a reasonable inference of non-discrimination. On the contrary, it would be just as reasonable to infer that the owner was motivated by the discriminatory purpose of giving the appearance that only Caucasians were employed in the establishment.

As in the example above, it is common for individuals of the same religious denomination to outwardly manifest their religious convictions to varying degrees. An individual's religion is a product of that individual's conscience, and the sincerely held religious beliefs and practices of individuals who ascribe to the same denomination may be markedly different; the religious practices of one Baptist may be quite unlike another. Andrews, by maintaining the religious title, Reverend, is publicly manifesting her status as a Baptist. Andrews' replacement, Carvalho, makes no such public manifestation. It follows that Andrews' replacement by Carvalho, even if they were both Baptists, does not give rise to the inference of non-discrimination. Rather, it would be just [*17] as reasonable to infer that VUU had the discriminatory intent of giving the appearance that it did not have employee Baptist ministers as academic department chairpersons. Thus, it is of no consequence to the legal sufficiency of Andrews' claim that she did not allege that her replacement was of a different religion.

Finally, Andrews has alleged that she is an ordained minister of the Baptist faith and that the exercise of her beliefs -- insisting on being called "Reverend" -- was the cause of VUU's actions. The close proximity in time between Andrews' assertion of her religious beliefs and the loss of the Chair position are sufficient to give rise to a plausible inference of unlawful discrimination. Consequently, the allegations, presumed to be true and viewed as an integrated whole, meet the threshold of a prima facie case and are sufficient to survive a motion to dismiss.

## II. Failure To Accommodate

In Count II, Andrews asserts that VUU failed to make reasonable accommodations for the exercise of her religious belief that she should be addressed as "Reverend." The basis of a failure to accommodate claim is that an employer refused to make "reasonable accommodations, short of undue hardship, [*18] for the religious practices of his employees." *Trans Worlds Airlines v. Hardison, 432 U.S. 63, 74 (1977); see also 42 U.S.C. § 2000e(j)* (defining religion as "all aspects of religious observance and practice, as well as beliefs, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship . . . .").

As with disparate treatment claims, a plaintiff asserting a failure to accommodate claim need only present a prima facie case to survive a motion to dismiss. *See Chalmers, 101 F.3d at 1019.* The Fourth Circuit articulated the elements of a prima facie failure to accommodate case in *Chalmers,* stating, "[A] plaintiff must establish that: '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" *Id.* (quoting *Philbrook v. Ansonia Bd. Of Educ., 757 F.2d 476, 481 (2nd Cir. 1985).*

It is clear that Andrews has alleged sufficient facts to satisfy the second and third elements of a failure to accommodate claim. VUU cannot [*19] deny that it was aware of Andrews' use of the religious title, "Reverend." VUU referred to Andrews as "Rev." on its website, faculty directory, and in Andrews' employment contract. Andrews also lodged a timely complaint with her supervisor, Onyedike, informing him of her objection to James' decision to prohibit faculty members' use of Reverend and her desire to continue using the title.

Likewise, there is no doubt that Andrews has alleged that she suffered specific consequences for continuing to assert that she should be called Reverend by her students and colleagues. She asserts both that she was demoted from her Chairmanship and that her pay was reduced. Either one of these adverse consequences can properly be characterized as "discipline." *Cf. id.*

The dispositive issue on Andrews' failure to accommodate claim is whether she has satisfied the first element of the test outlined in *Chalmers.* Is Andrews' insistence on using the title "Reverend" a "bona fide religious belief"? The court's task is complicated by the sensitive and personal nature of religious beliefs and the paucity of clear authority on this issue. [7]

7    Title VII's definition of religion is unhelpful: "The term 'religion' [*20] includes all aspects of religious observance and practice, as well as belief . . . ." *42 U.S.C. § 2000e(j).* This definition is too expansive to be of much use. Interpreting this provision, the EEOC defines religion as

moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. . . . The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee . . . .

*29 C.F.R. 1605.1 (2007).* This definition is also rather unhelpful in the context of a motion to dismiss. The EEOC's defini-

tion is laden with qualifying terms that are difficult to assess without a great deal of factual development. In particular, whether or not an individual sincerely believes something is difficult to divine from the sparse allegations found in most notice pleadings.

Andrews refers to her use of the title as "religious expression," Compl. P 1, but courts have held that not all religious expressions are religious beliefs. [8] Neither the Supreme Court nor the Fourth Circuit have set [*21] forth unambiguous guidelines for distinguishing bona fide religious beliefs from personal preferences. For that reason, the court looks to the holdings of other jurisdictions for guidance.

8    *See, e.g., Tiano v. Dillard Dep't Stores, 139 F.3d 679 (9th Cir. 1998)* (holding that an employee's religious pilgrimage was a personal preference because the employee's Catholic faith did not require that the pilgrimage be made during the employer's busiest season); *Anderson v. U.S.F. Logistics (IMC), Inc., 2001 U.S. Dist. LEXIS 2807 (S.D. Ind. 2001)* (holding that an employee's use of "have a blessed day" with customers was a personal preference rather than a bona fide religious belief because it was not a required element of the employee's faith).

The United States Court of Appeals for the First Circuit was confronted with a similar issue in *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49 (1st Cir. 2002).* In *Union Independiente,* an employee who was a member of the Seventh-Day Adventist Church claimed that his religious beliefs prohibited him from joining a union. *Id. at 51.* According to the First Circuit, in order to establish that a belief [*22] or practice must be accommodated under Title VII: "the plaintiff must demonstrate both [1] that the belief or practice is religious and [2] that it is sincerely held." *Id. at 56.*

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 10 of 97 PageID# 116

Page 9

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

Elaborating on this two-part test, the *Union Independiente* court explained that the religious nature of a belief is generally not at issue, but whether the belief is sincerely held "should be reserved 'for the factfinder at trial, not for the court [upon a pretrial motion].'" *Id.* The First Circuit's reasoning in *Union Independiente* is persuasive and the court will rely on it to dispose of the present matter.

Title VII's definition of religion "includes all aspects of religious observance and practice, as well as belief." *42 U.S.C. § 2000e(j).* Websters Third New International Dictionary defines "reverend" as "a member of the clergy." [9] Andrews uses the title in this fashion to denote her status as an ordained minister of the Baptist faith. Under Title VII's expansive definition of religion, the religious nature of the title, Reverend, as it is used by Andrews, is obvious.

> 9    Websters Third New International Dictionary 1943 (2002).

It may well be that Andrews' use of Reverend in her capacity as a university professor [*23] is a personal preference. There is some evidence in the Complaint to support this assertion. For instance, she states that "she thought the students should be free to call their professors by a religious title if the professor so chooses . . . ." Compl. P 39. This statement evidences more of a concern for her students' preferences than for her own religious beliefs.

However, *Chao, 415 F.3d at 346,* instructs that "all reasonable inferences" should drawn in favor of the plaintiff in the context of a motion to dismiss. Andrews states that she has used the title "Reverend" both personally and professionally since she became an ordained minister. She also characterizes her use of the title as a "religious belief []." Compl. P 1. The court is not in a position, at this stage of the action, to conclude that Andrews uses the title Reverend as matter of personal preference rather than as a practice that arises from the sincere belief that ministers should called Reverend. Because it is

reasonable to infer from the alleged facts that Andrews has such a sincere belief, her failure to accommodate claim will not be dismissed for legal insufficiency.

### III. Retaliation

Andrews' third claim is that VUU  [*24] retaliated against her for objecting to the administration's decision to disallow the use of the Reverend title. Andrews has alleged sufficient facts to make a plausible retaliation claim and thus the motion to dismiss Count III will be denied.

Under Title VII, an employer may not retaliate against an employee for (1) opposing an employment practice that is unlawful under Title VII or (2) participating in an "investigation, proceeding, or hearing" that is conducted under Title VII. *42 U.S.C. § 2000e-3(a).* "Discrimination" is defined more broadly in the retaliation provision of Title VII, *§ 2000e-3,* than it is in other substantive Title VII provisions. Plaintiffs need not prove an adverse employment action to maintain a retaliation claim. *Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2412-13, 165 L. Ed. 2d 345 (2006).* Retaliatory discrimination includes any action by the employer that "a reasonable employee would have found [to be] materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id. at 2415.*

Andrews' allegations satisfy the elements of a retaliation claim. Following VUU's decision to  [*25] prohibit the use of Reverend, Andrews filed Charge of Discrimination with the EEOC. That was a protected action under *§ 2000e-3,* and the filing of such a charge is sufficient to bring Andrews within the purview of the anti-retaliation provision. [10]

> 10    Because the EEOC complaint triggers Title VII anti-retaliation protection, the court need not decide at this time

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 11 of 97 PageID# 117

Page 10

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

whether Andrews' informal complaints to her supervisor triggered the protection at an earlier time. For the purposes of ruling on a motion to dismiss it is sufficient to note that Andrews has stated a claim upon which relief may be granted.

Assuming that Andrews' allegations are true, VUU engaged in several retaliatory actions that a reasonable employee would have found to be materially adverse, including: telling Andrews' replacement to find an excuse to fire her; making false and defamatory statements to the parents of Andrews' student advisees; informing the student bookstore to refrain from filling Andrews' textbook orders; and breaking into and "trash[ing]" Andrews' office on two separate occasions. Compl. PP 69, 70. A reasonable employee would be dissuaded from pursuing a discrimination claim in light of such actions. *See* **[\*26]** *Burlington Northern* 126 S. Ct. At 2415.

## IV. Defamation

Andrews' fourth claim is a Virginia common law defamation claim against Carvalho. Because the defamatory statements are alleged to have been made within the scope of Carvalho's employment, Count IV is also alleged against VUU.

Under Virginia law, the elements of defamation are "(1) publication (2) of an actionable statement with (3) the requisite intent." *Jordan v. Kollman, 269 Va. 569, 612 S.E.2d 203, 206 (Va. 2005).* Publication can involve an oral statement made to, or overheard by, a third party. *Snyder v. Fatherly, 158 Va. 335, 163 S.E. 358, 363-64 (Va. 1932).* An actionable statement is a statement of fact that is false. *Jordan, 612 S.E.2d at 206-07.* The requisite intent standard varies based on the status of plaintiff as a public or private figure. Where the plaintiff is a private individual, the defendant may be found liable if the defendant knew the statement to be false or negligently failed to ascertain whether the statement was false. *Gazette,*

*Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, 725 (Va. 1985).*

Further, under Virginia law, certain statements are actionable *per se*, including "[t]hose which impute to a person unfitness to perform the duties of an office **[\*27]** or employment of profit, or want of integrity in the discharge of the duties of such an office or employment." *Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 82 S.E.2d 588, 591 (Va. 1954).* Thus, "[e]very false and unauthorized imputation, spoken, written, or printed which imputes to a business or professional man conduct which tends to injure him in his business or profession is libelous and actionable without allegation or proof of special damages." *Id.*

Under the relevant Virginia law, Andrews has alleged sufficient facts to support a common law defamation claim. Andrews' complaint identifies at least two allegedly defamatory statements made by Carvalho. Each will be discussed in turn.

The first allegedly defamatory statement was an oral statement to the parents of Andrews' student advisees asserting that the students would not be able to graduate on time because Andrews had "misadvised" the students. This statement was published because it was made to several third parties.

The defendants contend that the statement appears to be an opinion. However, it reasonably can be construed as a statement of fact because it is "laden with factual content" and the underlying facts are allegedly false. *See* **[\*28]** *Richmond Newspapers, Inc. v. Lipscomb, 234 Va. 277, 362 S.E.2d 32, 43 n.8, 4 Va. Law Rep. 961 (Va. 1987).* By stating that Andrews' "misadvised" the advisees, Carvalho's statement presupposes the existence of prior statements made by Andrews in her capacity as advisor to the students. Accordingly, Carvalho's statement is laden with factual content. Further, Carvalho's statement implies that the advice given by Andrews caused the students' failure

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

to graduate on time. Andrews maintains, however, that the students did not graduate on time because they had chosen to "rush" fraternities and sororities.

The statement also supports the requisite intent; Andrews is a private individual and therefore the statement need only have been made negligently to be actionable. Andrews alleges that the statement was "bald and unsupported," Compl. P 60, which supports the inference that, even if Carvalho did not *know* that the statement was false, she was at least negligent in arriving at that the conclusion.

Moreover, the statement imputes Andrews' ability to perform her job. Under Virginia law, such a statement, if false, is actionable per se. *See Carwile, 82 S.E.2d at 591.*

Andrews alleges that Carvalho made defamatory statements on a **[*29]** second occasion. Carvalho sent an email to Andrews and another VUU professor, Raymond Hylton ("Hylton"), stating that Andrews had not supplied Carvalho with files and correspondences that were necessary for the social work department to receive accreditation. [11]

> 11  The email stated:
>
> Can you provide copies of the department's correspondence with CSWE [Council on Social Work Education], for example, the reaffirmation letter, assessments and other related documents?
>
> I met with CSWE officials at the BPD conference, last week; they were surprised to learn that the former chair, [sic] of VUU's social work department has not provided copies of files and correspondence with CSWE regarding accreditation and reaffirmation. I want to remind you of NASW's [National Association of Social Workers] Code of Ethics and ask that you return all departmental correspondence, files, surveys, and other documentation immediately.

(Compl. Exhibit H, Document No. 8.)

Defendants argue that the statement to Hylton is an intracorporate communication for which VUU enjoys an "absolute privilege." (Mem. in Supp. of Def.'s Mot. to Dismiss Pl.'s Claim 7, Docket no. 5.) Under Virginia law, however, intracorporate communications **[*30]** are subject to a qualified, not absolute, privilege. *See Larimore v. Blaylock, 259 Va. 568, 528 S.E.2d 119, 123 (Va. 2000).* The qualified privilege that attaches to communications between coworkers does not apply to statements made with common-law malice. *See Great Coastal Express v. Ellington, 230 Va. 142, 334 S.E.2d 846, 854 (Va. 1985).* Common-law malice, in the context of defamation, is defined as

> some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference or recklessness as to amount to a wanton or willful disregard of the rights of the plaintiff.

*Id. at 851 n.3 (quoting Preston v. Land, 220 Va. 118, 255 S.E.2d 509, 511 (Va. 1979)).*

2007 U.S. Dist. LEXIS 85273, *; 102 Fair Empl. Prac. Cas. (BNA) 580

Facts alleged in the complaint plausibly support the conclusion that the Carvalho's email to Hylton was made with common-law malice, defeating the qualified intracorporate privilege. Andrews' allegation that Carvalho was tasked with engaging in acts that would prompt Andrews to quit, (Compl. P 59), permits the inference that Carvalho had a "corrupt motive" - the desire to injure. Similarly, it is plausible to infer that  [*31] the statement was made with at least gross indifference because Andrews alleges that Carvalho was in possession of the files that Carvalho accused Andrews of withholding. (Compl. P 64.)

Returning to the elements of defamation under Virginia law, the statement was published because it was sent to Hylton, a third party not subject to qualified privilege. *See Larimore, 528 S.E.2d at 123; Snyder, 163 S.E.2d at 363-64.* It impugned Andrews' integrity and her ability to perform her job in accordance with her profession's ethical standards, which makes the statement actionable per se. *See Carwile, 82 S.E.2d at 591.* Lastly, Andrews alleges that she had informed Carvalho, before the email was sent, that the files in question were in Carvalho's office. Therefore, the reasonable inference is that the statement was false and that made it was published with a negligent disregard for the truth, if not maliciously. Thus it satisfies the requisite intent. *See Gazette, Inc. v. Harris, 325 S.E.2d at 725.*

Each of the statements discussed above states a plausible claim upon which relief may be granted. Accordingly, Defendants' motion to dismiss Count IV is denied.

## CONCLUSION

For the foregoing reasons, Andrews  [*32] has properly pled facts that, if true, will support plausible claims for relief. Therefore, Defendants' Motion To Dismiss Plaintiff's Claim Pursuant To Federal Rule 12(b)(6) (Docket No. 4) is denied as to all Counts.

It is so ORDERED.

/s/ REP

Robert E. Payne

Senior United States District Judge

Richmond, Virginia

Date: November 16, 2007



LexisNexis®

3 of 7 DOCUMENTS



Analysis
As of: Oct 08, 2011

**VICTOR E. CRETELLA, III, Plaintiff, v. DAVID L. KUZMINSKI, Defendant.**

**Action No. 3:08-CV-109**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

*2008 U.S. Dist. LEXIS 42152*

**May 29, 2008, Decided
May 29, 2008, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Cretella v. Kuzminski, 2009 U.S. Dist. LEXIS 67114 (E.D. Va., July 31, 2009)*

**COUNSEL:** [*1] Victor E. Cretella, III, Plaintiff, Pro se, Frederick, MD.

David L. Kuzminski, Defendant, Pro se, Petersburg, VA.

**JUDGES:** James R. Spencer, Chief United States District Judge.

**OPINION BY:** James R. Spencer

**OPINION**

*MEMORANDUM OPINION*

THIS MATTER is before the Court on a Motion to Dismiss by David L. Kuzminski. For the reasons stated below, the Court will GRANT in part and DENY in part the Motion.

*1. Background*

On February 7, 2007, Victor E. Cretella, III mailed a letter to Christine Norris on behalf of one of his clients, PublishAmerica LLLP, a publishing company. Norris allegedly published several defamatory comments about PublishAmerica on the internet, and Cretella asked her to stop doing so. Initially, Norris refused to comply, but on February 15, after she received a second letter, she agreed to do so, posting a message on the Absolute Write Water Cooler ("AWWC"), an online forum for aspiring authors, that Cretella was forcing her to stop complaining about PublishAmerica.

The members of the AWWC community reacted quickly and angrily to Cretella's activity on behalf of PublishAmerica. On February 16, Kuzminski posted a message stating that "it's time to report Vic Cretella to the Maryland Bar Association for attempted [*2] extortion" and that Cretella's law firm, Gordon and Simmons, "might not want the black[]eye [that] he's giving them." Kuzminski also posted a copy of an e-mail that he allegedly sent to Gordon and Simmons, as well as several members of the Maryland State Bar Association, stating that "Cretella seems to be involved in what I would characterize as extortion" and that Cretella is "actively ? furthering [PublishAmerica's] unethical[,] if not illegal[,] methods." Kuzminski added that he "fully intend[ed] to report [Cretella] to the Maryland State Bar Association." Kuzminski's comments were quoted in several subsequent messages on AWWC, most of which applauded his reaction.

Then, nearly three months later, on May 4, Kuzminski posted a message stating that "[w]e can only speculate on how much embarrassment [Cretella] caused" Gordon and Simmons, which he left in April 2007. On the same day, in response to a question by Norris, Kuzminski posted a message stating that Cretella "might be just that closer to losing his license" to practice law. The next day, Kuzminski stated that Cretella "attempt[ed] to attack [another] writer." Then, in July 2007, Kuzminski posted a message stating that Cretella [*3] "is demonstrating why he's no longer with his former firm. I guess socializing only goes so far, doesn't it, Vic? Somewhere along the line you actually have to produce." Kuzminski also claimed on a website that he operates, www.invirtuo.cc/prededitors, that Cretella "has infringed upon or is breaching the terms of [a] contract" executed by PublishAmerica and that "it's time to report Vic for his behavior" to the Maryland State Bar Association. Finally, in November 2007, Kuzminski repeated his allegations, posting a message on AWWC that Cretella was forced to leave Gordon and Simmons after he attempted "to extort payment" from a writer who criticized PublishAmerica.

In response, Cretella filed this suit, claiming that Kuzminski's remarks constituted defamation. Cretella originally sought $ 200,000 in compensatory damages and $ 200,000 in punitive damages. On April 24, 2008, the Court allowed Cretella to amend his Complaint to add six additional claims for defamation -- each asking for $ 200,000 in compensatory damages and $ 200,000 in punitive damages -- that rest primarily on the allegations in the original Complaint.

Kuzminski contends [1] that Cretella fails to state a claim for which [*4] relief can be granted because Kuzminski was entitled to complain about Cretella's conduct via the only channels that were available to him -- to Gordon and Simmons and the Maryland State Bar Association. Kuzminski also defends his comments on the grounds that (1) they were true, claiming that Cretella acted unethically because he knew or should have known that PublishAmerica is poorly regarded in its industry, and thus that Cretella should not have used "strong arm tactics" to "harm innocent" people; (2) he did not act maliciously, because he "reported only factual information"; (3) his comments were "rhetorical hyperbole" and "pure[ly] opinion," motivated only "a desire to see justice performed," not malice; (4) the members of AWWC who read Kuzminski's comments already knew about Cretella's conduct; and (5) that any injury that Cretella suffered was caused by his decision to represent "a predatory company." Kuzminski also alleges that Gordon and Simmons discharged him on the basis of the e-mail that Kuzminski sent. Finally, Kuzminski complains that PublishAmerica has attempted "to stifle ... dissent" by monitoring his activity and asking him to remove misleading information about PublishAmerica [*5] from a site that Kuzminski runs. Thus, Kuzminski argues, Cretella "is unlikely to prevail in this suit and it should be dismissed."

1   Kuzminski asks the Court to dismiss Cretella's claims in a document whose title is "Answer," responding to the allegations in Cretella's Complaint in a document entitled "Pretrial Motion to Dismiss Complaint" that does not identify as its basis any of the grounds for dismissal provided by *Federal Rule of Civil Procedure 12*. The Court, regarding Kuzminski's pleading liberally as the Supreme Court has directed, *see Boag v. MacDougall, 454 U.S. 364, 365, 102 S. Ct. 700, 70 L. Ed. 2d 551 (1982)*, will regard Kuzminski's "Answer" as a motion to dismiss pursuant to *Rule 12(b)(6)* and his "Pretrial Motion to Dismiss Complaint" as an answer to Cretella's Complaint.

## 2. *Standard of review*

A motion under *Federal Rule of Civil Procedure 12(b)(6)* to dismiss for failure to state a claim upon which relief can be granted challenges the legal sufficiency of a claim, not the facts supporting it. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *see Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007)*. Thus, in ruling on a *Rule 12(b)(6)* motion, a court must regard as true all of the factual allegations in   [*6] the complaint, *Erickson v. Pardus, 127 S.Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)*, as well as any facts that could be proved that are consistent with those allegations, *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*, and view those facts in the light most favorable to the plaintiff, *Christopher v. Harbury, 536 U.S. 403, 406, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002)*. But, the court does not have to accept legal conclusions that are couched as factual allegations. *Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)*. The court may grant a *Rule 12(b)(6)* motion only if it "appears beyond doubt" that the party bringing the claim cannot

prove any facts that would entitle it to relief. *Conley, 355 U.S. at 46*; *accord Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)*.

In deciding a *Rule 12(b)(6)* motion, a court may consider a document that is incorporated by reference into the complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007)*.

## 3. *Analysis*

### A. *Virginia law governs this action*

Cretella is a resident of Maryland, Kuzminski is a resident of Virginia, and Cretella seeks more than $ 75,000 in damages. Thus, the Court has diversity jurisdiction over this case. *See 28 U.S.C. § 1332(a)*. If a federal court has diversity   [*7] jurisdiction over a suit, the court must apply the law of the state in which it sits, *Van Dusen v. Barrack, 376 U.S. 612, 637, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)*, including that state's choice-of-law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)*. In a tort action, Virginia applies the law of the place of the wrong. *Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007)*; *accord Dreher v. Budget Rent-A-Car Sys., Inc., 272 Va. 390, 634 S.E.2d 324, 327 (Va. 2006)*; *see Wiest v. E-Fense, Inc., 356 F. Supp. 2d 604, 608 (E.D. Va. 2005)* (applying that rule in a suit for defamation).

This Court has applied Virginia law to a claim that a defamatory statement was published on a website that was controlled from Virginia, *Wiest, 356 F. Supp. 2d at 608*, as well as to a claim that an allegedly defamatory statement was published in Virginia, *Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 915 n.4 (E.D. Va. 2004)*. Here, the parties do not identify the state from which the AWWC is controlled -- nor does the site itself provide that information. The fact that Cretella filed suit in Virginia does not entail that Virginia law governs the case. *Cf. Fuqua Homes,*

*Inc. v. Beattie, 388 F.3d 618, 621 (8th Cir. 2004)* [*8] (chiding a district court for applying the substantive law of the state in which it sat without applying that state's choice-of-law rules). But, since (1) the allegedly defamatory statements were published in Virginia and (2) they were probably posted in Virginia, given that Kuzminski resides in Petersburg, Virginia, the Court will apply Virginia law.

### B. *Cretella has pled the elements of defamation*

The law of defamation balances our society's interest in promoting free discussion about matters of public importance with its "strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966); see Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-42, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)* (describing the "tension" between those values); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 756, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985)* (emphasizing that the state has a "strong and legitimate interest" in compensating a private person for an injury to his reputation). Under Virginia law, the elements of a claim for defamation are (1) the publication of (2) a false and defamatory statement (3) with the necessary intent. *Jackson v. Hartig, 274 Va. 219, 645 S.E.2d 303, 308 (Va. 2007).*

### 1. *Cretella has alleged* [*9] *that Kuzminski's statements were published*

To be published, a statement must be communicated to a person other than the injured party, so that it is heard and understood -- to refer to the injured party -- by that person. *Food Lion, Inc. v. Melton, 250 Va. 144, 458 S.E.2d 580, 584-85 (Va. 1995); Katz, 332 F. Supp. 2d at 915.* Thus, a written communication is published if it is read by someone other than the author or the injured party, even if the reader is not the intended recipient of the message. *Katz, 332 F. Supp. 2d at 915-16* (noting

that a telegram is published as soon as it is delivered to an employee of a telegram company). Circumstantial evidence is sufficient to show that a statement was published. *Melton, 458 S.E.2d at 585.*

In Count I of his Amended Complaint, Cretella alleges that Kuzminski posted a message on AWWC stating (in part) that "it's time to report Vic Cretella to the Maryland Bar Association for attempted extortion"; "Mr. Cretella seems to be involved in what I would characterize as extortion"; and Cretella was "actively consorting with [PublishAmerica] in furthering its unethical if not illegal methods." Other members of AWWC quoted those statements, proving that they were [*10] communicated to third parties. And, the fact that the statements refer to Cretella by name implies that those parties understood that the statements were about Cretella. Thus, Cretella has adequately alleged that the statements supporting Count I of his Amended Complaint were published.

The other six counts of Cretella's Amended Complaint are based on messages that Kuzminski allegedly posted on AWWC on May 4, 2007; May 5, 2007; July 10, 2007; July 14, 2007; November 17, 2007; and February 11, 2008. Cretella has not provided the Court with any evidence that those messages were published. But, in the context of this Motion, the Court must regard as true Cretella's allegations that those statements were posted on AWWC. *See Erickson, 127 S.Ct. at 2200.* And, if those statements were posted on a website that is publicly available and visited frequently, there is strong circumstantial evidence that at least one other person read the statements. Thus, the Court finds that Kuzminski's other allegedly defamatory statements were published. *See Conley, 355 U.S. at 46; Franks, 313 F.3d at 192* (holding that a court may grant a motion to dismiss only if it "appears beyond doubt" that the party bringing [*11] the claim

cannot prove any facts that would entitle it to relief).

*2. Cretella has alleged that Kuzminski's statements were false*

Next, to support a claim for defamation, a statement must be false. *Jackson, 645 S.E.2d at 308.* A statement that is "substantially true" -- even if it contains "minor or irrelevant inaccuracies" -- cannot be defamatory. *Jordan v. Kollman, 269 Va. 569, 612 S.E.2d 203, 207 (Va. 2005).* The plaintiff must allege a false statement with particularity, *Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993),* and prove that it is false by a preponderance of the evidence, *Food Lion, Inc., 458 S.E.2d at 584.*

Thus, an expression of opinion -- a statement that cannot be shown to be false - cannot be defamatory. *Raytheon Tech. Servs. v. Hyland, 273 Va. 292, 641 S.E.2d 84, 90 (Va. 2007).* For example, statements that a person was "frequently verbose and vocal" and "inappropriately and openly critical," and that she "appeared to be unwilling to accept ... feedback," were opinions that did not support a claim of defamation. *Id. at 92.* Similarly, a statement is not defamatory if it cannot reasonably be interpreted as stating a fact about a person. *Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 636 S.E.2d 447, 449-50 (Va. 2006);* [*12] *see Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 285, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974)* (ruling that "rhetorical hyperbole" and "imaginative expression[s]" cannot be defamatory). Accordingly, calling a union member a "scab" was not defamatory because that statement did not imply that he committed treason. *Old Dominion Branch No. 496, 418 U.S. at 285.* In addition, an expression of a perspective -- i.e., a statement that can be shown to be true, but only in the context of a particular viewpoint -- cannot be defamatory. *Tronfeld, 636 S.E.2d at 450.* Thus, for example,

stating that a corporal lacks experience is not defamatory, since a sergeant would agree but a private would disagree. *Chaves v. Johnson, 230 Va. 112, 119, 335 S.E.2d 97 (Va. 1985)* (noting that the "relative" nature of that statement is "obvious").

But, the fact that a statement conveys an opinion does not by itself entail that the statement is not defamatory. For example, an opinion that is "laden with factual content" may be defamatory. *Raytheon Tech. Servs., 641 S.E.2d at 90-91; see Milkovich v. Lorain Journal Co., 497 U.S. 1, 18, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)* (noting that an expression of "opinion" may often imply an assertion of objective fact, [*13] and consequently may be actionable). Moreover, a speaker may not protect himself from liability by qualifying a statement of fact as "my opinion." *Swengler v. ITT Corp. Electro-Optical Prods. Div., 993 F.2d 1063, 1071 (4th Cir. 1993).* Accordingly, the United States Supreme Court affirmed a judgment that a statement implying that an attorney was "unethical" and "capable of extortion" was a statement of fact. *See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 662 n.3, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989), aff'g 842 F.2d 825, 840-41 (6th Cir. 1988).* The Virginia Supreme Court ruled that a statement that a manager's performance was "significantly" lower than expected was a statement of fact, even though it implied a judgment. *See Raytheon Tech. Servs., 641 S.E.2d at 91.* And, even though allegations by a doctor's patients that they had been sexually assaulted by him "were arguably expressions of their ... opinions about the treatment [that] they had received," they were published as fact and without being placed in the context of information that contradicted the image that those statements conveyed, and thus were actionable. *WJLA-TV v. Levin, 264 Va. 140, 564 S.E.2d 383, 393 (Va. 2002).*

Thus, a statement that a person has [*14] broken the law may amount to an expression of

opinion, one that cannot support a claim of defamation. *See, e.g., Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970) (ruling that criticizing a real estate developer's - legal -- tactics as "blackmail" did not constitute an accusation that he had broken the law, because "even the most careless reader" would perceive "that the word was no more than rhetorical hyperbole, a vigorous epithet"). On the other hand, many courts have regarded accusations of unlawful activity as statements of fact. *See, e.g., Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588, 591-92 (Va. 1954).

Whether a statement expresses a fact or an opinion is a question of law. *Raytheon Tech. Servs.*, 641 S.E.2d at 91. Thus, the Court does not have to accept Cretella's claim that Kuzminski's statements were false, since a statement can be false only if it is a statement of fact, which is a legal conclusion. *See Bell Atl. Corp.*, 127 S.Ct. at 1964. But, for the purpose of ruling on this Motion, the Court must accept Cretella's characterization of any statements by Kuzminski that constitute statements of fact -- i.e., that they are false. *See Erickson*, 127 S.Ct. at 2200; [*15] *Hishon*, 467 U.S. at 73; *Christopher*, 536 U.S. at 406. Accordingly, the question for the Court to resolve is which, if any, of the statements that Cretella challenges *could* be shown to be false -- i.e., whether they are statements of fact or expressions of opinion.

In Count I, Cretella complains that Kuzminski accused him of engaging in extortion and acting unethically, if not illegally. Whether Cretella acted in a way that constitutes extortion or violates a law or rule of professional ethics can be verified. *See Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 662 n.3 (treating an allegation that an attorney was "unethical" and "capable of extortion" as a statement of fact). Kuzminski qualified his allegations, by saying that Cretella was "involved in *what I would characterize* as extortion" and suggesting that the Maryland State Bar Association

should "decide whether that's what [Cretella is] involved in." However, describing a statement as an expression of a personal view does not make it an opinion. *See Swengler*, 993 F.2d at 1071. And, Kuzminski allegedly made those statements in conjunction with a suggestion that Cretella should be reported to the Maryland State Bar Association for engaging [*16] in extortion, implying that the belief that Cretella acted wrongly can reasonably be imputed to Kuzminski. Moreover, the fact that he called for action suggests that the statements were not merely rhetorical hyperbole. *See Levin*, 564 S.E.2d at 393 (deciding whether a statement was one of fact or opinion partly on the basis of its context). Thus, the Court finds that the statements at issue in Count I are statements of fact.

Count II concerns a statement that Cretella "embarrass[ed]" Gordon and Simmons and "resonates with [PublishAmerica] like a glove." Those comments are judgments, but they imply that Cretella is no longer employed by Gordon and Simmons and is affiliated in some way with PublishAmerica, which are propositions that can be verified. *Compare Raytheon Tech. Servs.*, 641 S.E.2d at 91 (ruling that a statement that a sales team "significantly" missed performance targets was "not merely the view of [its author]," since it was accompanied by factual statements). For that reason, the Court finds that Count II involves statements of fact.

The statement at issue in Count III alleges that, prior to contacting Norris, Cretella took action against another author on behalf of PublishAmerica, [*17] a move that prompted several complaints. That statement is clearly capable of being verified, and thus is a statement of fact.

In Count IV, Cretella complains that Kuzminski said, "Seems to me ole Vic is demonstrating why he's no longer with his former firm. I guess socializing only goes so far, doesn't it, Vic? Somewhere along the line you actually have to produce." That statement

contains relatively little factual content. But, since Count IV will be dismissed on another ground, as discussed below, the Court will not decide whether that statement constitutes a statement of fact.

Count V concerns a statement that alleges, in part, that Cretella "infringed upon or is breaching the terms of [a] contract." It also implies that Cretella violated the Maryland bar's code of professional ethics. Similarly, Count VI alleges that Cretella engaged in extortion. Applying the Court's analysis of Count I, these statements are factual.

Finally, the statement at issue in Count VII is colorful, sarcastic, and confusing. It suggests that Cretella and Kuzminski "could have been kissing cousins [] except for that awful face paint" and expresses surprise that Cretella "could be so mean," given that he was **[*18]** "so close" to Kuzminski. The statement also refers to a "can of worms" that was "thrown in the[] lap" of Gordon and Simmons. Although the statement suggests that Cretella may be angry that he was reported to the Maryland State Bar Association, that implication occurs in the context of a rhetorical question that is laden with irony. Thus, identifying -- much less verifying -- any proposition that is conveyed by that portion of the statement is difficult. Accordingly, since this statement cannot reasonably be interpreted as alleging factual content about Cretella that could be shown to be false, the Court will DISMISS Count VII.

### 3. Cretella has alleged that Kuzminski's statements were defamatory

If a statement is false, it must also be defamatory: it must "tend ... to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin, 993 F.2d at 1092.* A statement that is "[m]erely offensive or unpleasant" is not defamatory; it must make the plaintiff appear "odious, infamous, or ridiculous." *Id.* In deciding whether a

statement is defamatory, a court should interpret its words "in their plain and natural **[*19]** meaning" and "according to the sense in which they appear to have been used." *Carwile, 82 S.E.2d at 591-92.* But, a statement may be defamatory even if it does not explicitly charge a person with wrongdoing: defamation may occur by "implication or insinuation." *Id. at 592.*

A statement that (1) "impute[s] to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished"; (2) suggests that the person is not fit "to perform the duties of an office or employment of profit" or lacks "integrity in the discharge of th[ose] duties"; or (3) "prejudice[s the] person in his ... profession" is defamatory per se. [2] *Tronfeld, 636 S.E.2d at 449-50; see Swengler, 993 F.2d at 1070* (recognizing that a false statement that "prejudice[s] a person in her or her profession" is defamatory per se). Obtaining property wrongfully is a crime that involves moral turpitude. *Tronfeld, 636 S.E.2d at 450* (ruling that an accusing an attorney of engaging in conduct that constituted larceny by trick or obtaining money by false pretenses was defamatory).

> 2   In addition, other statements may be defamatory if they cause "special damages." **[*20]** *Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 147, 334 S.E.2d 846 (Va. 1985).*

However, a statement does not have to establish all of the elements of a crime to be defamatory per se. *Schnupp v. Smith, 249 Va. 353, 457 S.E.2d 42, 46 (Va. 1995).* Nor must a statement explicitly impute criminal activity, *id.*; a statement "imputes the commission of a crime when it refers to matters that would naturally and presumably be understood by those hearing them as charging a crime," *Food Lion, Inc., 458 S.E.2d at 584.* Thus, the Virginia Supreme Court concluded that (1) a statement that an attorney who called for an investigation of

the Richmond Police Department "cast a shadow across the entire Police Department," in conjunction with (2) a statement that "the State Bar ... may request a court of competent jurisdiction to disbar an attorney for violation of the ethical code governing the professional conduct of attorneys," could reasonably be interpreted as charging the attorney with acting unethically or unprofessionally. *Carwile, 82 S.E.2d at 592.* Moreover, the Court found, the statements suggested that the attorney could be disbarred, thereby "tending to injure him in his profession." *Id.* Accordingly, the Court reversed **[*21]** a grant of summary judgment against the attorney.

In contrast, stating that a physician was "inexperienced" and that his fees were too high was not defamatory, because those statements did not impugn his character or standing in his profession, nor did they suggest that he could not perform his job. *Chaves, 230 Va. at 118-19.* And, a statement by a law firm to a group of debtors that an attorney failed to report payments by the debtors were not actionable. *Perk v. Vector Res. Group, Ltd., 253 Va. 310, 485 S.E.2d 140, 144 (Va. 1997)* (offering little explanation for this ruling).

Whether a statement is defamatory -- or is reasonably capable of conveying a defamatory meaning -- is a question of law for a court to decide. *Hatfill v. New York Times Co., 416 F.3d 320, 330 (4th Cir. 2005); Yeagle v. Collegiate Times, 255 Va. 293, 497 S.E.2d 136, 138 (Va. 1998).*

Counts I and VI involve statements that explicitly accuse Cretella of engaging in extortion, a crime. *See Md. Code, Crim. Law § 3-701* (providing that extortion may be punished by imprisonment and/or a fine); *cf. Diamond v. Kenley, 515 F. Supp. 1165, 1175 (E.D. Va. 1981)* (Warriner, J.) (including extortion in a list of offenses that involved moral turpitude). **[*22]** In addition, accusing an attorney of extortion implies that he lacks integrity. Thus,

those statements clearly could be found to be defamatory.

The statements at issue in Counts II, III, V, and VII imply that Cretella acted unethically -- by (a) suggesting that "he might be ... closer to losing his license" to practice law; (b) speculating that he was forced to leave his law firm because of a "backlash against his attempt to attack" another author, an attempt that prompted complaints to "lawyers in Maryland who [monitor] ethics among M[arylan]d lawyers"; (c) stating that "it's time to report Vic [to the Maryland State Bar Association] for his behavior," as well as a statement that Cretella breached a contract that PublishAmerica entered; and (d) stating that Cretella was reported to the Maryland State Bar Association "for attacking an AW[WC] member," respectively. According to *Carwile,* criticizing an attorney's conduct, coupled with a discussion of the availability of disciplinary sanctions, can reasonably be interpreted as implying that the attorney acted unethically or unprofessionally. *82 S.E.2d at 592.* And, suggesting that an attorney could be disbarred "tend[s] to injure him in his **[*23]** profession." *Id.* Moreover, charging Cretella with "attacking" an author could dissuade other people from dealing with him, especially since the nature of the "attacks" (which may have been merely aggressive, but legal and ethical, attempts to protect PublishAmerica) is not clear from the context of those statements, thereby damaging his career. Thus, the statements at issue in Counts II, III, V, and VII could be found to be defamatory.

Count IV concerns a statement that strongly implies that Cretella was forced to leave his law firm because he failed "to produce." This statement does not involve allegations of criminal or unethical conduct. Moreover, given the lack of any supporting details, the statement probably would not suggest that Cretella is unfit or damage his career. Thus, because this statement is not reasonably capable of having a defamatory meaning, entailing that this claim

cannot succeed as a matter of law, the Court will DISMISS Count IV.

### 4. *Cretella has alleged that Kuzminski acted negligently*

In 2005, the Virginia Supreme Court ruled that the intent that a plaintiff in a suit for defamation must prove depends on (1) whether the plaintiff is a public official or a public **[*24]** figure; and (2) the type of damages that are sought. *Jordan, 612 S.E.2d at 207.* Thus, if a plaintiff is not a public official or a public figure, to recover actual damages the plaintiff must show "that the defendant either knew [that a statement at issue was false], or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, 725 (1985).* [3] That rule applies regardless of whether the subject of the statement "relates to a matter of public or general concern," *id.; but see WJLA-TV v. Levin, 264 Va. 140, 564 S.E.2d 383, 389, 391-92 (Va. 2002)* (ruling that a plaintiff must show actual malice if an allegedly defamatory statement involves a matter of public concern *and* it was made by a media company). And, to recover punitive damages, a party must show actual malice -- regardless of the status, public or private, of the defendant. *Jordan, 612 S.E.2d at 207.*

> 3   In the context of a discussion of the impact of this rule on a media company, the *Harris* Court added that "the careless misstatement of fact which, on its face, does not appear to be defamatory will not result **[*25]** in liability." *325 S.E.2d at 725-26.* It is not clear from *Harris* whether the "careless misstatement" doctrine also applies to a statement by a defendant that is not a media company.

But, in earlier opinions, that court held that the requisite showing of intent is also determined by the type of harm that is alleged. *See*

*Food Lion, Inc., 458 S.E.2d at 584; accord Harris, 325 S.E.2d at 725.* In *Harris,* the Virginia Supreme Court held that the negligence standard applies *only* if the allegedly defamatory statement "makes substantial danger to reputation apparent"; otherwise, the plaintiff must show that the defendant acted with "actual malice," as the United States Supreme Court explicated that concept in *New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). 325 S.E.2d at 725; see WJLA-TV v. Levin, 264 Va. 140, 564 S.E.2d 383, 391 (Va. 2002)* (ruling that whether a statement endangers a person's reputation is a question of law). In *Food Lion,* the Virginia Supreme Court adopted a slightly different version of that doctrine, ruling that the negligence standard applies if the plaintiff is not a public figure and the allegedly defamatory statement imputes the commission of a crime. *458 S.E.2d at 584.* According **[*26]** to the *Harris* Court, that rule balances "the right of free expression enjoyed by the individual" with a person's right to enjoy his reputation. *Id.* Thus, for example, a statement that a physician committed crimes in the course of his practice, by sexually assaulting patients during pelvic examinations, "self-evident[ly] ... posed a substantial danger to his reputation as a physician." *WJLA-TV, 564 S.E.2d at 389, 391.*

Although *Jordan* is not clearly consistent with *Food Lion* and *Harris,* which were decided ten and twenty years earlier, respectively, those opinions can be reconciled on the ground that *Jordan* was a suit by a public official, whereas *Food Lion* and *Harris* were brought by private individuals. Thus, the plaintiff in *Jordan* was required to bear a heavier burden of proof, one that required a showing of actual malice; so, the *Jordan* court did not have to address the circumstances in which the negligence standard applies.

In this case, Cretella (1) is not a public figure or official; (2) he is seeking compensatory as well as punitive damages; and (3) Counts I

and VI explicitly allege that Cretella engaged in extortion, a crime, while Counts II, III, V, and VI imply that he engaged [*27] in conduct that could be sanctioned by a disciplinary committee, thereby endangering his professional reputation. Accordingly, under *Food Lion* and *Harris,* Cretella is required only to prove that Kuzminski acted negligently. *See* *458 S.E.2d at 584; 325 S.E.2d at 725.*

Cretella alleges that Kuzminski made the statements at issue knowing that they were false or without using reasonable care to determine whether they were false. Although that allegation is general, "[m]alice, intent, knowledge, and other conditions of a person's mind may be pled generally." *Fed. R. Civ. P. 9(b).* And, while the allegation that Kuzminski acted without using due care constitutes a legal conclusion that the Court is not required to accept, *Bell Atl. Corp., 127 S.Ct. at 1964,* Cretella's allegations and the inferences that can be drawn from them, viewed in the light most favorable to him -- e.g., the fact that Kuzminski accused Cretella of breaking the law and rules of professional ethics without explaining or providing any evidence for his belief, and that Kuzminski asked other people to provide "documentation" about Cretella's activity to the Maryland State Bar Association, implying that Kuzminski did not have [*28] enough evidence by himself to support his claims -- indicate that Cretella could satisfy his burden of proof on this issue.

## C. *Affirmative defenses*

In his response to Cretella's Complaint, Kuzminski suggests that his statements were privileged, arguing that he was entitled to complain about Cretella to the Maryland State Bar Association. [4] He also claims that they are true. But, whether a defendant in a defamation action is protected by a privilege is not a matter to be resolved in the context of a motion to dismiss. *Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)* (ruling that a

motion to dismiss "does not resolve ... the applicability of defenses"); *see Verrinder v. Rite Aid Corp., 2006 U.S. Dist. LEXIS 53385, 2006 WL 2375630, at *1 (W.D. Va. 2006)* (ruling that an adequately-pled claim of defamation may survive a motion to dismiss, even if a qualified privilege exists). Thus, Kuzminski's arguments are premature at this stage of these proceedings.

4   The common-law defense of qualified privilege protects a communication that was made (1) in good faith (2) by a person with an interest in, or a legal, moral, or social duty with respect to, the subject matter of the statement (3) to a person with [*29] a corresponding interest or duty. *Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 334 S.E.2d 846, 853 (Va. 1985).* Whether this privilege exists is a question of law. *Id.* To defeat this defense, a party must show by clear and convincing evidence that the statement at issue was made with malice, as defined by the common law -- not *New York Times* malice. *Id. at 854* (defining the requisite intent as "some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of the plaintiff").

## 4. *Conclusion*

Because Cretella has adequately pled each of the elements of a claim for defamation under Virginia law in Counts I, II, III, V, and VI of his Amended Complaint, the Court will DENY Kuzminski's Motion to Dismiss with respect to those claims. However, for the reasons stated above, the Court will GRANT the Motion with respect to Counts IV and VII, which will be DISMISSED.

It will be SO ORDERED.

/s/

James R. Spencer

Chief United States District Judge

ENTERED this 29th  **[*30]** day of May 2008





Positive
As of: Oct 17, 2011

**ERIK CURRAN, Plaintiff, v. AMAZON.COM, INC., GETTY IMAGES, INC., ST. MARTIN'S PRESS, LLC, SIDESHOW, INC., a California corporation, HOT TOYS, LTD., and CAFEPRESS.COM, INC., Defendants.**

**Civil Action No. 2:07-0354**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

*2008 U.S. Dist. LEXIS 12479; 86 U.S.P.Q.2D (BNA) 1784; 36 Media L. Rep. 1641*

**February 19, 2008, Decided**
**February 19, 2008, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff National Guardsman alleged defendants, a publisher, an internet retailer, and a T-shirts producer, invaded his rights of publicity and privacy by using a photograph taken of him while deployed in a combat zone for their financial gain in selling books and T-shirts without his consent or compensation. After removing the case from the Circuit Court of Kanawha County, West Virginia, defendants moved to dismiss.

**OVERVIEW:** Even if a soldier was a public figure, the Guardsman had not alleged he was a public figure or a soldier; publicity claims were dismissed without prejudice. Nor were there allegations on which to find an intrusion upon his solitude or seclusion. The book was titled "Killer Elite" and a reasonable person could find his picture under that title as highly offensive, thus, a false light claim could be shown if he established he was not a "killer;" that claim was sufficiently pleaded. Given that the Guardsman admitted his picture on the book cover was used for advertising the book and author, not to illustrate the subject matter, further factual development was required on the affirmative dense of newsworthiness or public interest. The producer's own website service agreement was insufficient to establish it as only an interactive computer service for Communications Decency Act of 1996, *47 U.S.C.S. § 230,* immunity, and the website was neither

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

integral to the complaint nor authenticated for it to even be considered at the dismissal stage. The Guardsman was entitled to prove allegations of a joint venture to dispute the retailer's defense that it was just like a "traditional bookseller."

**OUTCOME:** The motions to dismiss were granted without prejudice as to the invasion of right of publicity claims and granted with prejudice as to the invasion of right of privacy claims in so far as they claimed an unreasonable intrusion upon the seclusion of another. The motions were otherwise denied. An amended complaint could be filed as to the right of publicity claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN1] *Fed. R. Civ. P. 8(a)(2)* requires that a pleader provide a short and plain statement of the claim showing entitlement to relief. *Fed. R. Civ. P. 12(b)(6)* correspondingly permits a defendant to challenge a complaint when it fails to state a claim upon which relief can be granted.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN2] The required *Fed. R. Civ. P. 8(a)(2)* "short and plain statement" for a complaint must provide fair notice of what the claim is and the grounds upon which it rests. Additionally, the showing of an entitlement to relief amounts to more than labels and conclusions. A

formulaic recitation of the elements of a cause of action will not do. The complaint need not, however, "make a case" against a defendant or even forecast evidence sufficient to prove an element of the claim. Instead, the opening pleading need only contain factual allegations sufficient to raise a right to relief above the speculative level. Stated another way, the complaint must allege enough facts to state a claim to relief that is plausible on its face.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN3] Application of the *Fed. R. Civ. P. 12(b)(6)* standard requires that the court accept as true all of the factual allegations contained in the complaint. The court is additionally required to draw all reasonable inferences from those facts in the plaintiff's favor.

*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Intrusion > General Overview*
[HN4] The right of privacy and the right of publicity protect fundamentally different interests and must be analyzed separately.

*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Intrusion > General Overview*
[HN5] In West Virginia, a clear line has been drawn between the right of privacy and the right of publicity. The right of privacy protects individual personality and feelings, the right of publicity protects the commercial value of a name or likeness. The appropriation type of invasion of privacy, like all privacy rights, centers on damage to human dignity. Damages are usually measured by "mental distress" -- some bruising of the human psyche. On the

other hand, the right of publicity relates to commercial damage to the business value of human identity. Put simplistically, while infringement of the right of publicity looks to an injury to the pocketbook, an invasion of appropriation privacy looks to an injury to the psyche.

*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*
[HN6] Invasion of the right of publicity is a state-law claim.

*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Appropriation > Elements*
[HN7] There is no statutory right of publicity in West Virginia. The Supreme Court of Appeals of West Virginia, in a footnote, has cautioned that the right of publicity must not be confused with the right of privacy and has explained that a right of publicity claim is for the unjust enrichment caused by an unauthorized exploitation of the good will and reputation that a public figure develops in his name or likeness through the investment of time, money and effort. Given this dicta and the general acceptance of the doctrine, a common-law right of publicity is cognizable in West Virginia.

*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Intrusion > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Public Disclosure of Private Facts > General Overview*
[HN8] Like the right of publicity, the right of privacy is a state-law claim. In West Virginia, the right of privacy protects one from (1) an

unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public.

*Torts > Intentional Torts > Invasion of Privacy > Intrusion > Elements*
[HN9] The tort of unreasonable intrusion had been defined as follows: one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Torts > Intentional Torts > Invasion of Privacy > Intrusion > Elements*
[HN10] The place of the occurrence is relevant to a determination of the sufficiency of the evidence of intrusiveness for purposes of the unreasonable intrusion prong of an invasion of privacy claim, but it is not determinative of whether an intrusion into one's "solitude and seclusion" has occurred. Stated succinctly, the privacy which is invaded has to do with the type of interest involved and not the place where the invasion occurs.

*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Elements*
[HN11] Under the fourth prong of the right of privacy, a claim is actionable which unreasonably places another in a false light before the public. One form in which false light invasions of privacy often appears is the use of another's photograph to illustrate an article or book with which the person has no reasonable connection, and which places the person in a false light.

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Elements*

[HN12] The elements of a false light invasion of privacy claim consist of the following: (1) the false (2) publication (3) of private facts (4) portraying the plaintiff in a false light (5) which would be highly offensive to a reasonable person. The matter publicized as to the plaintiff must be untrue.

*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Elements*

[HN13] A plaintiff in a false light invasion of privacy action may not recover unless the false light in which he was placed would be highly offensive to a reasonable person. The objective standard ensures that liability will not attach for the publication of information so innocuous that notice of potential harm would not be present. When the item at issue in a false light claim does not clearly favor one construction over the other, the best course is to favor the nonmovant and allow the claim to go forward.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

[HN14] Although a motion pursuant to *Fed. R. Civ. P. 12(b)(6)* invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Appropriation > Defenses*

*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Defenses*

[HN15] Courts have engrafted exceptions and restrictions to the rights of publicity and privacy in order to avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest, guaranteed by the *First Amendment*. Two principal, closely-related exceptions are described as "newsworthy or public interest" and "incidental use." Absent a showing of the defendant's commission of actual malice, as explained in New York Times Co. v. Sullivan, both exceptions may bar right of publicity and right of privacy claims.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Figures*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Questions*
*Torts > Intentional Torts > Invasion of Privacy > Defenses*

[HN16] In West Virginia, the right of privacy does not extend to communications which concern public figures or matters of legitimate public interest.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Figures*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Questions*
*Torts > Intentional Torts > Invasion of Privacy > Defenses*

[HN17] There are two classes of newsworthy subjects which are privileged under privacy law: public figures and matters of legitimate public interest. In determining whether a manner of legitimate public interest is involved, the inquiry focuses on the information disclosed by the publication and asks whether truthful in-

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

formation of legitimate concern to the public is publicized in a manner that is not highly offensive to a reasonable person. Public interest includes both the dissemination of current events and any informational material of legitimate public interest.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Questions*
*Torts > Intentional Torts > Invasion of Privacy > Defenses*
[HN18] The public interest exception to a right of privacy claim applies to books. That a publishing company is primarily in the business of trying to make a profit does not necessarily detract from the potential newsworthiness. The newsworthy or public interest exception, however, will not apply if the picture bears no real relationship to the article or the article is an advertisement in disguise. This exception is designed to balance the need for the dissemination of news and information against an individual's right to control the use of his likeness.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Questions*
*Torts > Intentional Torts > Invasion of Privacy > Defenses*
[HN19] Courts must decide whether a publication is newsworthy for purposes of the public interest exception to a right of privacy claim based upon: (1) the social value of the published facts; (2) the extent of the intrusion into ostensibly private matters, and (3) the extent to which a party voluntarily assumed a position of public notoriety. Newsworthiness depends upon the logical relationship or nexus between the event that brought the plaintiff into the public eye and the particular facts disclosed, so long as the facts are not intrusive in great disproportion to their relevance.

*Communications Law > Federal Acts > Communications Decency Act*
*Communications Law > Internet Services*
*Computer & Internet Law > Censorship > Communications Decency Act*
*Computer & Internet Law > Privacy & Security > Invasion of Privacy*
*Torts > Intentional Torts > Invasion of Privacy > Defenses*
[HN20] Communications Decency Act of 1996 (CDA), *47 U.S.C.S. § 230*, immunity exists for both right of publicity claims and right of privacy claims. *Section 230* creates a distinction between "interactive computer services," which merely transmit information and "information content providers" that create or develop, in whole or in part, information eventually transmitted. *47 U.S.C.S. § 230(f)(2), (3)*. The former may be exempt from tort liability by the CDA, whereas the latter is not. *47 U.S.C.S. § 230(c)(1), (e)(3), (f)(2), (3)*.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*
*Communications Law > Federal Acts > Communications Decency Act*
*Communications Law > Internet Services*
*Computer & Internet Law > Censorship > Communications Decency Act*
*Computer & Internet Law > Privacy & Security > Invasion of Privacy*
[HN21] Immunity pursuant to *47 U.S.C.S. § 230(c)* of the Communications Decency Act of 1996 constitutes an affirmative defense. This affirmative defense is generally not fodder for dismissal under *Fed. R. Civ. P. 12(b)(6)*. Instead, such a defense is generally addressed as a *Fed. R. Civ. P. 12(c)* or *Fed. R. Civ. P. 56* motion.

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

[HN22] A court, under *Fed. R. Civ. P. 12(b)(6)*, may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

[HN23] It is generally imprudent to rely exclusively on a party's own website in support of its motion to dismiss. A party's website is self-serving and there is no assurance that the content is authentic. Relying on a party's website in support of its argument is akin to relying on their memoranda.

**COUNSEL:**  [*1] For Erik Curran, Plaintiff: Charles M. Love, IV, Marvin W. Masters, LEAD ATTORNEYS, THE MASTERS LAW FIRM, Charleston, WV.

For Amazon.com, Inc., a Delaware corporation, St. Martin's Press, LLC, a New York corporation, Defendants: David A. Barnette, W. Scott Evans, LEAD ATTORNEYS, JACKSON KELLY, Charleston, WV.

For Getty Images, Inc., a Delaware corporation, Defendant: Andrew B. Cooke, Elizabeth L. Taylor, LEAD ATTORNEYS, FLAHERTY SENSABAUGH & BONASSO, Charleston, WV; Stephen M. Rummage, LEAD ATTORNEY, DAVIS WRIGHT TREMAINE, Seattle, WA.

For Hot Toys, Ltd., a business entity incorporated in Hong Kong; and, Defendant: Ashley C. Pack, Mychal Sommer Schulz, LEAD ATTORNEYS, DINSMORE & SHOHL, Charleston, WV; Hannah Resnick, Marc S. Reiner,

LEAD ATTORNEYS, DORSEY & WHITNEY, New York, NY.

For Cafe Press.Com, Inc., a Delaware corporation, Defendant: Ian C. Ballon, Wendy M. Mantell, LEAD ATTORNEYS, GREENBERG TRAURIG, Santa Monica, CA; James K. Tinney, John H. Tinney, John H. Tinney, Jr., LEAD ATTORNEYS, THE TINNEY LAW FIRM, Charleston, WV.

**JUDGES:** John T. Copenhaver, Jr., United States District Judge.

**OPINION BY:** John T. Copenhaver, Jr.

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Pending are the motions to dismiss filed by the following  [*2] defendants on the following dates: Amazon.com, Inc. ("Amazon"), on June 5, 2007; St. Martin's Press, LLC ("St. Martin"), on June 8, 2007; CafePress.Com, Inc. ("CafePress"), on June 8, 2007; and Getty Images, Inc. ("Getty"), on June 27, 2007. [1]

> 1   CafePress has also filed, on November 21, 2007, a motion to extend the discovery deadline. It is ORDERED that the motion be, and it hereby is, denied as moot in view of the court's order entered on January 3, 2008, extending the existing case deadlines. Nevertheless, the motion for a status conference, filed by CafePress on January 15, 2008, suggests the extension of the deadlines may be insufficient as to it. The motion for a status conference is denied without prejudice to the filing of a further motion outlining the need for additional time in light of the within opinion and order.

I. Facts

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

According to plaintiff Erik Curran ("Curran") in his two-count amended complaint, defendants used plaintiff's likeness for their financial gain in the sale of their books, t-shirts, toys, and dolls without his consent and without providing him monetary compensation. (Am. Compl. PP 10, 15-18; Resp. to Amaz. M.T.D. at 2). Defendants have not disputed that plaintiff [*3] was in the West Virginia National Guard and that the image or likeness in question was taken while Curran was deployed in a combat zone. (Resp. to Amaz. M.T.D. at 2).

With respect to Getty, St. Martin, and Amazon ("the book defendants"), the amended complaint alleges Getty provided an unauthorized photograph of plaintiff to the publishing company, St. Martin, for use on the cover of the book, *Killer Elite*. (Am. Compl. PP 9-10). In April of 2007, it is alleged that Amazon, in a joint venture with Getty and St. Martin, began selling *Killer Elite* on its website. *(Id.* PP 8, 10).

Curran has furnished a copy of the cover of *Killer Elite*. [2] The book defendants do not dispute the authenticity of the copy. On the cover of the book, plaintiff's picture is directly underneath the title, KILLER ELITE, which is in all capital, large block letters. (Book Jacket, attached as Ex. A to Resp. to M.T.D.). The words, "KILLER ELITE," are significantly larger than the remainder of words on the cover. *(Id.).* Against a backdrop of helicopters, the plaintiff is bearded, sleeveless, wearing a baseball cap backwards, and holding a rifle. *(Id.).* To the right of his profile, in significantly smaller capital letters, [*4] is the subtitle, "THE INSIDE STORY OF AMERICA'S MOST SECRET SPECIAL OPERATIONS TEAM." *(Id.).* The name of the author, Michael Smith, in capital letters similar to the size of the subtitle is to the left of his profile. *(Id.).* In the far right margin of the cover, in tinier print, is a description of the contents of the book. *(Id.).* It explains that *Killer Elite* is a non-fiction examination of United States special operations activity since the attempt in 1980 to rescue hostages from the American Embassy in Iran. *(Id.).* The book cover was designed by PTG. (Resp. To Amaz. M.T.D. at 2).

2    The cover copy is attached to Curran's responses to the book defendants' motions to dismiss.

The back cover of the book advertises other books written by the author, Michael Smith, including *Emperor's Codes*. (Resp. to Amaz. M.T.D. at 2; Amaz. Reply to Resp. to M.T.D. at 3). Although the pages of *Killer Elite* contain photographs, none of them include Curran's image. (Resp. To Amaz. M.T.D. at 2).

A non-book defendant, CafePress, sells t-shirts which have Curran's image printed on them. [3] (Am. Compl. P 14). The image of Curran on the t-shirts is the same as the one displayed on the cover of *Killer Elite*. (CafePress [*5] Web Printout, attached as Ex. 1-B to Resp. to M.T.D.'s). There were three designs on CafePress's website featuring plaintiff's likeness. *(Id.).* The first includes Curran's image underneath the phrase: "Special Forces -- De Oppresso Liber," which in Spanish means liberate the oppressed. *(Id.).* In the second and third designs, plaintiff's image is paired with the saying: "Special Forces -- real men have beards." *(Id.).* In selling these t-shirts, CafePress apparently partners with another undisclosed party. (Resp. to CafePress M.T.D. at 2).

3    Another non-book defendant, Hot Toys, Ltd., is a foreign defendant. It was served recently and filed its motion to dismiss on January 22, 2008, which is now in the briefing process.

According to Curran, CafePress sets the base price for the t-shirt, determines the type of product its joint venture partner may sell, manufactures and prints the t-shirts, and earns money from each t-shirt sold on its website. *(Id.* at 2-3).

This action was filed in the Circuit Court of Kanawha County, West Virginia, on May 1, 2007, and removed to this court on June 1, 2007. On October 5, 2007, the court approved the first amended complaint which replaced the originally-named **[*6]** defendant, Sideshow, Inc., d/b/a Sideshow Collectibles, a Delaware corporation, with current defendant, Sideshow, Inc., a California corporation.

## II. Motion to Dismiss Standard

[HN1] *Federal Rule of Civil Procedure 8(a)(2)* requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief." *Fed. R. Civ. P. 8(a)(2)*. *Rule 12(b)(6)* correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ." *Fed. R. Civ. P. 12(b)(6)*.

[HN2] The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), overruled on other grounds, Twombly, 127 S. Ct. at 1969))*; *see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007)*. Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions . . . ." *Twombly, 127 S. Ct. at 1965*. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.*

The complaint need not, however, "make a case" against **[*7]** a defendant or even "forecast evidence sufficient to prove an element" of the claim. *Chao v. Rivendell Woods, Inc., 415 F.3d 342, 349 (4th Cir. 2005)* (quoting *Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002))*. Instead, the opening pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Twombly, 127 S. Ct. at 1965*. Stated another way, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id. at 1974*.

[HN3] Application of the *Rule 12(b)(6)* standard also requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)* (quoting *Twombly, 127 S. Ct. at 1965)*; *see also South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004)* (quoting *Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002))*. The court is additionally required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor . . . ." *Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)*.

## III. Sufficiency of Allegations

Plaintiffs **[*8]** allege the following two counts against all defendants: Invasion of Right of Publicity (Count I) and Invasion of Right of Privacy (Count II).

Courts have struggled to explain the difference between the "similar, but not identical" right of publicity and the misappropriation prong of the right of privacy. *See Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1446 (11th Cir. 1998)*. Nevertheless, [HN4] "the right of privacy and the right of publicity protect fundamentally different interests and must be analyzed separately." *Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 834 (6th Cir. 1983)*.

"[T]he rights of publicity and of privacy evolved from similar origins . . . ." *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 678, n. 26 (7th Cir. 1986)*. The right of privacy originated in the seminal article authored by Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 195 (1890). The right of publicity did not achieve full recognition until 63 years later in the case of *Haelan Laborato-*

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 33 of 97 PageID# 139

Page 9

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

*ries, Inc. v. Topps Chewing Gum, Inc., 202
F.2d 866, 868 (2d Cir. 1953). See, e.g., Crump
v. Beckley Newspapers, Inc., 173 W. Va. 699,
714 n. 6, 320 S.E.2d 70, 85 n. 6 (1984);* **[*9]**
*ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915,
952 (6th Cir. 2003).*

The right of publicity was essentially an
outgrowth of the right of privacy. *See, e.g.,
ETW Corp., 332 F.3d at 928* (citing J. Thomas
McCarthy, 5 *McCarthy on Trademarks and
Unfair Competition* § 1.4 (4th ed. 2007)). The
Second Circuit concluded a right of publicity
was necessary because

> many prominent persons (espe-
> cially actors and ball-players), far
> from having their feelings bruised
> through public exposure of their
> likenesses [as in a right of privacy
> claim], would feel sorely deprived
> if they no longer received money
> for authorizing advertisements,
> popularizing their countenances,
> displayed in newspapers, maga-
> zines, busses, trains and subways.
> This right of publicity would usu-
> ally yield them no money unless it
> could be made the subject of an
> exclusive grant which barred any
> other advertiser from using their
> pictures.

*Haelen Labs, 202 F.2d at 868.* This right, first
recognized in *Haelen Labs,* is so named for the
value generated by the publicity associated
with a person's likeness. *See, e.g., ETW Corp.,
332 F.3d at 929.*

**[HN5]** In West Virginia, a clear line has
been drawn between the two rights. *Crump,
173 W. Va. at 714 n. 6, 320 S.E.2d at 85 n. 6.*
**[*10]** "The right of privacy protects individual
personality and feelings, the right of publicity
protects the commercial value of a name or

likeness." *Id.* The Eleventh Circuit has ex-
plained

> [t]he appropriation type of in-
> vasion of privacy, like all privacy
> rights, centers on damage to hu-
> man dignity. Damages are usually
> measured by "mental distress" --
> some bruising of the human psy-
> che. On the other hand, the right of
> publicity relates to commercial
> damage to the business value of
> human identity. Put simplistically,
> while infringement of the right of
> publicity looks to an injury to the
> pocketbook, an invasion of appro-
> priation privacy looks to an injury
> to the psyche.

*Allison, 136 F.3d at 1447* (citing J. Thomas
McCarthy, 5 *McCarthy on Trademarks and
Unfair Competition* § 28:6 (1997)).

A. Count I - Right of Publicity

**[HN6]** Invasion of the right of publicity is a
state-law claim. *C.B.C. Distribution and Mar-
keting, Inc. v. Major League Baseball Ad-
vanced Media, L.P., 505 F.3d 818, 822 (8th
Cir. 2007)* (citing *Zacchini v. Scripps-Howard
Broad. Co., 433 U.S. 562, 566, 97 S. Ct. 2849,
53 L. Ed. 2d 965 (1977)).* As of 2003, approx-
imately half of the states had explicitly recog-
nized the right of publicity, either by statute or
by common law. *See,* **[*11]** *e.g., ETW Corp.,
332 F.3d at 928 n. 13* (citing J. Thomas
McCarthy, 5 *McCarthy on Trademarks and
Unfair Competition* § 28:6.1). It should be not-
ed that,

> [o]nly Nebraska and New York
> expressly rejected a common law
> right to publicity, but both of those
> states later recognized a right to
> publicity with statutory enact-
> ments. J. Thomas McCarthy, The

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 34 of 97 PageID# 140

Page 10

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

Rights of Publicity and Privacy, §§ 6.1-6.3 (2d ed.). In fact, of the United States territories, only Puerto Rico currently rejects the right to publicity. *Guedes v. Martinez, 131 F. Supp.2d 272 (D. P.R. 2001).*

*Bosley v. Wildwett.com, 310 F. Supp.2d 914, 935 (N.D. Ohio 2004).*

[HN7] There is no statutory right of publicity in West Virginia. The only mention of the right of publicity by the Supreme Court of Appeals of West Virginia was in a footnote in which it cautioned that the right of publicity must not be confused with the right of privacy and then explained the elements of a right of publicity claim. *Crump, 173 W. Va. at 714 n. 6, 320 S.E.2d at 85 n. 6.* Defendants have not disputed that such a right exists in West Virginia. The *Crump* footnote explained that a right of publicity claim is for

the unjust enrichment caused by an unauthorized exploitation [*12] of the good will and reputation that a *public figure* develops in his name or likeness through the investment of time, money and effort.

*Id.* (internal citations omitted and emphasis added). Though the Supreme Court of Appeals has yet to definitively consider whether the common-law right exists in West Virginia, given the *dicta* in *Crump* and the general acceptance of the doctrine, the court concludes that a common-law right of publicity is cognizable in West Virginia.

Amazon, St. Martin, CafePress, and Getty contend that plaintiff has not pled all of the elements of a successful right of publicity claim. (Amazon Memo. in Supp. of M.T.D. at

4; St. Martin Memo. in Supp. of M.T.D. at 2-3; CafePress Memo. in Supp. of M.T.D. at 6; Getty Memo. in Supp. of M.T.D. at 3). First, they argue that the complaint does not allege that plaintiff is a public figure. *(Id.).*

Plaintiff responds that he is a public figure inasmuch as the photograph of him was taken while he was serving in his capacity as a soldier. (Resp. to Amazon M.T.D. at 6). Relying upon *Tellado v. Time-Life Books, Inc., 643 F. Supp. 904, 909 (D. N.J. 1986),* Curran contends soldiers have been held to be public figures. *(Id.).* In *Tellado,* [*13] the District Court of New Jersey found the attention focused on plaintiff as a representative participant in the Vietnam War made him a public figure. *643 F. Supp. at 909.*

In concluding that a soldier may be considered a public figure, *Tellado* quoted approvingly the following statement found in Prosser and Keeton on Torts at 860:

A public figure has been defined as a person who, by his accomplishments, fame, or mode of living, or by adopting a profession or calling which gives the public a legitimate interest in his doings, his affairs, and his character, has become a 'public personage.' He is, in other words, a celebrity. Obviously to be included in this category are those who have achieved some degree of reputation by appearing before the public, as in the case of an actor, a professional baseball player, a pugilist, or any other entertainer. The list is, however, broader than this. It includes [public officers, famous inventors and explorers, war heroes and] even ordinary soldiers[, an infant prodigy, and no less a personage than the Grand Exalted Ruler of a lodge.] It includes, in short, anyone

who has arrived at a position where public attention is focused upon him as a person.

*Tellado, 643 F. Supp. at 909.*

The **[\*14]** citation Prosser and Keeton used for its assertion that an ordinary soldier could constitute a public figure, *Continental Optical Co. v. Reed, 119 Ind.App. 643, 646-647, 86 N.E.2d 306, 308 (Ind. App. 1949)* (en banc), *rehearing denied, 119 Ind. App. 643, 88 N.E.2d 55,* implicated a member of a mobile optical Army unit during World War II. The War Department took his picture abroad and published it in the United States in various morale-boosting publications. *Id. 119 Ind.App. at 646-647, 86 N.E.2d at 308.* The Appellate Court of Indiana found plaintiff had a commercial value in his image. *Id. 119 Ind.App. at 647, 653, 86 N.E.2d at 308, 310.* Because the right had not yet been dubbed the "right of publicity," it was couched as an extension of the right of privacy. *Id. 119 Ind.App. at 648-649, 86 N.E.2d at 309.*

There appears to be a split of authority over whether being a celebrity is a prerequisite to bringing a right of publicity claim. The right of publicity is sometimes restricted to celebrities. *See, e.g., Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc., 694 F.2d 674, 676 (11th Cir. 1983)* ("The right of publicity may be defined as a celebrity's right to the exclusive **[\*15]** use of his or her name and likeness."); *Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 835 (6th Cir. 1983)* (internal citations omitted) ("The right of publicity has developed to protect the commercial interest of celebrities in their identities."). "However, it should also be noted that other courts and commentators as well have found that 'non-celebrities should also be permitted to recover upon proof that the appropriated identity possessed commercial value.'" *ETW Corp., 332 F.3d at 953* (internal

citations omitted). In the latter viewpoint, the notoriety of the plaintiff is relevant to damages rather than liability. *See id.*

Regardless, the court need not resolve the issue in this memorandum opinion and order. Plaintiff's amended complaint does not contain an allegation that he is a public figure, or even a soldier. Because an essential element of the right of publicity claim is lacking, the court grants defendants' motions to dismiss, with respect to Count I, without prejudice. [4]

> 4   Second, St. Martin and Amazon contend that plaintiff has not established that his likeness has commercial value, which the aforementioned defendants assert is implicit in the direction in *Crump* **[\*16]** and an explicit element in other jurisdictions' descriptions of the right of publicity. (Amazon Memo. in Supp. of M.T.D. at 4; St. Martin Reply to Resp. to M.T.D. at 4). As the motion to dismiss for Count I has already been granted on the first ground, the court need not consider this argument at this juncture. The court notes that should the matter become ripe following plaintiff's amendment, the issue will be considered based on the existing briefing together with such additional briefing as the parties may choose to offer.

Plaintiff requests, in the alternative, that he be afforded an opportunity to amend his complaint to add a paragraph describing himself as a public figure. (Resp. to St. Martin M.T.D. at 9). The plaintiff is directed to file a motion to amend and attach a proposed second amended complaint by February 29, 2008, should he continue to desire to maintain a right of publicity claim against the defendants. [5]

> 5   The request to amend was first articulated in plaintiff's response to St. Martin's motion to dismiss and was filed on June 25, 2007. (Resp. to St. Martin

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 36 of 97 PageID# 142

Page 12

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

M.T.D. at 8). The court previously ordered that amended pleadings be filed by September 15, 2007. Inasmuch as **[\*17]** plaintiff's request to amend was prior to the imposed deadline, the court will use the standard in *Rule 15(a) of the Federal Rules of Civil Procedure* rather than the *Rule 16* standard in assessing any motion to amend. *See Fed. R. Civ. P. 15(a), 16.*

## B. Count II - Right of Privacy

[HN8] Like the right of publicity, the right of privacy is a state-law claim. *Id. at 173 W. Va. at 711, 320 S.E.2d at 82* . In West Virginia, the right of privacy protects one from

> (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public.

Syl. pt. 3, *Benson v. AJR, Inc., 215 W. Va. 324, 325, 599 S.E.2d 747, 748 (2004)* (quoting syl. pt. 8, *Crump, 173 W. Va. 699, 320 S.E.2d 70*). Plaintiff alleges the first, second, and fourth prongs of the four-prong tort of privacy. (Am. Compl. PP 19-21). Defendants challenge the sufficiency of the allegations only with respect to the first and fourth prongs. (Amazon Memo. in Supp. of M.T.D. at 3; St. Martin Memo. in Supp. of M.T.D. at 3-4; Reply to Resp. to St. Martin M.T.D. at 6-7; **[\*18]** Getty Memo. in Supp. of M.T.D. at 3).

Although there are no reported West Virginia cases that consider the elements required for an intrusion upon seclusion claim in West Virginia, courts have routinely adopted the description of the tort of intrusion upon seclusion set forth in the *Restatement (Second) of Torts §* 652B. See, e.g., *Jennings v. Univ. of North*

*Carolina, at Chapel Hill, 444 F.3d 255, 281 (4th Cir. 2006)* (applying North Carolina law), *overruled on other grounds by 482 F.3d 686 (4th Cir. 2007)* (en banc); *Ruzicka Elec. and Sons, Inc. v. International Broth. of Elec. Workers, Local 1, AFL-CIO, 427 F.3d 511, 524 (8th Cir. 2005)* (en banc) (applying Missouri law); *Kline v. Security Guards, Inc., 386 F.3d 246, 260 (3d Cir. 2004)* (applying Pennsylvania law); *Dubbs v. Head Start, Inc., 336 F.3d 1194, 1220-21 (10th Cir. 2003)* (applying Oklahoma law); *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc., 306 F.3d 806, 812 (9th Cir. 2002)* (applying Arizona law).

The *Restatement (Second) of Torts, Section 652B* defines [HN9] the tort of unreasonable intrusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another **[\*19]** or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Tracking the Restatement (Second) definition, plaintiff alleges conclusionally that "[t]he defendants and each of them invaded upon Erik Curran's right of privacy by unreasonable intrusion upon his seclusion." (Am. Compl. P 19).

St. Martin and Getty contend plaintiff has not stated a cognizable claim of intrusion upon seclusion. (St. Martin Memo. in Supp. of M.T.D. at 3-4; Reply to Resp. to St. Martin M.T.D. at 6-7; Getty Memo. in Supp. of M.T.D. at 3). Citing *Pierson v. Newsgroup Publications, Inc., 549 F. Supp. 635, 640 (S.D. Ga. 1982)*, St. Martin argues that a picture of a soldier taken in a combat zone cannot be the basis for an intrusion upon seclusion claim.

(Reply to Resp. to St. Martin M.T.D. at 6). In *Pierson,* summary judgment was granted based on the lack of any physical intrusion. *549 F. Supp. at 640.* Yet, the public location of the alleged tort was only a factor in the conclusion in *Pierson* that there was not an intrusion. *Id.*

Plaintiff acknowledges that the "photograph was taken of him while deployed in a **[*20]** combat zone" and the photograph of the plaintiff on the cover of the book, a copy of which is attached as an exhibit to plaintiff's responses, appears to corroborate the plaintiff's acknowledgment. (Resp. to CafePress M.T.D. at 2; Book Jacket, attached as Ex. A to Resp. to M.T.D.). [HN10] "[T]he place of the occurrence is relevant to a determination of the sufficiency of the evidence of intrusiveness, [but] it is not determinative of whether an intrusion into one's 'solitude and seclusion' has occurred." *Evans v. Detlefsen, 857 F.2d 330, 338 (6th Cir. 1988). Comment C to the Restatement (Second) of Torts, Section 652B* explains the point with the following examples:

> Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters.

*Id.* Stated succinctly, "the privacy which is invaded has to do with the type of interest **[*21]** involved and not the place where the invasion occurs." *Evans, 857 F.2d at 338* (citing *Galella v. Onassis, 487 F.2d 986, 994-95 (2d Cir. 1972)).*

However, no allegations of this type have been made by the plaintiff. Other than the conclusional allegation in the amended complaint, plaintiff has offered no basis -- neither in the complaint or the briefing -- as to how defendants have infringed such an interest that would give rise to an intrusion upon his solitude or seclusion. The motions to dismiss of St. Martin and Getty as to the first prong of the right of privacy are granted. Plaintiff has not demonstrated a basis for an intrusion upon seclusion claim against any of the defendants.

Turning to [HN11] the fourth prong of the right of privacy, a claim is actionable "which unreasonably places another in a false light before the public." *Crump, 173 W. Va. at 715, 320 S.E.2d at 86.* "One form in which false light invasions of privacy often appears is the use of another's photograph to illustrate an article or book with which the person has no reasonable connection, and which places the person in a false light." *Id. Crump* cites a series of examples in which a false light claim has been found. *Id.* **[*22]** (citing *Leverton v. Curtis Pub. Co., 192 F.2d 974, 977 (3d Cir. 1951)* (photograph of a child who was nearly struck by a car next to an article about the role of pedestrian carelessness in causing accidents); *Peay v. Curtis Pub. Co., 78 F. Supp. 305, 306 (D. D.C. 1948)* (photograph of an honest taxi driver accompanying article about dishonest ones); *Gill v. Curtis Pub., 38 Cal.2d 273, 239 P.2d 630, 633 (1952)* (photograph of an affectionate couple used to illustrate an article about how love at first sight is founded on sexual attraction and often followed by divorce)).

[HN12] The elements of a false light claim consist of the following: (1) the false (2) publication (3) of private facts (4) portraying the plaintiff in a false light (5) which would be highly offensive to a reasonable person. *See Benson, 215 W. Va. at 329, 599 S.E.2d at 752; Crump, 173 W. Va. at 716, 320 S.E.2d at 87-88; Davis v. Monsanto Co., 627 F. Supp.*

*418, 421 (S.D.W. Va. 1986)* (*Restatement (Second) of Torts § 652D* (1977)).

St. Martin and Getty contest two elements of the false light claim. [6] First, they contend plaintiff has not pled falsity. (St. Martin Memo. in Supp. of M.T.D. at 4). As *Crump* notes, "the matter publicized **[*23]** as to the plaintiff must be untrue." *Id. 173 W. Va. at 716, 320 S.E.2d at 87*. The amended complaint plainly states that "[t]he defendants and each of them created publicity that unreasonable [sic] placed Erik Curran in a false light before the public." (Am. Compl. P 21). Plaintiff also pled that the cover of the book, *Killer Elite,* features his photograph. *(Id.* P 8). If plaintiff establishes he is not a "killer," then the arguably negative connotation on the cover of the book could be said to portray plaintiff in a false light. The necessary element of falsity has therefore been sufficiently pled in the amended complaint to survive the motions to dismiss of St. Martin and Getty.

6 Inasmuch as CafePress does not contest the sufficiency of plaintiff's allegations for his false light claim, the court need not address the issue with respect to CafePress's sale of t-shirts.

Second, [HN13] "[a] plaintiff in a false light invasion of privacy action may not recover unless the false light in which he was placed would be highly offensive to a reasonable person." *Crump, 173 W. Va. at 718, 320 S.E.2d at 90* (citing *Restatement (Second) of Torts § 652E(a)* (1977)). The objective standard "ensures that liability **[*24]** will not attach for the publication of information so innocuous that notice of potential harm would not be present." *Id.* Suffice it to observe that a reasonable person could find his picture under the title "Killer Elite" to be highly offensive. Moreover, *Crump* stated that when the item at issue in a false light claim does not clearly favor one construction over the other, the best course is to favor the nonmovant and allow the claim to go forward. *See id.* at *173 W. Va. at 719, 320 S.E.2d at 90.*

Defendants do not contest the remaining element of the false light claim, which requires that the subject matter was private before it was publicly disclosed. *See Benson, 215 W. Va. at 329, 599 S.E.2d at 752*; *Crump, 173 W. Va. at 716, 320 S.E.2d at 87-88*; *Davis, 627 F. Supp. at 421* (citing *Restatement (Second) of Torts § 652D* (1977)).

IV. Defenses as a Matter of Law

Consideration of the affirmative defenses remains. [HN14] "Although a motion pursuant to *Rule 12(b)(6)* invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the *face of the complaint clearly reveals the existence of* **[*25]** *a meritorious affirmative defense." Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181 (4th Cir. 1996)* (internal citation omitted and emphasis added).

Amazon, St. Martin, and Getty argue that, on these facts, the remainder of Count II is barred by the *First Amendment*. (Amazon Memo. in Supp. of M.T.D. at 3-4; St. Martin Memo. in Supp. of M.T.D. at 5-6; Reply to Resp. to St. Martin M.T.D. at 7-10; Getty Memo. in Supp. of M.T.D. at 3-5; Reply to Resp. to Getty M.T.D. at 4-7). [HN15] Courts have engrafted exceptions and restrictions to the rights of publicity and privacy in order to "avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest," guaranteed by the *First Amendment*. *Time, Inc. v. Hill, 385 U.S. 374, 382, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967)* (internal citation omitted). Two principal, closely-related exceptions are described as "newsworthy or public interest" and "incidental use." *See, e.g., Williams v. Newsweek, Inc., 63 F. Supp.2d 734, 736-738 (E.D. Va. 1999)*. Absent a showing of the defendant's commission of actual malice, as explained in *New York*

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

*Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964),* both exceptions may bar right of publicity and right **[\*26]** of privacy claims. *See Crump, 173 W. Va. at 713, 320 S.E.2d at 85* ([HN16] "in West Virginia, the "right of privacy" does not extend to communications . . . which concern public figures or matters of legitimate public interest . . . ."); *Rosemont Enterprises, Inc. v. Random House, Inc., 58 Misc.2d 1, 6, 294 N.Y.S.2d 122, 129 (N.Y. Sup. 1968)* ("Just as a public figure's 'right of privacy' must yield to the public interest so too must the 'right of publicity' bow where such conflicts with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest."); *Bankers Trust Co. v. Publicker Industries, Inc., 641 F.2d 1361, 1364 (2d Cir. 1981)* (incidental use exception exists for the right of publicity); *Groden v. Random House, Inc., 61 F.3d 1045, 1049 (2d Cir. 1995)* (incidental use was present and barred statutory right of privacy claim). Because the right of publicity claim has been dismissed without prejudice, the court considers the defenses only as a bar to the remaining prongs of the right of privacy claim in Count II, namely, appropriation and false light.

In this section, the court also considers CafePress's assertion of immunity under the Communications Decency **[\*27]** Act of 1996 ("CDA"), *47 U.S.C. § 230,* and Amazon's contention that the analogy of Amazon to a traditional book seller in *Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1326 (11th Cir. 2006),* bars the claims against it.

A. Newsworthy or Public Interest Exception

[HN17] "There are two classes of newsworthy subjects which are privileged under privacy law: public figures and matters of legitimate public interest." *Crump, 173 W. Va. at 712, 320 S.E.2d at 83.* The amended complaint does not allege that plaintiff is a public figure. With respect to the public interest analysis, *Crump* is again instructive.

In determining whether a manner of legitimate public interest is involved, the inquiry "focuses on the information disclosed by the publication and asks whether truthful information of legitimate concern to the public is publicized in a manner that is not highly offensive to a reasonable person." *Campbell v. Seabury Press, 614 F.2d at 397; see also Valentine v. C.B.S., Inc., 698 F.2d 430, 433 (11th Cir. 1983).* "Public interest" includes both the dissemination of current events and any "informational material of legitimate public interest." *Buzinski v. DoAll Co., 31 Ill. App. 2d 191, 195, 175 N.E.2d 577, 579 (1961);* **[\*28]** *see also* W. PROSSER, THE LAW OF TORTS § 117 (1971).

*Crump, 173 W. Va. at 712, 320 S.E.2d at 84 (1984).* Plaintiff has not disputed that [HN18] the public interest exception applies to books. *See, e.g., Dallesandro v. Henry Holt & Co., 4 A.D.2d 470, 166 N.Y.S.2d 805, 806 (1957).* That the publishing company is primarily in the business of trying to make a profit does not necessarily detract from the potential newsworthiness. *Id.; Davis v. High Soc'y Magazine, 90 A.D.2d 374, 457 N.Y.S.2d 308, 313 (1982).* The [newsworthy or public interest] exception, however, will not apply if the picture bears "no real relationship to the article or the article is an advertisement in disguise." *Dallesandro, 166 N.Y.S.2d at 806* (internal citations omitted). *See also Finger, 564 N.Y.S.2d 1014, 566 N.E.2d at 144* (internal citations omitted). This exception is designed to balance the need for the dissemination of news and in-

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

formation against an individual's right to control the use of his likeness. *Falwell, 797 F.2d at 1278; Berger,* 1995 WL 1056043 at *2.

*Williams v. Newsweek, Inc., 63 F. Supp.2d 734, 736 (E.D. Va. 1999), aff'd 202 F.3d 262 (4th Cir. 1999); accord Klein v. McGraw-Hill, Inc., 263 F. Supp. 919, 921 (D. D.C. 1966).* **[*29]** At least one court has set forth factors to consider in this balance.

[HN19] Courts must decide whether a publication is newsworthy based upon: (1) the social value of the published facts; (2) the extent of the intrusion into ostensibly private matters, and (3) the extent to which a party voluntarily assumed a position of public notoriety. Newsworthiness depends upon the logical relationship or nexus between the event that brought the plaintiff into the public eye and the particular facts disclosed, so long as the facts are not intrusive in great disproportion to their relevance.

*Four Navy Seals v. Associated Press, 413 F. Supp. 2d 1136, 1146 (S.D. Cal. 2005)* (internal citations omitted).

Further factual development is needed for the court to adequately gauge all of the relevant considerations in the balance and make a conclusive statement on the matter. For example, Curran raises the possibility that defendants commercially exploited his image. He states that the book jacket in question advertises a second book by the author in addition to *Killer Elite;* the inside contents of the book do not contain Curran's image or likeness and do not refer to him in any way; and the photographs contained **[*30]** in the inside of the book illustrating its contents do not contain pictures of

him. (Resp. to St. Martin M.T.D. at 8). Curran thus concludes that his picture on the cover was used to advertise the book and the author, not illustrate the subject matter. *(Id.).* In view of these contentions, the applicability of the newsworthy or public interest exception to the torts alleged in Count II cannot be decided at this juncture. The exception does not presently bar the claim from going forward.

B. Incidental Use Exception

Although *Crump* discussed the defenses to a right of privacy action only in terms of newsworthiness and consent, it explained in the following passage that the incidental use of the photograph in that case prohibited the plaintiff from proceeding on her misappropriation claim. *173 W. Va. at 712, 715, 320 S.E.2d at 83, 86.*

Crump's photograph was not published because it was her likeness, it was published because it was the likeness of a woman coal miner. It was merely a file photograph used as a matter of convenience to illustrate an article on women coal miners. This type of incidental use is not enough to make the publication of a person's photograph an appropriation. Therefore, **[*31]** Crump is not entitled to recover under the appropriation theory of recovery as a matter of law.

*Id. at 173 W. Va. at 715, 320 S.E.2d at 86; accord Williams, 63 F. Supp.2d at 737 (E.D. Va. 1999)* (internal citation omitted).

While *Crump* and *Williams* were at the summary judgment stage, the context here is a motion to dismiss. Consideration of the motivation for the choice of Curran's likeness on the book cover or on the t-shirts without the benefit

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 41 of 97 PageID# 147

Page 17

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

of discovery would be speculative. The court finds this area requires factual elaboration to determine whether the use was incidental.

## C. CDA Preemption Asserted by CafePress

CafePress asserts that *§ 230 of the Communications Decency Act* grants it federal immunity from tort liability and preempts Counts I and II. As the Ninth Circuit notes, [HN20] CDA immunity exists for both right of publicity claims (such as Count I), *see Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1119 n. 5 (9th Cir. 2007)*, and right of privacy claims (such as Count II), *see Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1125 (9th Cir. 2003)*.

*Section 230 of the CDA* creates a distinction between "interactive computer services," which merely transmit information and "information [*32] content providers" that create or develop, in whole or in part, information eventually transmitted. *See 47 U.S.C. § 230(f)(2) and (3)*. The former may be exempt from tort liability by the CDA, whereas the latter is not. *See id. §§ 230 (c)(1), (e)(3), (f)(2) and (3)*.

In response to CafePress's argument that the CDA provides immunity, the plaintiff contends first, an affirmative defense such as CDA immunity is not an appropriate basis for dismissal on a *Rule 12(b)(6)* motion, and second, that the CDA does not provide immunity for CafePress as a manufacturer and joint venture partner with a non-defendant third party using plaintiff's image to sell t-shirts. (Resp. to CafePress M.T.D. at 2, 9-11).

With respect to the plaintiff's first retort, [HN21] immunity pursuant to *§ 230(c) of the CDA* constitutes an affirmative defense. *Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003)*. This affirmative defense is generally not fodder for dismissal under *Rule 12(b)(6)*. *Id.* "Instead, such a defense is generally addressed as a *Rule 12(c)* or *Rule 56* motion." *Novak v. Overture Svcs., Inc., 309 F. Supp.2d 446, 452 (E.D.N.Y. 2004)* (citing *GTE Corp, 347 F.3d at 657)*. In

both *Novak* and *GTE Corp.*, the courts considered [*33] the issue of CDA immunity because the plaintiffs in those cases neither protested the court's use of *Rule 12(b)(6)* nor requested better notice or additional discovery. *Id.* The claims in both cases were dismissed. *Id.*

In attempting to distinguish plaintiff's reliance upon the unpublished opinion of *Doctor's Associates, Inc. v. QIP Holders, LLC, 82 U.S.P.Q.2d 1603, 1605, 2007 U.S. Dist. LEXIS 28811, 2007 WL 1186026 *2 (D. Conn. 2007)*, [7] which relied on *GTE Corp.* and *Novak*, CafePress states:

> Since it was unclear from the allegations in the Complaint whether Quiznos [the defendant] created or developed the allegedly infringing commercial at issue, the court in that case held that it could not decide "at this stage of the proceeding" whether the defendant was entitled to immunity. Here . . . there is no allegation that CafePress created or developed the allegedly infringing photograph on t-shirts offered for sale over the Internet by "Big Bopper Tees" (Response Ex. 1) and hence, CafePress cannot be an information content provider under the Act.

(Reply to Resp. to CafePress M.T.D. at 4). This statement demonstrates the fallacy of CafePress's argument. CafePress relies upon the absence of facts not pled in the complaint [*34] and seeks to place the onus on the plaintiff to plead around affirmative defenses, which it need not do. *See GTE Corp., 347 F.3d at 657*.

7    Although this opinion is unpublished, it was addressed in the briefing by the plaintiff and CafePress.

In the examples cited by CafePress for its assertion that courts have granted motions to dismiss based on the immunity provided by *§ 230 of the CDA*, either the parties did not dispute that the defendant was an interactive computer service or there were allegations in the complaint upon which the court could reasonably conclude that the defendants were interactive computer services. *See Universal Communication Systems, Inc. v. Lycos, 478 F.3d 413, 415, 418-419 (1st Cir. 2007)* (facts alleged in complaint indicated that defendant was an interactive computer service); *Beyond Systems, Inc. v. Keynetics, Inc., 422 F. Supp.2d 523, 536-37 (D. Md. 2006)* (parties did not dispute that the defendant was an interactive computer service); *PatentWizard, Inc. v. Kinko's Inc., 163 F. Supp.2d 1069, 1071 (D. S.D. 2001)* (parties agreed that defendant was an interactive computer service as defined by the Act and only issue of whether the claims sought to treat defendant **[*35]** as a publisher or speaker of information remained and could be plainly resolved on the face of the complaint); *Doe v. Bates, 35 Media L. Rep. 1435, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, *10 (E.D. Tex. 2006)* ("based on Plaintiffs' current allegations and the applicable case law, no amount of discovery would establish a set of facts that would entitle Plaintiffs to relief"); [8] *Gentry v. eBay, Inc., 99 Cal. App. 4th 816, 833-834, 121 Cal. Rptr. 2d 703 (2002)* (allegations of complaint revealed defendant is an interactive computer service). Here, the amended complaint states merely that Cafe-Press sold t-shirts featuring plaintiff's likeness. (Am. Compl. PP 14, 17). In the briefing, plaintiff disputes CafePress's assertion and refers to CafePress as an information content provider rather than an interactive computer service. (Resp. to CafePress M.T.D. at 11).

8      Although this opinion is unpublished, it was addressed in the briefing by the plaintiff and CafePress.

In order to support its argument that it is an interactive computer service and qualifies for CDA immunity, CafePress does not address information pled in the complaint or present a stipulation with respect thereto. Instead, it attempts to use its own terms of service agreement **[*36]** dated April 11, 2007, posted on its website and attached as Exhibit A to the motion to dismiss. (CafePress Memo. in Supp. of M.T.D. at 5).

In arguing that its terms of service webpage may be properly considered on a *Rule 12(b)(6)* motion, CafePress, in its section on the applicable standard of review, cites *Secretary of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)*, *Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005)*, and *Norfolk Federation of Business Dist. v. HUD, 932 F. Supp. 730, 736 (E.D. Va. 1996)*. (CafePress Memo in Supp. of M.T.D. at 3). These three cases, however, do not suggest that the court is compelled to consider the Cafe-Press's terms of service webpage in resolving the motion to dismiss.

CafePress seizes on the portion of *Trimble Navigation,* in which our court of appeals states that [HN22] a court may consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *484 F.3d at 705* (citing *Blankenship v. Manchin, 471 F.3d 523, 526 n. 1 (4th Cir. 2006))*. Previously, our court of appeals allowed a court to consider a document not attached to the complaint **[*37]** when "it was integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999)* (citing *Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir.1998); Shaw, 82 F.3d at 1220; Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2nd Cir. 1991))*. The terms of service webpage from CafePress's website is neither integral to the complaint nor authenticated.

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

As to the requirement that the document must be integral to the complaint, the amended complaint does not refer to CafePress's terms of service webpage or its website generally. The terms of service webpage is certainly not integral to the essence of Curran's affirmative claims involving the use of his image or likeness. *Cf. Blankenship, 471 F.3d at 526 n. 1* (newspaper article, not attached to, but "relied upon," by the complaint was permissibly considered in motion to dismiss); Charles A. Wright & Arthur R. Miller, 5A *Federal Practice and Procedure* § 1327 (2007) (document may definitely be considered on *Rule 12(b)(6)* motion when plaintiff has referred to the item in the complaint and it is central to the affirmative case).

Contrary **[*38]** to CafePress's assertions, the rationale of *Knievel* is not applicable here. The Ninth Circuit noted, "the purpose of [what it dubs] the ["incorporation by reference"] doctrine is to include all material normally read in conjunction with the allegedly offending material." *Knievel, 393 F.3d at 1076.* The incorporation by reference doctrine was invoked in *Knievel* to consider the surrounding webpages viewers could not avoid in accessing the webpage featuring the allegedly defamatory photograph and caption. *Id. at 1076-77.* Curran's response attaches as an exhibit at least some of CafePress webpages displaying t-shirts for sale featuring his likeness. (Website Excerpts, attached as Ex. 1 to Resp. to CafePress M.T.D.). Unlike the defendant in *Knievel*, CafePress does not argue that its terms of service webpage must be viewed prior to accessing the allegedly infringing use of Curran's image or that it otherwise provides an indispensable context for the allegedly offending images. Indeed, a user may visit a website frequently without ever viewing particular webpages of the given website. Thus, webpages from the same website do not necessarily provide a background or a context for other webpages **[*39]** found at that website. Rather,

the relationship between webpages will depend on the configuration of the particular website.

Moreover, with respect to the authenticity of CafePress's terms of service webpage, [HN23] it is generally imprudent to rely exclusively on a party's own website in support of its motion to dismiss. *See, e.g., St. Clair v. Johnny's Oyster & Shrimp, Inc., 76 F. Supp.2d 773, 774-775 (S.D. Tex. 1999)* (internet is catalyst for rumor, innuendo, and misinformation, with no way of verifying the authenticity" of its contents; information found on the internet is "inherently untrustworthy [as] [a]nyone can put anything on the internet . . . [and] can adulterate the content on any web-site"). A party's website is self-serving and there is no assurance that the content is authentic. *Id.* Relying on a party's website in support of its argument is akin to relying on their memoranda. *See id.*

Nevertheless, authenticity is not a bar to consideration of the document if plaintiff does not challenge it. *Phillips, 190 F.3d at 618.* In his response, Curran does not address consideration of the terms of service webpage. If it were only a question of the webpage's authenticity the court could **[*40]** permissibly consider it. However, the court has already found that the document is not integral to the complaint.

Raising a slightly different point was CafePress's reliance on the district court case of *Norfolk Federation*, which held that some matters of public record may be considered on a *Rule 12(b)(6)* motion. (Memo. in Supp. of CafePress M.T.D. at 3). The Eastern District of Virginia considered an extraneous redevelopment plan of the city attached to a motion to dismiss. *Norfolk Federation, 932 F. Supp. at 736-737.* After noting "a court has wide discretion to exclude matters outside of the pleadings in order to preserve the motion as one to dismiss," *Norfolk Federation* cited the "unique characteristics" of the redevelopment plan that it considered in ruling on the motion to dismiss. *Id. at 736.* At oral argument, the parties agreed that the redevelopment plan was a public rec-

Case 2:11-cv-00480-RGD -DEM   Document 10-2   Filed 10/17/11   Page 44 of 97 PageID# 150

Page 20

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

ord. *Id. at 737 n. 3.* Suffice it to say that a city's redevelopment plan is of an entirely different nature than a party's own webpage. Unlike the solemnity of a formal city plan, a self-serving webpage is no more a public record than a flier tacked to a bulletin board. The court does not find the unique circumstances **[*41]** that existed in *Norfolk Federation* to be present here.

Accordingly, CafePress's terms of service webpage is not being considered in deciding the *12(b)(6)* motion. CDA immunity is a question awaiting discovery and exploration, though plaintiff faces an uphill battle given the broad grant of immunity conferred by *§ 230*, as interpreted in the seminal case of *Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997), cert. denied, 524 U.S. 937, 118 S. Ct. 2341, 141 L. Ed. 2d 712 (1998).*

Because the court finds there is no basis upon which *§ 230 CDA* immunity may be conferred at this time, there is no need to address the merits of plaintiff's second response that CDA immunity is unavailable inasmuch as plaintiff claims CafePress participated in a joint venture. [9]

> 9   Plaintiff also suggests, without further elaboration, that CafePress is liable to him for what it "does aside from its internet site." (Resp. to CafePress M.T.D. at 10).

D. Amazon as Traditional Book Seller

Defendant Amazon claims it is distinct from the other defendants insofar as the "sole" allegation as to Amazon is that it "sells a non-fiction book published by St. Martin's Press, which contains a cover depicting Mr. Curran, among other things." (Amaz. Memo. **[*42]** in Supp. of M.T.D. at 2). Curran has alleged that Amazon participated in a joint venture with St. Martin and Getty to appropriate his image to aid in selling books. (Am. Compl. P 10). Amazon offers the following passage from *Almeida, 456 F.3d at 1326.*

Rather, we find that, as a matter of business practice, Amazon's use of book cover images closely simulates a customer's experience browsing book covers in a traditional book store.

. . .

Under the allegations of Almeida's complaint, we discern no set of facts by which an internet retailer such as Amazon, which functions as the internet equivalent to a traditional bookseller, would be liable for displaying content that is incidental to book sales, such as providing customers with access to a book's cover image and a publisher's description of the book's content.

*Id.* Unlike in *Almeida,* where the Eleventh Circuit upheld the district court's decision to grant Amazon's motion for summary judgment on the right of publicity and right of privacy counts, *inter alia,* the issue here arises in the course of resolving a motion to dismiss. Plaintiff is entitled to the opportunity to prove his allegations of a joint venture. At this time, Amazon's argument **[*43]** does not provide the court with a basis to dismiss it from the litigation.

V.

It is, accordingly, ORDERED as follows:

1. Amazon's motion to dismiss be, and it hereby is, granted without prejudice as to Count I, granted with prejudice as to the first prong of Count II, and denied as to the remainder of the motion;

2. St. Martin's motion to dismiss be, and it hereby is, granted

2008 U.S. Dist. LEXIS 12479, *; 86 U.S.P.Q.2D (BNA) 1784;
36 Media L. Rep. 1641

without prejudice as to Count I, granted with prejudice as to the first prong of Count II, and denied as to the remainder of the motion;

3. CafePress's motion to dismiss be, and it hereby is, granted without prejudice as to Count I, granted with prejudice as to the first prong of Count II, and denied as to the remainder of the motion;

4. Getty's motion to dismiss be, and it hereby is, granted without prejudice as to Count I, granted with prejudice as to the first prong of Count II, and denied as to the remainder of the motion; and

5. The plaintiff may file a motion to amend his amended complaint as set forth herein, provided that such filing be made on or before February 29, 2008.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

DATED: February 19, 2008

/s/ John T. Copenhaver,   [*44] Jr.

John T. Copenhaver, Jr.

United States District Judge




Caution
As of: Oct 17, 2011

**DOCTOR'S ASSOCIATES, INC., Plaintiff v. QIP HOLDERS, LLC and IFILM CORP., Defendants.**

**CIVIL ACTION NO. 3:06-cv-1710 (JCH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2007 U.S. Dist. LEXIS 28811; 82 U.S.P.Q.2D (BNA) 1603; 2007-1 Trade Cas. (CCH) P75,743*

**April 18, 2007, Decided**
**April 19, 2007, Filed**

**COUNSEL:** [*1] For Doctor's Assoc Inc, Plaintiff: Jeffrey J. Mirman, LEAD ATTORNEY, Levy & Droney, P.C., Farmington, CT; Lisa A. Zaccardelli, LEAD ATTORNEY, Levy & Droney, P.C., Farmington, CT.

For QIP Holders LLC, IFilm, Inc., Defendants: James C. Riley, LEAD ATTORNEY, Whitman, Breed, Abbott & Morgan, Greenwich, CT; Marlon E. Lutfiyya, LEAD ATTORNEY, Winston & Strawn, LLP -IL, Chicago, IL; Ronald Y. Rothstein, LEAD ATTORNEY, Winston & Strawn, LLP -IL, Chicago, IL.

**JUDGES:** Janet C. Hall, United States District Judge.

**OPINION BY:** Janet C. Hall

**OPINION**

**RULING ON DEFENDANT'S PARTIAL MOTION TO DISMISS [Doc. No. 73]**

**I. INTRODUCTION**

Doctor's Associates, Inc. ("Subway") has filed a complaint against QIP Holders, LLC ("Quiznos") and iFilm Corp. ("defendants," collectively). Defendant Quiznos has moved to dismiss Count Four of the plaintiff's Fourth Amended Complaint, which states a violation of the Lanham Act in connection with the "Quiznos v. Subway TV Ad Challenge," alleging that the defendants engaged in false and misleading advertising in violation of *15 U.S.C. § 1125 et seq.* Quiznos has moved to dismiss Count Four because it claims it is entitled to immunity under [*2] the Communications Decency Act ("CDA"), *47 U.S.C. § 230(c)(1).*

2007 U.S. Dist. LEXIS 28811, *; 82 U.S.P.Q.2D (BNA) 1603;
2007-1 Trade Cas. (CCH) P75,743

## II. STANDARD OF REVIEW

In deciding a motion to dismiss, the court takes the allegations of the Complaint as true, and construes them in a manner favorable to the pleader. *Hoover v. Ronwin, 466 U.S. 558, 587, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984); see Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), overrruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)*. The court must draw all reasonable inferences in the plaintiff's favor. *See, e.g., Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005)* (discussing *Rule 12(b)(6)* motion to dismiss); *Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)* (internal citations omitted) (discussing *Rule 12(b)(1)* motion to dismiss).

A motion to dismiss for failure to state a claim, pursuant to *Rule 12(b)(6)*, tests only the adequacy of the complaint. *United States v. City of New York, 359 F.3d 83, 87 (2d Cir. 2004)*. A *Rule 12(b)(6)* motion can be granted **[*3]** only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Such a motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint. *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quotation omitted). However, "bald assertions and conclusions of law will not suffice" to meet this pleading standard. *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)*.

## III. FACTS [1]

1    The court takes the facts alleged in the Fourth Amended Complaint ("4th Am. Comp.") [Doc. No. 53] as true for purposes of this motion and draws all reasonable inferences in the plaintiff's favor.

On or about October 31, 2006, the defendants co-sponsored a nationwide **[*4]** contest, "Quiznos v. Subway TV Ad Challenge" (the "Contest"), in which Quiznos sought out contestants to submit video entries comparing a Subway sandwich to the Quiznos Prime Rib Cheesesteak sandwich. *See* 4th Am. Comp. at P 21. As an example, Quiznos posted three sample videos to the iFilm website that compared the two products. *Id.* at P 23. The Contest rules informed entrants to log onto "meatnomeat.com" to submit their video entries. *Id.* at P 21. The entries were posted up through December 8, 2006, and, over Subway's objection, remained on the iFilm website following the end of the Contest and selection of a winner. *Id.* at P 26. Subway alleges that "[t]he advertising statements encouraged and promoted by the Defendants are false and misleading," in violation of the Lanham Act. *Id.* at P 25.

## IV. DISCUSSION

The Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *47 U.S.C. § 230(c)(1)*. "Interactive computer service" is defined as "any information service, system, or **[*5]** access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." *Id.* at *§ 230(f)(2)*. "Information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* at *§ 230(f)(3)*. Thus, unless an exception applies, Quiznos is immune from liability if "(1) [Quiznos] is a 'provider or user of an interactive

computer service'; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [Quiznos] 'as the publisher or speaker' of that information." *Universal Communication Systems, Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007).*

While courts have "generally interpreted *Section 230* immunity broadly, so as to effectuate Congress's 'policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious **[*6]** messages,'" *id.* (citing cases), this court finds it cannot decide whether Quiznos is entitled to immunity at this stage of the proceeding. Because "invocation of *Section 230(c)* immunity constitutes an affirmative defense[, a]s the parties are not required to plead around affirmative defenses, such an affirmative defense is generally not fodder for a *Rule 12(b)(6)* motion." *Novak v. Overture Servs., Inc., 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004); see also Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003)* ("Affirmative defenses do not justify dismissal under *Rule 12(b)(6)*; litigants need not try to plead around defenses."). [2] Thus, "such a defense is generally addressed as *Rule 12(c)* or *Rule 56* motion." *Novak, 309 F. Supp. 2d at 452.* Moreover, taking the allegations in the Fourth Amended Complaint as true for purposes of this motion, the court cannot, as a matter of law, state that "the plaintiff can prove no set of facts in support of" a finding of no immunity under the CDA. *Conley, 355 U.S. at 45-46.* Instead, whether or not Quiznos is an "information content provider" is a question awaiting further discovery. **[*7]**   [3]

[2]   While Quiznos correctly points out that the courts in both *Novak* and *Doe* ultimately considered the immunity defense on the merits, the reason for doing so was because the plaintiffs in those cases neither protested to the district court's use of *Rule 12(b)(6)*, nor requested better notice or additional discovery. In this case, however, the plaintiff has requested both that the court not address this defense on a *Rule 12(b)(6)* motion and additional discovery.

[3]   The court does not agree with Quiznos that the allegations in the Fourth Amended Complaint do not at all encompass whether or not Quiznos altered or was otherwise creatively involved with any part of the contestant videos. *See* Def.'s Reply at 4 [Doc. No. 84]. Subway has satisfied the simplified notice pleading standard under *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002):*

> *Federal Rule of Civil Procedure 8(a)(2)*[] provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. *See id. at 47-48; Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168-169, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).*

2007 U.S. Dist. LEXIS 28811, *; 82 U.S.P.Q.2D (BNA) 1603;
2007-1 Trade Cas. (CCH) P75,743

[*8]   Thus, the court denies Quiznos' Motion to Dismiss Count Four of the Fourth Amended Complaint, without prejudice to raise this claim as a *Rule 56* Motion following discovery.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES the defendant's partial motion to dismiss [**Doc. No. 73**].

## SO ORDERED.

Dated at Bridgeport, Connecticut this 18th day of April, 2007.

/s/ Janet C. Hall

United States District Judge





Positive
As of: Oct 09, 2011

### NEIL R. HARRINGTON, et al., Plaintiffs, v. SPRINT NEXTEL CORPORATION, et al., Defendants.

### 1:08cv336 (JCC)

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

### *2008 U.S. Dist. LEXIS 42071*

### May 29, 2008, Decided
### May 29, 2008, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employees filed an action against defendants, a former employer and a manager, as a result of their termination. The employer and the manager filed a motion to dismiss under *Fed. R. Civ. P. 12(b)*.

**OVERVIEW:** The motion to dismiss challenged the counts for: breach of contract, defamation, defamation per se, and intentional infliction of emotional distress. Upon review, the court held that the breach of contract counts would not be dismissed because a motion to dismiss was not the appropriate setting for the court to weigh evidence to determine whether the employees rebutted the presumption of at-will employment or whether the alleged contract survived an alleged disclaimer. In addi-

tion, the court concluded that reasonable persons could consider defendants' alleged behavior consisting of orchestrating a scheme to accuse the employees of harboring and disseminating pornography to be atrocious and intolerable in a civilized community and thus, sufficient for purposes of establishing intentional infliction of emotional distress. Statements asserting that the employees were unfit to perform the duties of their employment and that they lacked integrity along with the effect that was prejudicial to the employees in their reputation and work were sufficient for the defamation counts to overcome the motion to dismiss.

**OUTCOME:** The court denied the motion.

**LexisNexis(R) Headnotes**

**Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims**

**Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation**

[HN1] A *Fed. R. Civ. P. 12(b)(6)* motion to dismiss tests the legal sufficiency of the complaint, and should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. In passing on a motion to dismiss, the material allegations of the complaint are taken as admitted. Moreover, the complaint is to be liberally construed in favor of plaintiff. In addition, a motion to dismiss must be assessed in light of *Fed. R. Civ. P. 8*'s liberal pleading standards, which require only a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8*. Nevertheless, while *Rule 8* does not require detailed factual allegations, a plaintiff must still provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss**

[HN2] As a general rule, in the context of a motion to dismiss under *Fed. R. Civ. P. 12(b)*, the court may not consider matters outside the pleadings without converting the motion to dismiss into a motion for summary judgment. Documents a court may consider include those that are either attached to, or referenced in, the complaint.

**Contracts Law > Breach > Causes of Action > Elements of Claims**

[HN3] Under Virginia law, the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of

that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.

**Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview**

**Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > General Overview**

[HN4] The employee at-will doctrine is merely a rebuttable presumption and not a substantive rule of law. However, in Virginia a clear disclaimer in an employee manual effectively negates any other provisions or attempts to rebut the at-will presumption.

**Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements**

[HN5] In Virginia, the tort of intentional infliction of emotional distress has four elements that must be proved: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. Due to the risks inherent in torts where injury to the mind or emotions is claimed, such torts are not favored in the law of Virginia. Unlike a claim of negligence, a plaintiff alleging a claim for intentional infliction of emotional distress must allege in her motion for judgment all facts necessary to establish the cause of action in order to withstand challenge on demurrer.

**Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements**

[HN6] Liability for intolerable conduct has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Under Virginia law, when reasonable persons could view alleged conduct in this manner and the other elements of the tort are properly pleaded, the controversy must be resolved at a trial on the merits of the claim. Although termination of employment does not rise to the level of intolerable conduct.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN7] Liability for intentional infliction of emotional distress arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.

*Civil Procedure > Pleading & Practice > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN8] In the interests of efficiency for all parties, including the courts, it is best to stall the proceedings on all counts until after the court rules on the *Fed. R. Civ. P. 12(b)(6)* motion.

*Torts > Intentional Torts > Defamation > Defamation Per Se*
*Torts > Intentional Torts > Defamation > Procedure*
[HN9] In Virginia, a defamation complaint must only provide a short and plain statement of the claim that is sufficient to give the defendant fair notice of the nature of the claim and the grounds upon which it rests. *Fed. R. Civ. P. 8(a)(2)).* It is error to apply a stricter standard to a plaintiff's complaint than the ordinary standards under *Fed. R. Civ. P. 12(b)(6).* At common law, defamatory words that prejudice a person in his or her profession or trade are actionable as defamation per se. As for appropriate pleading, under Virginia law, a plaintiff seeking to recover for defamation per se

must allege a publication of false information concerning the plaintiff that tends to defame the plaintiff's reputation.

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges*
[HN10] A qualified privilege exists between co-employees and employers in the course of employment discipline and discharge matters. This doctrine of qualified privilege has been applied to cases involving defamatory statements made between co-employees and employers in the course of employee disciplinary or discharge matters. The privilege exists because an employer, or his proper representatives, should be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer" without leading to defamation charges.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN11] A court is to liberally construe a complaint on a motion to dismiss.

*Torts > Intentional Torts > Defamation > Elements > General Overview*
*Torts > Intentional Torts > Defamation > Procedure*
[HN12] Under Virginia law, details such as the time and place of the alleged communication, the name of a defendant's agent, and the names of the individuals to whom the defamatory statement was purportedly communicated can be provided in a bill of particulars if not included in a plaintiff's pleading.

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges*

*Torts > Intentional Torts > Defamation > Elements > General Overview*
[HN13] A qualified privilege may be defeated if the plaintiff proves that the defamatory statement was made maliciously. The question whether a defendant was actuated by malice, and has abused the occasion and exceeded the privilege is a question of fact for a jury rather than one for a court to determine on a motion to dismiss.

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
[HN14] In Virginia, a claim for tortious interference with a contract has four elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy, on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. In a situation when a contract is terminable at will, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference that caused the termination of the at-will contract, but also that the defendant employed improper methods.

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
[HN15] Under Virginia law, methods of interference with a contract considered improper are those means that are illegal or independently tortious, including fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship, as well as those that violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN16] A person cannot intentionally interfere with his own contract. In a situation where an employee is acting within the scope of his employment, then he is an agent of the employer such that the employer's contract is also his contract, and he cannot interfere with it.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN17] For purposes of interference with a contract, in most circumstances, the question of whether the defendants were acting within the scope of their employment is an issue that requires an evidentiary hearing. However, a court can dismiss the claim without a hearing if the party fails to allege action outside the scope of the ordinary duties of an employee in that position.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN18] *Fed. R. Civ. P. 8(d)* permits pleadings in the alternative. A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN19] In Virginia, a litigant who prosecutes a cause of action for actual fraud must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. Constructive fraud differs from actual fraud in that

the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*

[HN20] On a motion to dismiss, a court takes the material allegations of the complaint as admitted, liberally construing it in favor of plaintiffs.

**COUNSEL:** [*1] For Neil R. Harrington, John W. Kiely, Plaintiffs: Elaine C. Bredehoft, LEAD ATTORNEY, Carla Denette Brown, Christopher Anthony Costa, Charlson Bredehoft & Cohen, PC, Reston, VA.

For Sprint Nextel Corporation, Charles Roberts, Defendants: Rafael Eloy Morell, LEAD ATTORNEY, Ogletree Deakins Nash Smoak & Stewart PC, Washington, DC.

**JUDGES:** James C. Cacheris, UNITED STATES DISTRICT COURT JUDGE.

**OPINION BY:** James C. Cacheris

**OPINION**

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion to Dismiss. For the following reasons, this Motion will be denied.

**I. Background**

This case arises out of the termination of Plaintiffs Neil Harrington ("Mr. Harrington") and John Kiely ("Mr. Kiely") (collectively, the "Plaintiffs"), from the employ of Sprint/United Management Company ("Sprint") by Human Resources Manager Charles Roberts ("Mr. Roberts") (collectively, the "Defendants").

Both Plaintiffs had received commendations for outstanding job performance, with no former warnings or reprimands for misconduct. ¹ Despite these accolades, on December 18, 2005, they were terminated. Mr. Harrington was 51 at the time of the termination, and Mr. Kiely was 53. Sprint told Mr. Harrington he was fired for use of email in violation [*2] of Sprint's policies: sending a personal email in 2005. Mr. Kiely was terminated for misuse of computer equipment due to possession of inappropriate files on his company laptop, files he had never seen. Mr. Roberts and Sprint gave fabricated reasons for the hiring and lied about Sprint's policies, including allegations that Plaintiffs violated Sprint's previously unmentioned "Zero Tolerance Policy." Both Plaintiffs requested review of the termination decisions in accord with the procedures provided by Sprint's Alternative Dispute Resolution ("ADR") policy, but the relevant procedures were not followed. Plaintiffs were also accused, in front of others, of unethical behaviors, accusations which prejudiced their business relations and caused them physical and emotional distress. As a consequence of Sprint's and Mr. Robert's actions, Plaintiffs have suffered financial loss and physical harm.

> 1    "For the purposes of a motion to dismiss, the material allegations of the complaint are taken as admitted," and are therefore set forth as described by Plaintiffs. *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*.

On April 8, 2008, Plaintiffs filed an eight-count Complaint. Against Sprint alone, they [*3] alleged Breach of Contract (Counts I and II); age discrimination in violation of the Age Discrimination Employment Act ("ADEA") (Count IV); and defamation and defamation per se (Count V). Plaintiffs alleged Tortious Interference with Contractual Relations and Business Expectancy against Mr. Roberts alone (Count VI). Against both De-

fendants, Plaintiffs alleged Intentional Inflic-
tion of Emotional Distress (Count III) and Ac-
tual and Constructive Fraud (Counts VII and
VIII).

On April 30, 2008, Defendants filed a Mo-
tion to Dismiss with respect to Counts I, II, III,
V, VI, VII, and VIII of the Complaint. Plain-
tiffs filed an Opposition on May 14, 2008, and
Defendants replied on May 21, 2008. This Mo-
tion is currently before the Court.

## II. Standard of Review

[HN1] A *Rule 12(b) (6)* motion to dismiss
tests the legal sufficiency of the complaint, *see
Randall v. United States, 30 F.3d 518, 522 (4th
Cir. 1994),* and should be denied unless "it ap-
pears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which
would entitle him to relief." *De Sole v. United
States, 947 F.2d 1169, 1177 (4th Cir. 1991)*
(citations omitted); *see also Conley v. Gibson,
355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80
(1957).*

In passing **[*4]** on a motion to dismiss,
"the material allegations of the complaint are
taken as admitted." *Jenkins v. McKeithen, 395
U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404
(1969)* (citations omitted). Moreover, "the
complaint is to be liberally construed in favor
of plaintiff." *Id.* In addition, a motion to dis-
miss must be assessed in light of *Rule 8's* liber-
al pleading standards, which require only "a
short and plain statement of the claim showing
that the pleader is entitled to relief." *Fed. R.
Civ. P. 8.* Nevertheless, while *Rule 8* does not
require "detailed factual allegations," a plaintiff
must still provide "more than labels and con-
clusions, and a formulaic recitation of the ele-
ments of a cause of action will not do." *Bell
Atlantic Corp. v. Twombly,    U.S.    , 127 S.
Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)*
(citation omitted).

## III. Analysis

### A) Exhibits attached to Defendants' Memorandum

Defendants attached three exhibits to its
Memorandum in Support of Motion to Dismiss.
[HN2] "As a general rule, in the context of a
motion to dismiss under *Rule 12(b),* the court
may not consider matters outside the pleadings
without converting the motion to dismiss into a
motion for summary judgment." *Shooting
Point, L.L.C. v. Cumming, 238 F. Supp. 2d 729,
736 (E.D. Va. 2002)*(citing **[*5]** *Gay v. Wall,
761 F.2d 175, 178 (4th Cir. 1985)).* Documents
the Court may consider include those "that are
either attached to, or referenced in, the com-
plaint." *Id.* (citing *Moore v. Flagstar Bank, et
al., 6 F. Supp. 2d 496 (E.D. Va. 1997)).*

The exhibits are purported to be a copy of
the Employee Guide and alternative dispute
resolution policy referenced in the Complaint.
The third exhibit is titled "Sprint Nextel Com-
puter and Network Security Usage Policy," the
document Defendants assert is referred to in the
Complaint as Sprint's "Zero Tolerance Policy."

Plaintiffs argue that the documents in ques-
tion are Sprint's internal documents that have
not been subject to discovery. Plaintiffs assert
that the attached documents are not of unques-
tioned authenticity and should therefore not be
considered by this Court as part of the Motion
to Dismiss. In particular, Plaintiffs point out
that the Employee Guide has been amended
and is not that referred to in the Complaint.
Due to the disputed authenticity of the docu-
ments, the Court will not consider them at this
stage of the proceedings.

### B) Counts I and II: Breach of Contract

Defendants argue that Plaintiffs were
at-will employees who did not have **[*6]** any
employment contract with Defendants. Plain-
tiffs argue not that they were not at-will em-
ployees, but that the Employee Guide and the
ADR policy formed contracts regarding "provi-
sions that will govern the parties' conduct as
long as the employee is employed." Pl.'s Opp'n

to Def.'s Mot. to Dismiss at 10. [HN3] Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610 (Va. 2004)* (citations omitted). Plaintiffs argue that Defendants breached their obligation to follow the provisions in the Employee Guide by inappropriately firing Plaintiffs for allowed conduct and for failing to follow the agreed-upon procedures for dispute resolution. Defendants emphasize that Plaintiffs were at-will employees and therefore could be fired at any time for any reason, and assert that nothing in the Employee Guide changed this arrangement.

Courts applying Virginia law have "conclude[d] that [HN4] the employee at-will doctrine is merely a rebuttable presumption and [*7] not a substantive rule of law." *Thompson v. American Motor Inns, Inc., 623 F. Supp. 409, 416 (W.D. Va. 1985)* (finding that the employee handbook in question created an employment contract). However, Virginia courts have also held that "[a] clear disclaimer in an employee manual effectively negates any other provisions or attempts to rebut the at-will presumption," a disclaimer Defendant alleges is included in the Employee Guide. *Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 454 (4th Cir. 2004)* (citing *Nguyen v. CNA Corp., 44 F.3d 234, 239 (4th Cir. 1995)*) (applying Virginia law). Not only were *Walton* and *Nguyen* summary judgment decisions, but Plaintiffs also distinguish their allegations from those plaintiffs'. Rather than argue that the handbooks had replaced at-will employment, Plaintiffs Harrington and Kiely assert that the contract created by the Employee Guide and ADR policy governed the methods of termination, including a graduated disciplinary response. Pl.'s Mem. at 14-15. Plaintiffs do not dispute their at-will status. They allege that the breached contract at issue governed the parties' conduct during employment.

A Motion to Dismiss is not the appropriate setting for this [*8] Court to weigh evidence to determine whether Plaintiffs have rebutted the presumption of at-will employment or whether the alleged contract survives the disclaimer Defendant posits, is included in the Employee Guide. Therefore, Counts One and Two, for breach of contract, will not be dismissed.

## C) Count III: Intentional Infliction of Emotional Distress

[HN5] In Virginia, the tort of intentional infliction of emotional distress has four elements that must be proved: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." *Harris v. Kreutzer, 271 Va. 188, 624 S.E.2d 24, 33 (Va. 2006)* (citing *Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145, 148 (Va. 1974)*). Due to "the risks inherent in torts where injury to the mind or emotions is claimed, such torts are not favored in the law" of Virginia. *Id.* (quotations omitted). Unlike "a claim of negligence, a plaintiff alleging a claim for intentional infliction of emotional distress must allege in her motion for judgment all facts necessary to establish the cause of action in order to withstand [*9] challenge on demurrer." *Almy v. Grisham, 273 Va. 68, 639 S.E.2d 182, 187 (Va. 2007)* (citing *Harris, 624 S.E.2d at 33*; *Russo v. White, 241 Va. 23, 400 S.E.2d 160, 163, 7 Va. Law Rep. 1253 (Va. 1991)*). Defendants attack Plaintiffs' Complaint on two grounds: failing to allege outrageous and intolerable conduct, and failing to allege severe emotional distress. The Court "must consider whether [Plaintiff] alleged sufficient facts to establish each element of the tort." *Id.*

### 1) Outrageous and Intolerable Conduct

[HN6] Liability for intolerable conduct "has been found only where the conduct has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White, 241 Va. 23, 400 S.E.2d 160, 162, 7 Va. Law Rep. 1253 (Va. 1991)* (citing *Restatement (Second) of Torts § 46 comment d* (1965)); *see also Harris, 624 S.E.2d at 34*. Under Virginia law, "[w]hen reasonable persons could view alleged conduct in this manner and the other elements of the tort are properly pleaded, the controversy must be resolved at a trial on the merits of the claim." *Almy, 273 Va. 68, 639 S.E.2d 182, 187* (citations omitted).

Although termination of employment does not rise to the level **[*10]** of intolerable conduct, the allegedly outrageous conduct suffered by Plaintiffs was "of defendants engaged in a scheme orchestrated to accuse the Plaintiffs of harboring and disseminating pornography." Pl.'s Mem. at 20. The Court concludes that reasonable persons could consider the behavior alleged by Plaintiffs, if proved, to be atrocious and intolerable in a civilized community.

2) Severe Emotional Distress

[HN7] "Liability for intentional infliction of emotional distress 'arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.'" *Harris, 624 S.E.2d at 34* (quoting *Russo v. White, 400 S.E.2d at 163*). Plaintiffs have alleged that they have suffered injuries including "pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses." Compl. P 193. The Complaint alleges that Mr. Harrington "has suffered severe emotional distress, with physical manifestations," and that Mr. Kiely "suffered **[*11]** severe emotional distress, with physical manifestations, including becoming physically ill and nearly collapsing upon hear-

ing news of his shocking termination. Mr. Kiely continues to be treated under a doctor's care." Compl. PP 189, 190. Plaintiffs argue that these allegations exceed those claimed by the plaintiffs in *Russo v. White, 241 Va. 23, 400 S.E.2d 160, 7 Va. Law Rep. 1253 (Va. 1991)* and *Harris v. Kreutzer, 271 Va. 188, 624 S.E.2d 24 (Va. 2006)*, which the Virginia Supreme Court found insufficiently severe to survive a demurrer.

The *Russo* Court found the plaintiff's allegations to be conclusory, failing to claim "that she had any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." *400 S.E.2d at 163*. *Harris* similarly only alleged psychological injury. *624 S.E.2d at 34*. Considering the allegations in the light most favorable to Plaintiffs, the Court finds that their allegations of physical manifestation and lost wages are more severe than those in *Russo* and *Harris* and will therefore survive this Motion to Dismiss. Count Three of the Complaint, alleging intentional infliction of emotional distress, will not be dismissed **[*12]** for failure to state a claim on which relief can be granted.

**D) Count IV: Violation of ADEA**

Plaintiffs assert that because Defendants have not filed any responsive pleadings to Plaintiffs' Count IV, Plaintiffs are entitled to judgment by default as to liability on that count. Defendant argues that filing its Motion to Dismiss postponed its *Federal Rule of Civil Procedure 12* deadline for filing an answer as to all claims, not just those that are subject to the Motion. The Court agrees, following the lead of other courts in this Circuit. [HN8] "In the interests of efficiency for all parties, including the courts, it is best to stall the proceedings on all counts until after the court rules on the *Rule 12(b)(6)* motion." *Godlewski v. Affiliated Computer Servs., 210 F.R.D. 571, 572 (E.D. Va. 2002)*(quoting *Ricciuti v. New York City Transit Auth., 1991 WL 221110 at *2,*

*1991 U.S. Dist. LEXIS 13981 at *5 (S.D. N.Y. 1991)); see also FDIC v. Heidrick, 812 F. Supp. 586, 591 (D. Md. 1991).*

### E) Count V: Defamation

Defendants argue that Plaintiffs' defamation claim should be dismissed due to their failure to state the defamation claim with sufficient particularity. They assert that Plaintiffs "fail to state [*13] in their Complaint the exact words of the alleged defamatory statement and make only vague references" to the persons who made the statements and to the statements' audience. Def.'s Mem. at 7.

#### 1) Defamatory Statement

[HN9] Applying Virginia law, the Fourth Circuit has made it clear that "a defamation complaint must only provide a 'short and plain' statement of the claim that is sufficient to give the defendant fair notice of the nature of the claim and the grounds upon which it rests." *Southprint, Inc. v. H3, Inc., 208 Fed. Appx. 249, 254 n2 (4th Cir. 2006)* (citing *Hatfill v. N.Y. Times Co., 416 F.3d 320, 329 (4th Cir. 2005)*; *Fed. R. Civ. P. 8(a)(2)*). Indeed, the Fourth Circuit has declared it to be error to "appl[y] a stricter standard to [a plaintiff's] complaint than the ordinary standards under *Rule 12(b)(6).*" *Hatfill, 416 F.3d at 329-30.*

"At common law, defamatory words that prejudice a person in his or her profession or trade are actionable as defamation per se." *Union of Needletrades, Indus. & Textile Emples. v. Jones, 268 Va. 512, 603 S.E.2d 920, 924 (Va. 2004)* (citing *Fuste v. Riverside Healthcare Association, Inc., 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003)*). As for appropriate pleading, "[u]nder [*14] Virginia law, a plaintiff seeking to recover for defamation per se must allege a publication of false information concerning the plaintiff that tends to defame the plaintiff's reputation." *Id.* (citing *Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993)*); *see also Southprint, 208 Fed. Appx. at 254* (allegations of "'false, misleading and disparaging statements' that 'defamed' [Plaintiff] and damaged its reputation in the industry . . . [are] sufficient to state a defamation per se claim under the liberal, federal rules of pleading").

The Complaint alleges that Defendant Sprint, through its employees, "made false and defamatory statements to numerous employees and to third parties, stating that Mr. Harrington and Mr. Kiely had been terminated as a result of their violation of Sprint's 'Zero Tolerance Policy' regarding personal use of company equipment," statements which "were patently and demonstrably false." Compl. P 216. These statements "assert that Mr. Harrington and Mr. Kiely were unfit to perform the duties of their employment and that they lacked integrity," with an effect that "was prejudicial to Mr. Harrington and Mr. Kiely in their reputation and work." Compl. [*15] P 220. The Court finds that Plaintiffs have sufficiently alleged statements of false information tending to damage their reputation in the industry.

#### 2) Publication to Non-Privileged Third Parties

[HN10] A qualified privilege exists between co-employees and employers in the course of employment discipline and discharge matters. This doctrine of "qualified privilege" has been applied to "cases involving defamatory statements made between co-employees and employers in the course of employee disciplinary or discharge matters." *Larimore v. Blaylock, 259 Va. 568, 528 S.E.2d 119, 121 (Va. 2000)* (citations omitted). The privilege exists because "an employer, or his proper representatives, [should] be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer" without leading to defamation charges. *Id.* (quoting *Chesapeake Ferry Co. v. Hudgins, 155 Va. 874, 156 S.E. 429, 441 (Va. 1931)*).

Defendants argue that Plaintiff fail to identify any non-employee third party to whom the defamatory statements were made. In the Complaint, Plaintiffs allege that the defamatory statements were made "to [*16] numerous employees and third parties." Compl. P 216. Although the third parties are not specifically identified, [HN11] the Court is to liberally construe the Complaint on a motion to dismiss. The reasonable inference from the Complaint is that these persons were not employees, such that the qualified privilege would not apply. Failure to specifically identify the third parties is not fatal to Plaintiffs' claim. [HN12] Under Virginia law, "details such as the time and place of the alleged communication, the name of a defendant's agent, and the names of the individuals to whom the defamatory statement was purportedly communicated can be provided in a bill of particulars if not included in a plaintiff's pleading." *Fuste, 575 S.E.2d at 862.*

In addition, [HN13] the qualified privilege "may be defeated if the plaintiff proves that the defamatory statement was made maliciously." *Larimore, 528 S.E.2d at 121* (citing *Chalkley v. Atlantic Coast Line R.R. Co., 150 Va. 301, 306, 143 S.E. 631, 632 (1928)).* Plaintiffs have pled that Sprint was motivated by "spite, ill-will, negligence and malice." Compl. P 222. "[T]he question whether a defendant was actuated by malice, and has abused the occasion and exceeded the privilege [*17] is a question of fact for a jury" rather than one for the Court to determine on a Motion to Dismiss. *Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 135, 575 S.E.2d 858 (Va. 2003)*(quoting *Alexandria Gazette Corp. v. West, 198 Va. 154, 160, 93 S.E.2d 274, 279-80 (1956))*(internal quotations omitted).

Plaintiffs have sufficiently stated a claim for defamation. Count Five will not be dismissed on this Motion.

**F) Count VI: Tortious Interference with Contractual Relations and Business Expectancy**

[HN14] In Virginia, a claim for tortious interference with a contract has four elements: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy, on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97, 102 (Va. 1985)* (citing *Calbom v. Knudtzon, 65 Wash. 2d 157, 162-63, 396 P.2d 148, 151 (1964)).* In a situation "when a contract is terminable at will, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove [*18] not only an intentional interference that caused the termination of the at-will contract, but also that the defendant employed 'improper methods.'" *Duggin v. Adams, 234 Va. 221, 360 S.E.2d 832, 836, 4 Va. Law Rep. 820 (Va. 1987)* (citing *Hechler Chevrolet v. General Motors Corp., 230 Va. 396, 337 S.E.2d 744, 748 (Va. 1985)*; *Restatement (Second) of Torts § 766 comment g (1979)).*

Defendants argue that Plaintiffs have not presented a prima facie case for tortious interference involving an at-will employment contract "because they cannot establish that Charles Roberts employed any methods that were independently tortious or otherwise improper." Def.'s Mem. at 15. [HN15] Under Virginia law, "[m]ethods of interference considered improper are those means that are illegal or independently tortious," including "fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship," as well as those that "violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods." *Duggin, 360 S.E.2d at 836-37* (citations omitted). Plaintiffs allege that Mr. Roberts [*19] acted improperly "by lying about Sprint's policies, requiring

Mr. Harrington to sign a statement acknowledging his violation of a fabricated policy, and by accusing Mr. Kiely of having personal files on his computer he had never seen before." Compl. P 239. Although these are not overt breaches of statute, they do fit into the broad category of improper methods under Virginia law.

[HN16] "A person cannot intentionally interfere with his own contract." *Fox v. Deese, 234 Va. 412, 362 S.E.2d 699, 707, 4 Va. Law Rep. 1248 (Va. 1987)* (citing *Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97, 102 (Va. 1985)*. In a situation where an employee was "acting within the scope of his employment, then he was an agent of the [employer]" such that "the [employer]'s contract was also his contract, and he could not interfere with it." *Id.* Defendants argue that Mr. Roberts was acting as Sprint's agent when performing the alleged wrongful conduct, and, as such, could not interfere with any contractual relation or business expectancy between Plaintiffs and Sprint, but Plaintiffs allege that Mr. Roberts' allegedly fraudulent actions were outside the scope of his employment. Compl. P 240. [2] [HN17] In most circumstances, the question of "whether the defendants were acting **[*20]** within the scope of their employment is an issue that requires an evidentiary hearing." *Fox, 362 S.E.2d at 708.* However, the Court can dismiss the claim without a hearing if the party fails to allege action outside the scope of the ordinary duties of an employee in that position. *Calkins v. Pacel Corp., 2007 U.S. Dist. LEXIS 57380, *4, 2007 WL 2301626, *2. (W.D. Va. 2007).* Because Plaintiffs allege action outside the scope of an ordinary Human Resources Manager's duties, the Court believes further discovery is appropriate on this question and will not dismiss Count VI.

2   In the context of Count III, Plaintiffs allege that Mr. Harris committed the same conduct "while in the course and scope of his employment, and these acts

arose out of the execution of his duties." Compl. P 184. Although Mr. Harris could not perform the same acts both at the behest of and also against the will of his employer, [HN18] *Federal Rule of Civil Procedure 8(d)* permits pleadings in the alternative: "A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." *Id.*

## G) Counts VII and VIII: Actual and Constructive Fraud

[HN19] In Virginia,   **[*21]** "a litigant who prosecutes a cause of action for actual fraud must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Prospect Dev. Co. v. Bershader, 258 Va. 75, 515 S.E.2d 291, 296 (Va. 1999)* (citing *Bryant v. Peckinpaugh, 241 Va. 172, 400 S.E.2d 201, 203, 7 Va. Law Rep. 1424 (1991); Winn v. Aleda Constr. Co., 227 Va. 304, 315 S.E.2d 193, 195 (1984))*. "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it." *Evaluation Research Corp. v. Alequin, 247 Va. 143, 439 S.E.2d 387, 390, 10 Va. Law Rep. 779 (Va. 1994)* (citing *Nationwide Mut. Ins. Co. v. Hargraves, 242 Va. 88, 405 S.E.2d 848, 851, 7 Va. Law Rep. 2858 (1991); Kitchen v. Throckmorton, 223 Va. 164, 286 S.E.2d 673, 676 (1982))*.

Defendants do not assert that Plaintiffs fail to properly allege fraud, but instead assert a defense to the claims. [HN20] On a motion to dismiss, the Court takes the material allegations of the complaint as admitted, liberally construing it in favor of Plaintiffs. *Jenkins, 395 U.S. at 421.* The Court   **[*22]** will not consider the merits of any factual dispute at this stage of the

proceedings, and will therefore deny Defendants motion to dismiss as to counts 7 and 8.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss will be denied.

An appropriate Order will issue.

May 29, 2008

Alexandria, Virginia

/s/

James C. Cacheris

UNITED STATES DISTRICT COURT JUDGE

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

(1) Defendants' Motion to Dismiss is DENIED;

(2) Defendants are ORDERED to file an Answer to Plaintiff's Complaint within ten (10) days;

(3) the Clerk of the Court shall forward copies of this Order and the accompanying Memorandum Opinion to all counsel of record.

May 29, 2008

Alexandria, Virginia

/s/

James C. Cacheris

UNITED STATES DISTRICT COURT JUDGE





Positive
As of: Oct 12, 2011

**SIGNATURE FLIGHT SUPPORT CORPORATION, Plaintiff, v. LANDOW AVIATION LIMITED PARTNERSHIP, Defendant.**

**1:08cv955 (JCC)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

*2009 U.S. Dist. LEXIS 1938*

**January 13, 2009, Decided
January 13, 2009, Filed**

**SUBSEQUENT HISTORY:** Injunction denied by *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship, 2009 U.S. Dist. LEXIS 2541 (E.D. Va., Jan. 14, 2009)*

**PRIOR HISTORY:** *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship, 2009 U.S. Dist. LEXIS 1937 (E.D. Va., Jan. 13, 2009)*

**COUNSEL:** [*1] For Signature Flight Support Corporation, a Delaware corporation, Plaintiff: Louis Edward Dolan, Jr., LEAD ATTORNEY, Nixon Peabody LLP, Washington, DC.

For Landow Aviation Limited Partnership, a Virginia limited partnership, Defendant: John Daniel Victor Ferman, LEAD ATTORNEY, Drinker, Biddle & Reath LLP, Washington, DC.

For Landow Aviation Limited Partnership, a Virginia limited partnership, Counter Claimant: John Daniel Victor Ferman, LEAD ATTORNEY, Drinker, Biddle & Reath LLP, Washington, DC.

For Signature Flight Support Corporation, a Delaware corporation, Counter Defendant: Louis Edward Dolan, Jr., LEAD ATTORNEY, Nixon Peabody LLP, Washington, DC.

**JUDGES:** James C. Cacheris, UNITED STATES DISTRICT COURT JUDGE.

**OPINION BY:** James C. Cacheris

**OPINION**

**MEMORANDUM OPINION**

2009 U.S. Dist. LEXIS 1938, *

This matter is before the Court on Defendant Landow Aviation Limited Partnership's (Defendant's) Motion to Dismiss Count III of Signature Flight Support Corp.'s (Plaintiff's) Amended Complaint. For the following reasons, the Court will deny the motion.

## I. Background

The facts as alleged in the Amended Complaint are as follows. Plaintiff is a Fixed Base Operator (FO) operating numerous FBOs at airports throughout the United States, including Washington [*2] Dulles International Airport (Dulles). FBOs are airport service centers that offer aircraft handling, fuel, parking, maintenance, de-icing, ground services, baggage handling, crew rooms, passenger lounges, and related services to the general aviation and charter aviation industries, i.e., the non-commercial aviation industries.

Plaintiff entered into a concession contract with the Metropolitan Washington Airports Authority (MWAA) in 1997 (Concession Contract), which set forth the terms and conditions under which Plaintiff operates an FO at Dulles. There are two FBOs licensed to operate at Dulles: Plaintiff and Landmark Aviation (Landmark). The Concession Contract also awarded Plaintiff an option on an undeveloped parcel of land at Dulles contiguous to its FO. In 2004, Plaintiff exercised this option and entered into a supplemental agreement (Supplemental Agreement) setting forth Plaintiff's rights in that parcel. At that time, it also entered into a Ground Sublease Agreement (GSA). In the GSA, Plaintiff "passed through" some of its rights and obligations under the Concession Contract and Supplemental Agreement to Defendant.

Under the GSA, Defendant is authorized by both Plaintiff and [*3] the MWAA to operate the Dulles Jet Center (Center), a corporate hangar facility adjacent to Plaintiff's FO facilities, but not to act as an FO. The GSA gives Plaintiff the exclusive right to provide fuel to Defendant's clients, to direct and service all arriving transient aircraft, and to direct "overflow" transient traffic to Defendant, if necessary.

Since the opening of the Center in 2006, Defendant has improperly expanded the scope of the services that it provides, invading the business that Plaintiff and the MWAA have reserved to Plaintiff. Defendant is soliciting transient aircraft, servicing approximately 6 transient aircraft per day, and holding itself out as an FO. Defendant has not shared any of its fees from these activities with Plaintiff.

On September 15, 2008, Plaintiff filed a complaint alleging five counts (Complaint): Count I for declaratory judgment, Count II for breach of contract, Count III for intentional interference with contract, Count IV for an accounting and disgorgement, and Count V, for permanent injunctive relief. On October 17, 2008, Defendant filed a Motion to Dismiss Count III. The Court granted this motion on November 17.

On December 2, 2008, Plaintiff [*4] filed an amended complaint restating Counts I, II, IV, and V, and bringing Count III for intentional interference with prospective business or economic advantage. Defendant moved to dismiss Count III on December 22, 2008. Plaintiff opposed that motion on January 6, 2008. This matter is currently before the Court.

## II. Standard of Review

A *Rule 12(b)(6)* motion to dismiss tests the legal sufficiency of the complaint, *see Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994)*. In passing on a motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)* (citations omitted). Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.* In addition, a motion to dismiss must be assessed in light of *Rule 8*'s liber-

al pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8.* Nevertheless, while *Rule 8* does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)* **[*5]** (citation omitted).

### III. Analysis

In Count III of the Amended Complaint, Plaintiff alleges that "[b]ut for Landow's improper and wrongful conduct, Signature has a reasonable certainty that it would have realized its full business expectancy from . . . [servicing] transient aircraft" at Dulles. Am. Compl. at 91 90. The alleged improper and wrongful conduct includes "a campaign of false, deceptive and misleading statements designed to divert transient aircraft" from Plaintiff to Defendant. *Id.* at 91 82.

To state a claim for intentional interference with a business expectancy, a plaintiff must allege:

> (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued the relationship or realized the expectancy; and (4) damage to plaintiff.

*Smithfield Ham & Prods. Co. v. Portion Pac, Inc. 905 F. Supp. 346, 349 (E.D. Va. 1995)* (citations omitted). In addition, when alleging a mere business expectancy, "the plaintiff must

show that the defendant's actions were improper." *Id.* (citing **[*6]** *Duggin v. Adams, 234 Va. 221, 360 S.E.2d 832, 836, 4 Va. Law Rep. 820 (Va. 1987); Hechler Chevrolet, Inc. v. Gen. Motors Corp., 230 Va. 396, 337 S.E.2d 744, 748 (Va. 1985)).*

Methods that have been recognized as "improper" include (1) "means that are illegal or independently tortious," (2) "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship," (3) means that "violate an established standard of a trade or profession," (4) "[s]harp dealing, overreaching, unfair competition," or "other competitive conduct below the behavior of fair men similarly situated." *Duggin v. Adams, 360 S.E.2d at 836-37* (internal quotations and citations omitted) (collecting cases).

First, Plaintiff alleges that it "has a reasonable business expectancy" that it will provide standard and supplemental services, for a fee, to "all transient aircraft on Signature's premises at Dulles . . . based, in part, on the terms of the Concession Contract, the Supplemental Agreement and the GSA." Am. Compl. at PP 74-77. Plaintiff also alleges that it "has been, and is currently, engaged in ongoing business **[*7]** relationships with many transient aircraft utilizing Dulles." *Id.* at P 80. The Court finds that these allegations are sufficient to allege the first element of a claim for intentional interference with a business expectancy: a business relationship or expectancy with a probability of future economic benefit to plaintiff.

Defendant argues that Plaintiff's allegations are not sufficiently specific because Plaintiff does not identify exactly which aircraft it would service and what fees it would receive for its services. Nor, according to Defendant, can Plaintiff prove that any specific aircraft would rely on its FO services over those of Landmark, the other FO at Dulles. These ar-

guments have no merit. *Rule 8* only requires Plaintiff to provide "a short and plain statement," "not H detailed factual allegations." *Fed. R. Civ. P. 8.* Further, a valid business expectancy is still merely an expectancy. It need not be absolutely guaranteed. *See, e.g. Buffalo Wings Factory, Inc. v. Mohd, 2007 U.S. Dist. LEXIS 91324, at *25 (E.D. Va. Dec. 12, 2007); Masco Contractor Servs. E., Inc. v. Beals, 279 F. Supp. 2d 699, 710 (E.D. Va. 2003).* Plaintiff has satisfied this element by alleging an identifiable **[*8]** business expectancy in the provision of FO services to transient aircraft at Dulles under the Concession Contract, Supplemental Agreement, and GSA.

Second, Plaintiff alleges that "Landow was and is aware of each of these business expectancies." Am. Compl. at PP 78-79. Plaintiff also provides a number of detailed facts supporting this allegation. *Id.* at P 78. The Court finds that these allegations are more than sufficient to allege the second element of Plaintiff's claim: Defendant's knowledge of the relationship or expectancy.

Plaintiff next alleges that Defendant engaged in "a campaign of false, deceptive and misleading statements" with the intent to harm Signature's reputation and its relationships with current and future customers. *Id.* at PP 82-84, 87. Plaintiff further states that "some or many of the aircraft that have used and continue to use the Dulles Jet Center would not have done so but for Landow's communications and its otherwise improper conduct." *Id.* at P 90. Plaintiff identifies 176 aircraft that were Plaintiff's customers, but have also used Defendant's services at least once. *Id.* at 9191 79, 89, Ex. 11. The Court finds that these allegations are sufficient to allege **[*9]** the third element of this claim: Defendant's intentional misconduct and a reasonable certainty that Plaintiff would have realized its business expectancy absent that conduct.

Defendant argues that these allegations are insufficient because they only allege a possibil-

ity that Plaintiff would realize its expectancy, not a probability. Def.'s Mem. in Supp. at 11-12 (citing *Rescue Phone, Inc. v. Enforcement Tech. Group, Inc., No. 2:07cv58, 2007 U.S. Dist. LEXIS 49401, at *17 (E.D. Va. July 9, 2007)*). It also submits that Plaintiff must allege that its expected customers were "loyal and repeat" customers in order to show this probability. Def.'s Mem. in Supp. at 12. As noted above, however, a valid business expectancy is still merely an expectancy. It need not be absolutely guaranteed. *See, e.g. Buffalo Wings, 2007 U.S. Dist. LEXIS 91324, at *25; Masco, 279 F. Supp. 2d at 710.* Plaintiff has sufficiently alleged that at least some of its 176 specifically-identified former customers have been lured away by Defendant's conduct.

Finally, Defendant argues that, as one of two FBOs at Dulles, Plaintiff is unable to establish with reasonable certainty that any aircraft would use Plaintiff's FO services **[*10]** over those of Landmark. Plaintiff has pled that it is one of two licensed FBOs at Dulles and identified nearly two hundred planes (by tail number) that have used both it and the Center for FO services. The Court finds that these statements are sufficient to allege a reasonable certainty that Plaintiff would have continued to provide FO services to at least some of these aircraft, all of which had patronized it previously. The cases cited by Defendant do not contradict this finding. *See Rescue Phone, Inc., 2007 U.S. Dist. LEXIS 49401, at *17; Buffalo Wings, 2007 U.S. Dist. LEXIS 91324, at *25; Masco, 279 F. Supp. 2d at 710.* The Amended Complaint successfully pleads the existence of a business expectancy that Plaintiff would have realized had Defendant not made false and misleading statements regarding its FO services.

Plaintiff further alleges that "[a]t least 176 transient aircraft that were at one time customers of Signature have utilized the Dulles Jet Center on at least one occasion since Dulles Jet Center opened, thereby harming and damaging

Signature." Am. Compl. at 91 89; *see also id.* at P 81. The Court finds that this allegation is sufficient to allege the fourth element of Plaintiff's **[*11]** claim: damage to Plaintiff.

Fifth, Plaintiff alleges that "[s]ince the opening of Dulles Jet Center in 2006, Landow has engaged in a campaign of false, deceptive and misleading statements designed to divert transient aircraft from Signature[]." *Id.* at 91 82; *see also id.* at PP 83-86. Plaintiff alleges that Defendant communicated these statements "to MWAA and other parties, including transient aircraft operators utilizing Signature's premises at Dulles." *Id.* at 87. The Court finds that this allegation is sufficient to allege the final element of Plaintiff's claim: improper actions by Defendant.

Defendant asserts that its alleged actions do not qualify as "improper" because Plaintiff fails to allege every element of the separate torts of unfair competition or fraud. While Defendant may be correct that Plaintiff did not allege these independent torts, a plaintiff need not allege a separate and complete tort to state a claim for tortious interference. *Restatement (Second) of Torts § 767 cmt. c* (1979) ("One may be subject to liability for intentional interference even when his fraudulent representation is not of such a character as to subject him to liability for other torts."); *see also Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.,* 254 Va. 408, 493 S.E.2d 375, 378 (Va. 1997), **[*12]** rev'd in part on other grounds, 259 Va. 92, 524 S.E.2d 420 (Va. 2000).

Defendant's argument also ignores the myriad of actions that can constitute "improper conduct" for an intentional interference with business expectancy claim. *See Duggin,* 360 S.E.2d at 836-37 (collecting cases). The basis of Count III is Plaintiff's allegation that Defendant made false, deceptive, and misleading statements to others with the intent to divert Plaintiff's repeat business to itself. Am. Compl. at P 82. The Court finds that these types of statements constitute improper conduct be-

cause, as alleged, they fall under the rubric of "misrepresentation or deceit," "[s]harp dealing, overreaching," or "other competitive conduct 'below the behavior of fair men similarly situated.'" *See Duggin,* 360 S.E.2d at 836-37.

Defendant's final argument is that Count III fails to state a claim for which relief can be granted because Plaintiff does not identify a distinct common law duty by Defendant to refrain from servicing transient aircraft at Dulles. Defendant bases this argument on the Court's November 17, 2008 ruling [23] dismissing Plaintiff's claim for tortious interference with contract because Plaintiff only alleged losses suffered **[*13]** as a result of Defendant's alleged breach of contract.

As the Court noted in that opinion, Virginia courts "have acknowledged that a party can, in certain circumstances, show both a breach of contract and a tortious breach of duty." *17th Street Assoc's, LLP v. Markel Int'l Ins. Co. Ltd.,* 373 F. Supp. 2d 584, 599 (E.D. Va. 2005) (citing *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.,* 256 Va. 553, 507 S.E.2d 344, 347 (Va. 1998), *Foreign Mission Bd. v. Wade,* 242 Va. 234, 409 S.E.2d 144, 148, 8 Va. Law Rep. 1000 (Va. 1991)). This recognition is limited, however, by the requirement that the tortiously breached duty "must be a common law duty, not one existing between the parties solely by virtue of the contract." *Id.* (citations omitted).

Defendant, however, does not address the fact that Plaintiff has made a new allegation that forms the basis of Count III. Plaintiff's original claim, for intentional interference with contract, was based on the allegation that Defendant "improperly and illegally expanded the scope of its services [under the GSA]. . . invading the business MWAA and Signature reserved for Signature [by the Concession Contract]." Compl. at PP 28, 33. In the Amended Complaint, however, Plaintiff alleges tortious interference **[*14]** with a business expectancy based on the allegation that Defendant made "false, deceptive and misleading statements de-

signed to divert transient aircraft" from using Plaintiff's FO services to using Defendant's. Am. Compl. at P 82.

Plaintiff also alleges that "Landow owes Signature a common law duty to refrain from making false, misleading and deceptive statements regarding Signature's business to Transient aircraft, MWAA and other third parties." *Id.* at P 91. Thus, Plaintiff's claim no longer relies merely on Defendant's contractual obligations. Instead, Plaintiff pleads a common law duty not to make false and misleading statements to a competitor's customers. Such a duty can exist. *See, e.g., Rescue Phone, 2007 U.S. Dist. LEXIS 49401, at *17* (allowing this claim to proceed on allegations that Defendants made "statements to customers . . . that Rescue Phone does not have the right to sell its products in violation of ETGI's patent"). For these reasons,

the Court finds that Plaintiff has properly pled the existence of a duty separate from those assumed through the Supplemental Agreement and the GSA that Defendant owes to Plaintiff.

## IV. Conclusion

For these reasons, the Court will deny [*15] Defendant's motion.

An appropriate Order will issue.

January 13, 2009

Alexandria, Virginia

/s/

James C. Cacheris

UNITED STATES DISTRICT COURT JUDGE





Analysis
As of: Oct 08, 2011

**WILLIAM VERRINDER, Plaintiff, v. RITE AID CORPORATION, Defendant.**

**CIVIL ACTION NO. 3:06-CV-00024**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA, CHARLOTTESVILLE DIVISION**

*2006 U.S. Dist. LEXIS 53385*

**August 2, 2006, Decided**
**August 2, 2006, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Summary judgment denied by *Verrinder v. Rite Aid Corp., 2007 U.S. Dist. LEXIS 90931 (W.D. Va., Dec. 11, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant former employer alleging defamation and defamation per se. Pursuant to *Fed. R. Civ. P. 12(b)(6)*, the employer moved to dismiss the complaint for failure to state a claim upon which relief could be granted. The employee contested the motion.

**OVERVIEW:** While working as a pharmacist, the employee complained to a human resources manager about coworkers, and in so doing, he discussed the condition of a pharmacy patient, whom he described as "this guy." Based on this conversation, the manager and a pharmacy manager sent the employee a notice that he violated the Health Insurance Portability and Accountability Act (HIPAA). The notice also stated a coworker had complained about another exchange when the employee allegedly referred to a another coworker's prescription as "happy pills." The court dismissed the defamation claim. The statements that the employee violated HIPAA and disclosed confidential patient information did not make him appear odious, offensive, or ridiculous. However, the court declined to dismiss the defamation per se claim. These statements prejudiced the employee in his profession as a pharmacist by impugning his ability to maintain the confidentiality of medical information. While publication of the statements to all of the employer's workers, except the two managers, were enti-

tled to a qualified privilege, the employee sufficiently alleged malice to defeat the privilege for the purposes of a motion to dismiss.

**OUTCOME:** The court granted the motion to dismiss as to the employee's defamation claim, but denied the motion to dismiss as to the defamation per se claim.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN1] A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* tests the legal sufficiency of a complaint and does not resolve contests concerning the facts, the merits of claims, or the applicability of defenses. Such motions should be granted only in very limited circumstances, and a complaint will survive as long as it sets out sufficient facts for the court to infer that each element of a cause of action is present. In considering a *Rule 12(b)(6)* motion, a complaint is to be construed in the light most favorable to plaintiff and a court is to assume its factual allegations to be true. A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim.

*Torts > Intentional Torts > Defamation > Elements > General Overview*
[HN2] The elements of defamation under Virginia law are: (1) a publication about plaintiff; (2) an actionable statement; and (3) the requisite intent. To be actionable, a statement must be both false and defamatory. A defamatory statement must be more than unpleasant or offensive, but must make plaintiff appear odious, infamous, or ridiculous.

*Torts > Intentional Torts > Defamation > Defamation Per Se*
[HN3] A statement may be defamatory per se, however, where it prejudices a person in his business or trade, and specifically where it relates to the skills or character needed in that occupation. A statement is also defamatory per se if it imputes to the plaintiff the commission of an offense involving moral turpitude for which he may be indicted and punished; an infection with a contagious disease which would exclude him from society; or unfitness to perform the duties of an office or employment for profit, or want of integrity in the performance of those duties. An offense involving moral turpitude may be one which imputes the commission of a crime punishable by imprisonment, as well as one regarded by public opinion as involving moral turpitude.

*Torts > Intentional Torts > Defamation > General Overview*
[HN4] Allegedly defamatory words are taken in their plain and natural meaning and that meaning cannot be extended by innuendo beyond its ordinary and common acceptation.

*Torts > Intentional Torts > Defamation > Elements > General Overview*
[HN5] Publication is an essential element of defamation and requires the uttering of slanderous words to some third party so as to be heard and understood by that third party.

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges*
[HN6] Statements made within a corporate entity or between co-employees and employers regarding employee discipline or discharge may be protected under a qualified privilege where the hearers had some duty or interest in

the action. Where the hearer had no duty or interest in the communication, the statement is not protected by the privilege.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges***
[HN7] Clear and convincing evidence of malice, however, can defeat a qualified privilege. At an early stage in the proceedings, only a sufficient allegation of malice is necessary. Although conclusory statements of malice are insufficient to overcome a claim of qualified immunity, a plaintiff can survive a motion to dismiss by alleging facts showing some greater pattern of animus by defendant.

**COUNSEL:**  [*1]  William Verrinder, Plaintiff, Pro se, Raleigh, NC US.

For Rite Aid Corporation, Defendant: Beth A. Moeller, Daniel E. Turner, ASH, RAFUSE & HILL, LLP, ATLANTA, GA US; Charles Peter Groppe, MORGAN, LEWIS & BOCKIUS, LLP, WASHINGTON, DC US; Joyce Elaine Taber, Washington, DC; Wilson F. Vellines, Jr., VELLINES COBBS GOODWIN & GLASS, STAUNTON, VA.

**JUDGES:**  Norman K. Moon, U.S. District Judge.

**OPINION BY:** Norman K. Moon

**OPINION**

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court on the motion of Defendant Rite Aid Corporation ("Rite Aid") to dismiss Plaintiff's Amended Complaint, filed on June 8, 2006. ¹ For the following reasons, this motion shall be granted in part and denied in part.

1   Also before the Court is the Defendant's motion to dismiss Plaintiff's original complaint. The arguments in that motion were incorporated by reference into Defendant's motion to dismiss the amended complaint, and therefore the Court will refer only to the motion to dismiss the amended complaint.

**I**

Plaintiff [*2]   William Verrinder ("Verrinder") filed suit on May 1, 2006 against Rite Aid alleging defamation and defamation per se. He subsequently amended his complaint on May 20, 2006, stating further allegations of defamation and defamation per se. According to the Amended Complaint, Verrinder worked as a pharmacist at a Rite Aid in Staunton, Virginia. During his tenure there, he complained about other employees to Linda Hall, a human resources manager for Rite Aid, and in so doing, discussed with her the condition of a pharmacy patient, whom he described only as "this guy." Hall and Mark Owens, a pharmacy development manager, later sent Plaintiff a written notice stating that he had violated the Health Insurance Portability and Accountability Act ("HIPAA") through this conversation. The notice also stated another employee had complained about Verrinder because of an exchange that may have been overheard by other associates and customers where he referred to the employee's prescription as "happy pills." All of Verrinder's sixteen counts of defamation and defamation per se spring from the publication to other Rite Aid officers and employees of either this HIPAA violation notice or the statement [*3]  "Bill violated HIPAA."

Rite Aid now moves to dismiss, arguing that the statement at issue is not defamatory, that it is not defamatory per se, that it was not published for purposes of Virginia law, and that it is protected by a qualified privilege.

## II

[HN1] A motion to dismiss under *Rule 12(b)(6)* tests the legal sufficiency of a complaint and does not resolve contests concerning the facts, the merits of claims, or the applicability of defenses. *See Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994)*. Such motions "should be granted only in very limited circumstances," *Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989)*, and a complaint will survive as long as it sets out sufficient facts for the court to infer that each element of a cause of action is present. *See Wolman v. Tose, 467 F.2d 29, 33 (4th Cir. 1972)*. In considering a *Rule 12(b)(6)* motion, the complaint is to be construed in the light most favorable to the plaintiff and the court is to assume its factual allegations to be true. *See Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*; *Martin Marietta v. Int'l Tel. Satellite, 991 F.2d 94, 97 (4th Cir. 1992)*. [*4] "A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 328 (4th Cir. 1996) (en banc)*.

[HN2] The elements of defamation under Virginia law are: (1) a publication about the plaintiff; (2) an actionable statement; and (3) the requisite intent. *Ramey v. Kingsport Publishing Corp., 905 F. Supp. 355, 358 (W.D. Va. 1995)*; *Chapin v. Greve, 787 F. Supp. 557, 562 (E.D. Va. 1992)*. To be actionable, a statement must be both false and defamatory. *Id.* A defamatory statement must be more than unpleasant or offensive, but must make the plaintiff appear odious, infamous, or ridiculous. *Id.* [HN3] A statement may be defamatory per se, however, where it prejudices a person in his business or trade, and specifically where it relates to the skills or character needed in that occupation. *Swengler v. ITT Corp. Elec-tro-Optical Prods. Div., 993 F.2d 1063, 1070-71 (4th Cir. 1993) (citing Fleming v. Moore, 221 Va. 884, 275 S.E.2d 632 (1981))*. [*5] A statement is also defamatory per se if it imputes to the plaintiff the commission of an offense involving moral turpitude for which he may be indicted and punished; an infection with a contagious disease which would exclude him from society; or unfitness to perform the duties of an office or employment for profit, or want of integrity in the performance of those duties. *Great Coastal Express v. Ellington, 230 Va. 142, 146-47, 334 S.E.2d 846 (1985)*. An offense involving moral turpitude may be one which imputes the commission of a crime punishable by imprisonment, *Schnupp v. Smith, 249 Va. 353, 360, 457 S.E.2d 42 (1995)*, as well as one regarded by public opinion as involving moral turpitude. *Great Coastal Express, 230 Va. at 147*.

Rite Aid argues that neither the notice of HIPAA violation nor the statement "Bill violated HIPAA" is defamatory. It is well accepted that [HN4] allegedly defamatory words are taken in their plain and natural meaning, and that meaning cannot be extended by innuendo beyond its ordinary and common acceptation. *Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 7-8, 82 S.E.2d 588 (1954)*. Here, the statement that "Bill violated HIPAA" does not make [*6] the plaintiff appear odious, offensive, or ridiculous. Assuming that the hearer would understand this to mean that Plaintiff disclosed confidential medical information without authorization, the statement does not rise to the level of offensiveness needed to qualify as defamatory in Virginia. Similarly, the statements in the notice of HIPAA violation, while they do not show Plaintiff in the most favorable light, are not so grave or offensive as to rise to the level of infamy. Hence, Plaintiff's claim for defamation must be dismissed because the statements at issue are not defamatory.

Rite Aid argues that Plaintiff's claims for defamation per se must also be dismissed. Specifically, Defendant argues that a violation of HIPAA is not a crime of moral turpitude or a crime punishable by imprisonment, nor does such a violation impute that Plaintiff is unfit to perform the duties of employment or prejudice him in his profession. The parties have spent significant energy arguing whether a violation of HIPAA is in fact a crime punishable by imprisonment. The Court need not reach this argument in order to find that Plaintiff's allegations are sufficient to state a claim for defamation per se. [*7] The statements that "Bill violated HIPAA" and that he disclosed confidential patient information prejudice him in his profession as a pharmacist by impugning his ability to maintain the confidentiality of medical information. Discretion is an important trait in any medical professional, and a claim that a pharmacist has violated HIPAA or disclosed patient information is to some degree comparable with a claim that an attorney has acted unethically or a doctor has made improper advances toward his patients. *See Fleming v. Moore, 221 Va. 884, 890, 275 S.E.2d 632 (1981).* All of these claims, which might be merely insulting to a layperson, become actionable when applied to certain professionals because they bear directly on how the individuals at issue will be seen in the performance of their jobs. Hence, the Court holds that the statements that Plaintiff violated HIPAA or disclosed patient information prejudice him in his profession and are thus defamatory per se.

Rite Aid further argues that even if the statements at issue are actionable, they were not published. [HN5] Publication is an essential element of defamation and requires the uttering of slanderous words to some third party so as [*8] to be heard and understood by that third party. *Thalhimer Bros. v. Shaw, 156 Va. 863, 159 S.E. 87 (1931).* In arguing this point, Rite Aid relies *Cobb v. Rector and Visitors of the University of Virginia, 84 F. Supp. 2d 740, 750 (W.D. Va. 2000),* in which this Court held that no publication occurs under Virginia law when a defamatory statement is communicated only between persons within a corporate entity who have a duty and interest in the subject matter.

Some months after *Cobb* was decided, however, the Virginia Supreme Court clarified the law on this issue. In *Larimore v. Blaylock,* the court rejected the defendant's arguments that statements "published only to persons within a corporate entity having a duty and interest in the subject matter of the communication, have not been 'published' for defamation purposes." *259 Va. 568, 573, 528 S.E.2d 119 (2000).* The defendants there had sought to argue, as the defendant in this case does, that they were protected by a form of intra-corporate immunity because all of the defamatory statements they had made remained within the corporate entity for which they worked. *See id.* The Virginia Supreme Court rejected this [*9] argument, noting that under these circumstances, the defendants were merely entitled to a qualified privilege. *Id. at 573-74. Larimore* did not overrule *Chalkley v. Atlantic Coast Line R. Co., 150 Va. 301, 143 S.E. 631 (1928),* or *Montgomery Ward & Co. v. Nance, 165 Va. 363, 182 S.E. 264 (1935),* the cases on which *Cobb* relied. Rather, the Virginia Supreme Court examined these cases and determined:

> The thrust of these cases is that employment matters are occasions of privilege in which the absence of malice is presumed. . . . We find nothing in these cases to suggest, as the defendants contend, that all transmissions of defamatory statements between members of the corporate entity are entitled to absolute immunity. Furthermore, no case subsequently decided by this Court has resolved defamation claims involving employees of a corporate entity by utilizing the concept of absolute immunity suggested by the defendants.

*Id.* at 574-75. In addition, the court also held that this privilege is lost if the plaintiff proves the defamatory statements were made maliciously. *See id.* at 575-76; *Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 134, 575 S.E.2d 858 (2003).* **[*10]** Hence, it is clear in the wake of *Larimore* that the effect of communications within a corporate entity is subject to a qualified privilege analysis, and therefore Defendant's argument as to publication fails, as the issue is subsumed within the qualified privilege question.

As noted above,[HN6] statements made within a corporate entity or between co-employees and employers regarding employee discipline or discharge may be protected under a qualified privilege where the hearers had some duty or interest in the action. *Larimore v. Blaylock, 259 Va. 568, 572, 528 S.E.2d 119 (2000); Montgomery Ward Co. v. Nance, 165 Va. 363, 378-80, 182 S.E. 264 (1935).* Where the hearer had no duty or interest in the communication, the statement is not protected by the privilege. *Id.* Here, Verrinder argues that the notice of HIPAA violation and the statement that he violated HIPAA were published to numerous Rite Aid officers. Of those officers, however, he only claims that two-- Chris Watson and Brandi Greenawalt-- had no duty or interest in the information. The Amended Complaint discloses that all the other recipients of the information had some interest in it. Hence, the publication of the statements **[*11]** to all of the Rite Aid employees except Watson and Greenawalt are entitled to a qualified privilege. [2]

---

2   Defendant also argues that Watson and Greenawalt had an interest in Plaintiff's discipline. On a motion to dismiss, the Court must accept as true the factual allegations made in the complaint. Defendant's arguments raise questions of fact which are not appropriate at this

stage in the proceedings and which will likely require some discovery to resolve.

[HN7] Clear and convincing evidence of malice, however, can defeat the qualified privilege. *See Larimore, 259 Va. at 575-76; Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 134, 575 S.E.2d 858 (2003). Accord Montgomery Ward Co. v. Nance, 165 Va. 363, 380-82, 182 S.E. 264 (1935).* At this early stage in the proceedings, only a sufficient allegation of malice is necessary. *See Wuchenich v. Shenandoah Mem. Hosp., 215 F.3d 1324, **16 (4th Cir. 2000) (unpublished)* (holding that the defendant's claim of immunity under a statute protecting **[*12]** reports to the State Board of Medicine did not protect the defendant "at the early dismissal stage of litigation because the complaint clearly alleges that [defendant] engaged in defamatory conduct in bad faith and with malicious intent.") Although conclusory statements of malice are insufficient to overcome a claim of qualified immunity, a plaintiff can survive a motion to dismiss by alleging facts showing some greater pattern of animus by the defendant. *See Echtenkamp v. Loudon County Pub. Schools, 263 F. Supp. 2d 1043, 1062 (E.D. Va. 2003)* (holding that the plaintiff properly pleaded malice when his complaint alleged facts indicating a larger pattern of retaliation against the plaintiff); *Conley v. Town of Elkton, No. 5:04cv00030, 2005 U.S. Dist. LEXIS 2602, at *34 (W.D. Va. Feb. 22, 2005)* (holding that the allegations in the plaintiff's complaint sufficiently alleged malice where it described the defendant's various attempts to discredit the plaintiff and asserted that the defendant made a statement out of hatred or a desire to injure the plaintiff.)

In this case, the Plaintiff sufficiently alleges malice to overcome a motion to dismiss. The **[*13]** parties have spent some effort arguing what degree of malice must be shown, and whether the intermediate level known as *New York Times* malice suffices. This question is academic because the Amended Complaint

states a sufficient basis for the existence of common-law malice. Specifically, the Amended Complaint alleges that Hall and Owens acted out of spite, ill-will, and a desire for revenge against Plaintiff because he had reported Hall to her supervisor and to the Equal Employment Opportunity Commission. He alleges that he suffered racial and sexual harassment while working at Rite Aid and when he reported it, Hall retaliated against him and threatened and insulted him. Plaintiff's complaint further alleges in detail some of the exchanges between Plaintiff and Hall and Owens. *See* Amended Complaint, at PP 55-63, 77, 78, 81, 112, 114. The Amended Complaint pleads facts showing a pattern of animus against Plaintiff by Hall and Owens, and thus makes a sufficient showing of malice to overcome a motion to dismiss based on qualified immunity. Of course, at this early stage of the case the Court must accept as true all factual allegations, and the ultimate burden will remain on Plaintiff **[*14]** to prove malice by clear and convincing evidence.

In sum, Plaintiff has sufficiently alleged defamation per se, and that either the statements made by Hall and Owens were not protected by the qualified privilege or that they acted with sufficient malice to overcome the privilege. Plaintiff, however, has failed to show that the statements made him appear odious, infamous, or ridiculous, and therefore Count 1 of the Amended Complaint must be dismissed. This case will proceed only on Plaintiff's defamation per se claims. Defendant's motion to

dismiss is therefore granted in part and denied in part.

An appropriate order shall issue this day.

Norman K. Moon

U.S. District Judge

August 2, 2006

Date

ORDER

JUDGE NORMAN K. MOON

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ADJUDGED and ORDERED**

that Defendant's motion to dismiss Plaintiff's Amended Complaint is granted in part and denied in part. Count One of Plaintiff's Amended Complaint is hereby DISMISSED; however, Plaintiff may proceed on his claims for defamation per se.

It is so ORDERED.

The Clerk is hereby directed to send a copy of this Order and accompanying Memorandum Opinion **[*15]** to Plaintiff and to all counsel of record.

Norman K. Moon

U.S. District Judge

August 2, 2006

Date



Analysis
As of: Oct 09, 2011

JOHN D. WUCHENICH, M.D., Plaintiff-Appellant, v. SHENAN-DOAH MEMORIAL HOSPITAL; ROBERT KARMY, M.D.; DAVID CIOCHETTY, M.D.; GEORGE PHILLIPS, M.D., Defend-ants-Appellees.

No. 99-1273

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*2000 U.S. App. LEXIS 11557; 2000-1 Trade Cas. (CCH) P72,913*

January 28, 2000, Argued
May 22, 2000, Decided

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 19461.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. James H. Michael, Jr., Senior District Judge. (CA-98-41-5).

**DISPOSITION:** AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff appealed an order of the United States District Court for the Western District of Virginia, which dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* his complaint against defendants, hospital and related individuals, alleging defendants were responsible for the lack of patient volume in plaintiff's anesthesiology practice and the revocation of his medical staff privileges.

**OVERVIEW:** Plaintiff, doctor, appealed a district court order which dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* his complaint alleging numerous causes of action under Virginia law against defendants, hospital and related individuals, in connection with the lack of patient

2000 U.S. App. LEXIS 11557, *; 2000-1 Trade Cas. (CCH) P72,913

volume in plaintiff's anesthesiology practice and the hospital's revocation of his medical staff privileges. The court affirmed in part, vacated in part, and remanded the district court's dismissal of the doctor's various claims. In vacating the district court's dismissal, the court held that the complaint sufficiently alleged that the hospital owed the doctor the legal obligation to follow its bylaws, the hospital breached that obligation, and the doctor suffered damages as a result. Thus, the district court erred by dismissing the doctor's breach of contract claim alleging breach of the hospital's bylaws. However, the court affirmed the district court's dismissal of the doctor's tortious interference claims pertaining to the hospital's bylaws.

**OUTCOME:** Judgment affirmed in part, dismissing plaintiff, doctor's, tortious interference claims; vacated the dismissal of the doctor's breach of contract claim and remanded on finding defendant, hospital owed the doctor a legal obligation to follow its bylaws, the hospital breached that obligation, and the doctor suffered damages as a result.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN1] On appeal from a *Fed. R. Civ. P. 12(b)(6)* dismissal, an appellate court must accept all of the factual allegations contained in the complaint as true and draw all reasonable factual inferences therefrom in plaintiff's favor.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN2] *Fed. R. Civ. P. 12(b)(6)* provides for dismissal of a complaint for failure to state a claim upon which relief can be granted. The

purpose of a *Rule 12(b)(6)* motion is to test the sufficiency of a complaint; importantly, a *Rule 12(b)(6)* motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Rather, a *Rule 12(b)(6)* motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. For purposes of a *Rule 12(b)(6)* motion, courts are not required to accept as true the legal conclusions set forth in a plaintiff's complaint.

*Contracts Law > Breach > Causes of Action > General Overview*
*Contracts Law > Remedies > Compensatory Damages > Consequential Damages*
[HN3] Under Virginia law, the essential elements of a cause of action for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Evidence > Documentary Evidence > Parol Evidence*
[HN4] Under Virginia law, if the terms of the parties' agreement are contained in a clear explicit writing, that writing is the sole memorial of the contract and the sole evidence of the agreement. In that event, parol evidence could not be used to explain the written contractual terms. Conversely, the rule excluding parol evidence has no application where the writing on its face is ambiguous, vague, or indefinite. In such a case, the proper construction of the contract is an issue for the trier of fact, and the

court should receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them.

*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
[HN5] The language of a written contract is ambiguous if it is reasonably susceptible to more than one interpretation or makes reference to two or more things at the same time. The question of whether a writing is ambiguous is one of law, not of fact.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
*Contracts Law > Types of Contracts > Oral Agreements*
*Evidence > Documentary Evidence > Parol Evidence*
[HN6] Under Virginia law, the parol evidence rule is not applicable if either the partial integration doctrine or the collateral contract doctrine is applicable. Under the partial integration doctrine where the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties. Under the collateral contract doctrine, parol evidence is admissible to establish a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing.

*Contracts Law > Contract Modifications > Oral Modifications*
*Contracts Law > Types of Contracts > Guaranty Contracts*
*Contracts Law > Types of Contracts > Oral Agreements*

[HN7] Virginia case law requires a mutual intention to modify an existing contract.

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN8] See *Va. Code Ann. § 18.2-499 to 500* (Michie 1996).

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Scope of Authority*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Unlawful Acts of Agents > Intentional & Willful Injuries*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General Overview*
[HN9] *Va. Code Ann. § 18.2-499 to 500* (Michie 1996) does not require proof that a conspirator's primary and overriding purpose is to injure another in his reputation, business, trade or profession. Instead, only legal malice is required, i.e., proof that the defendant acted intentionally, purposely, and without lawful justification. Furthermore, the two or more persons requirement is not satisfied by proof that a principal conspired with one of its agents acting within the scope of his agency. Under such a circumstance, a conspiracy is a legal impossibility because a principal and an agent are not separate persons for purposes of the conspiracy statute.

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN10] Virginia does not recognize an exception to the general rule that a principal cannot conspire with one of its agents to form a conspiracy, a rule sometimes referred to as the intracorporate immunity rule.

*Contracts Law > Breach > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Governments > Courts > Common Law*
[HN11] Virginia common law recognizes a cause of action against those who conspire to induce the breach of a contract, even when one of the alleged conspirators is a party to the contract. The foundation of an action alleging common law conspiracy is the damage caused by the acts committed in furtherance of the conspiracy.

*Torts > Intentional Torts > Defamation > Elements > General Overview*
[HN12] A plaintiff asserting a defamation claim in Virginia state court is required to plead the exact words that the plaintiff alleges are defamatory in order to survive a motion to dismiss.

*Torts > Intentional Torts > Defamation > General Overview*
[HN13] In general, defamation consists of the publication of an injurious falsehood.

*Torts > Intentional Torts > Defamation > General Overview*
[HN14] Unlike other jurisdictions, Virginia makes no distinction between slander (spoken words) and libel (written words) in actions for common law defamation.

*Torts > Intentional Torts > Defamation > Defamation Per Se*
[HN15] Virginia recognizes two general varieties of defamation: (1) words that are defamatory per se; and (2) all other defamatory words which, though not in themselves actionable, occasion a person special damage. Words that are defamatory per se are words that: (1) impute the commission of a criminal offense involving moral turpitude; (2) impute infection of a contagious disease, where if true, would exclude the plaintiff from society; (3) impute unfitness to perform the offices or duties of employment, or lack of integrity in the discharge of those duties; or, (4) prejudice a person in his or her profession or trade. Furthermore, the author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Intentional Torts > Defamation > Defenses > Statutes of Limitations*
[HN16] Effective July 1, 1995, a cause of action for defamation under Virginia law has been governed by a one-year statute of limitation prescribed by *Va. Code Ann. § 8.01-247.1. Va. Code Ann. § 8.01-247.1* (Michie 1999 Supp.). A cause of action for defamation accrues for statute of limitation purposes on the date the defamatory acts allegedly occurred.

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
*Torts > Business Torts > Commercial Interference > Prospective Advantage*
[HN17] Under Virginia law, a cause of action for tortious interference by a third party with a contract that is not terminable at will, is comprised of the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to

the party whose relationship or expectancy has been disrupted. If the contract at issue is terminable at will, the plaintiff must also allege and prove that the defendant interfered with the contract by employing improper methods.

***Torts > Business Torts > Commercial Interference > Contracts > Elements***

***Torts > Business Torts > Commercial Interference > Prospective Advantage***

[HN18] Under Virginia law, a cause of action for tortious interference with a contractual or business expectancy is comprised of the following elements: (1) the existence of a contractual or business expectancy, (2) knowledge on the part of the third-party of the expectancy; (3) intentional interference with the expectancy; (4) the third-party's use of improper methods to interfere with the expectancy; and (5) damage to the party making the claim proximately resulting from the third-party's conduct.

**COUNSEL:** ARGUED: Edward B. Lowry, MICHIE, HAMLETT, LOWRY, RASMUSSEN & TWEEL, P.C., Charlottesville, Virginia, for Appellant.

Gregory Thomas St. Ours, WHARTON, ALDHIZER & WEAVER, P.L.C., Harrisonburg, Virginia, for Appellees.

ON BRIEF: Robert A. Kantas, MICHIE, HAMLETT, LOWRY, RASMUSSEN & TWEEL, P.C., Charlottesville, Virginia, for Appellant.

Marshall H. Ross, WHARTON, ALDHIZER & WEAVER, P.L.C., Harrisonburg, Virginia, for Appellees Hospital and Karmy; C.J. Steuart Thomas, III, Randall T. Perdue, TIMBERLAKE, SMITH, THOMAS & MOSES, P.C., Staunton, Virginia, for Appellee Ciochetty; William D. Cremins, Jennifer E. Cremins, CREMINS & ASSOCIATES, P.C., Fairfax, Virginia, for Appellee Phillips.

**JUDGES:** Before NIEMEYER, Circuit Judge, HAMILTON, Senior Circuit Judge, and Frederic N. SMALKIN, United States **[*2]** District Judge for the District of Maryland, sitting by designation.

**OPINION**

PER CURIAM:

Pursuant to *Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6))*, the district court dismissed the complaint of Dr. John Wuchenich, M.D. (Dr. Wuchenich), a professionally licensed anesthesiologist, alleging numerous causes of action under Virginia law, premised upon diversity jurisdiction, against Shenandoah Memorial Hospital (SMH) and/or three fellow physicians in connection with the lack of patient volume in his anesthesiology practice and SMH's revocation of his medical staff privileges. Dr. Wuchenich appeals the district court's dismissal of his complaint. For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings.

I

[HN1] Because this case is before us on appeal from a *Rule 12(b)(6)* dismissal, we must accept all of the factual allegations contained in Dr. Wuchenich's complaint as true and draw all reasonable factual inferences therefrom in his favor. *See Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)*. In light of this mandate, the facts for purposes of this appeal are as follows.

In April 1995, SMH, located in **[*3]** Woodstock, Virginia, recruited Dr. Wuchenich as an anesthesiologist to provide services to its patients. At that time, Dr. Wuchenich was practicing anesthesiology in his well-established private medical practice in California. In August 1995, Dr. Wuchenich and SMH entered into a written twelve-month agreement (the Physician Guarantee Agreement or the Agreement), which guaranteed Dr. Wuchenich an

income of $ 15,000 per month for the first four months after he obtained medical staff privileges at SMH. The Physician Guarantee Agreement also called for Dr. Wuchenich to repay any monies received from the income guarantee over the ensuing eight-month period to the extent he earned an income over $ 15,000 a month. Dr. Wuchenich alleges that SMH induced him to sign the Physician Guarantee Agreement by orally assuring him that it would be hiring more surgeons, updating its equipment, and making other changes that would ensure his success in establishing an anesthesiology practice at SMH.

Of relevance to the issues on appeal, Article I of the Physician Guarantee Agreement provided as follows:

[Dr. Wuchenich], in consideration of the covenants and agreements made by [SMH] contained [*4] herein, covenants and agrees to practice medicine in the specialty of *Anesthesia* at [SMH] and upon the effective date hereof to immediately apply, become upon commencement of this medical practice at [SMH] and remain continuously during the term of this Agreement, a member of [SMH's] Active Medical Staff as defined in its Medical Staff Bylaws subject, however, to said Bylaws.

(J.A. 34-35). Also of relevance to the issues on appeal, Article XVII of the Physician Guarantee Agreement contained the following merger clause:

This writing constitutes the entire agreement between [Dr. Wuchenich] and [SMH]. No oral or written prior or contemporaneous agreements shall have any force or effect, nor shall any subsequent agreements have any force or af-

fect [sic], unless signed and embodied in writing.

(J.A. 41).

By its terms, the Physician Guarantee Agreement was not terminable at will. Specifically, Article IV provided for an effective duration of twelve months from the date Dr. Wuchenich began practice in Woodstock, Virginia, unless earlier terminated as provided in the Agreement. For example, Article VIII provided that the Agreement would terminate if [*5] Dr. Wuchenich became mentally ill in the opinion of a panel of three independent health practitioners so that he became unable to carry on the practice of anesthesiology for a period of three months.

In accord with the terms of the Physician Guarantee Agreement, upon the effective date of that Agreement, Dr. Wuchenich immediately applied for medical staff privileges at SMH. SMH in turn granted him medical staff privileges.

After setting up his practice in Woodstock, Dr. Wuchenich did not receive a warm reception from several of the physicians who practiced at SMH. For example, Dr. George Phillips (Dr. Phillips), the only other physician practicing anesthesiology at SMH prior to Dr. David Ciochetty (Dr. Ciochetty) arriving to fill the position of Chief of Anesthesiology in the early spring of 1996, engaged in several actions in an effort to quell competition from Dr. Wuchenich. First, although Dr. Wuchenich postponed two surgeries for medical reasons on patients of Dr. Baumunk, an orthopedic surgeon, Dr. Phillips falsely told Dr. Baumunk that the postponements were unnecessary, and that Dr. Wuchenich "was not a very good anesthesiologist." (J.A. 13). Thereafter, Dr. Baumunk refused [*6] to use Dr. Wuchenich's services for a period of three months. Second, in his capacity as senior anesthesiologist at SMH, Dr. Phillips instigated the implementation of a new

policy causing all operating room cases to be assigned to anesthesiologists according to surgeon request. He then asked all surgeons to request him for their anesthesia needs, indicating to them that Dr. Wuchenich was less than competent. Third, prior to the time the surgeon request policy was in place, Dr. Phillips, in his capacity as senior anesthesiologist assigned the vast majority of cases to himself and to Certified Registered Nurse Anesthetists (CRNA) performing services under his supervision, for which he was compensated.

Another example of hostility encountered by Dr. Wuchenich at SMH related to SMH's appointment of a Chief of Anesthesiology. Prior to Dr. Ciochetty's appointment to the position of Chief of Anesthesiology, CRNA Clark held the position. After CRNA Clark resigned, Dr. Wuchenich inquired regarding the availability of the position of Chief of Anesthesiology at SMH and requested a job description. SMH refused to provide him with a job description and shortly thereafter told him in a letter [*7] dated January 17, 1996, that it intended to continue to fill the position with a CRNA. SMH then approved a thirty-day appointment of CRNA Hubbard pending completion of her application. CRNA Hubbard is the wife of Dr. C. Hubbard, an orthopedic surgeon who practiced at SMH. By hiring CRNA Hubbard in this fashion, SMH facilitated and participated in a plan to allow Dr. Phillips to maintain control of two operating rooms thereby ensuring that Dr. Wuchenich would not succeed financially.

Approximately six weeks later, in March 1996, without consulting Dr. Wuchenich or Dr. Phillips, SMH circulated a memorandum announcing that it had contracted with Dr. Ciochetty to become Chief of Anesthesiology. SMH did not ask for Dr. Wuchenich's opinion regarding what effect the hiring of a third anesthesiologist would have on his ability to earn a living, nor did SMH pay any attention to the fact that there was an insufficient number of anesthesiology patients to support the practices of two or more anesthesiologists and several CRNAs.

Upon his appointment as Chief of Anesthesiology, Dr. Ciochetty stated that he would be assigning all anesthesia cases. Concerned about the effect a third anesthesiologist [*8] would have on his practice, Dr. Wuchenich asked Dr. Ciochetty how he planned to deal with the apparent lack of work to support three anesthesiologists and expressed his concern that there was insufficient work for two anesthesiologists. Dr. Ciochetty responded that Dr. Wuchenich would not need to work full time and that whatever SMH had promised him was "'old news'" because he (Dr. Ciochetty) was in charge, and SMH had hired him to do things his way. (J.A. 15). In his capacity as Chief of Anesthesiology, acting for his own independent benefit and acting in conspiracy with SMH, Dr. Ciochetty picked up where Dr. Phillips left off, assigning the vast majority of cases to himself and the CRNAs whom he was paid to supervise.

On or about March 20, 1996, Dr. Phillips and Linda Aleska, the Co-Chief Operating Officer of SMH, had a conversation during which Linda Aleska stated that "they would have to get rid of Dr. Wuchenich because he won't work with us." (J.A. 15) (internal quotation marks omitted). On or about April 15, 1996, SMH unexpectedly forced Dr. Phillips to resign his medical staff privileges at SMH.

After Dr. Phillips resigned, SMH, in consultation with Dr. Ciochetty, once again [*9] began recruiting another anesthesiologist, despite the fact that Dr. Wuchenich had voiced his concerns over the lack of sufficient cases for two, let alone three, anesthesiologists. As part of SMH's recruiting efforts, in May 1996, Dr. Ciochetty sent a note to Jim Greer stating that he (Dr. Ciochetty) would need a partner for his pain clinic, even though Dr. Ciochetty had not discussed personnel needs with Dr. Wuchenich. [1] In sending this letter, Dr. Ciochetty

acted in his capacity as Chief of Anesthesiology, for his own economic benefit, as well as in conspiracy with SMH to injure Dr. Wuchenich.

1   The complaint does not allege any facts describing the identity of Jim Greer.

In addition to Dr. Phillips and Dr. Ciochetty's hostile actions towards Dr. Wuchenich, Dr. Wuchenich was subjected to hostile conduct by Dr. Robert Karmy (Dr. Karmy). At the same time SMH engaged in efforts to recruit Dr. Wuchenich, and after Dr. Wuchenich accepted SMH's offer, SMH engaged in efforts to recruit Dr. Wuchenich's sister, [*10] Dr. Nanette Wuchenich. Dr. Nanette Wuchenich maintained a successful medical practice in obstetrics and gynecology (OB/GYN) in California. As an experienced, practicing OB/GYN physician, Dr. Nanette Wuchenich posed a financial threat to Dr. Karmy, who at the time was the only OB/GYN physician on staff at SMH, and in the City of Woodstock. As a result of this financial threat, Dr. Karmy had an openly hostile attitude toward Dr. Wuchenich in hopes of scaring off Dr. Wuchenich's sister from accepting medical staff privileges at SMH. Out of the dozens of cases performed by Dr. Karmy during Dr. Wuchenich's time at SMH, Dr. Wuchenich was only assigned four of them and none at the request of Dr. Karmy. Dr. Karmy falsely reported to Dr. Ciochetty, the Chief of Anesthesiology at SMH, that Dr. Wuchenich possibly committed malpractice with respect to two cases. These two cases ultimately came before the Peer Review Committee for evaluation of Dr. Wuchenich's professional performance.

On or about May 28, 1996, at a regularly scheduled Peer Review Committee meeting, four cases in which Dr. Wuchenich was involved, including the two instigated by Dr. Karmy, were reviewed. None of the patients involved [*11] in the four cases suffered any adverse consequences as a result of the care provided by Dr. Wuchenich. Nor did the Peer Review Committee obtain an opinion from an anesthesiologist with respect to the actions of Dr. Wuchenich in the four cases. Furthermore, the Peer Review Committee did not give Dr. Wuchenich an opportunity to respond to any allegations made against him. In spite of these facts and the fact that the actions of Dr. Wuchenich were within the relevant standard of care for anesthesiologists in each of the four cases, the Peer Review Committee recommended to the Executive Committee of SMH that Dr. Wuchenich's privileges to practice at SMH be revoked.

Dr. Wuchenich then received a letter dated May 31, 1996 (the Suspension Letter), which stated, *inter alia*:

Based upon the results of the Peer Review, the Executive Committee of the General Medical Staff has recommended that your privileges be suspended at Shenandoah Memorial Hospital. Based upon this recommendation and the fact that the allegations pertain to matters that could endanger the safety and well-being of patients, the acting Chief Executive Officers have directed that you be removed from On Call status [*12] until further notice. This action is deemed necessary based upon the results of the Peer Review and the facts surrounding the cases that were submitted for review.

(J.A. 49). SMH then promptly reported Dr. Wuchenich's suspension to the State Board of Medical Examiners. SMH knew the State Board of Medical Examiners would in turn report the suspension to the National Practitioner's Data Bank, which would operate as a bar to Dr. Wuchenich obtaining medical staff privileges at any other hospital in the United States.

On September 12, 1996, SMH held a hearing to review Dr. Wuchenich's suspension. SMH appointed attorney Paul Neal as the hearing officer. Paul Neal also serves as legal counsel to SMH. Paul Neal along with six members of SMH's medical staff not previously mentioned constituted the hearing committee (the Hearing Committee). The Hearing Committee heard opinions from anesthesiologists relating to Dr. Wuchenich's four cases. None stated they believed suspension of Dr. Wuchenich's medical staff privileges was appropriate. Indeed, the only two outside expert anesthesiologists to testify were brought by Dr. Wuchenich. These two experts testified without contradiction that [*13] Dr. Wuchenich did not depart from the appropriate standard of care for anesthesiologists with respect to the four cases at issue.

On September 24, 1996, the Hearing Committee issued its report. In its report, the Hearing Committee recommended that Dr. Wuchenich's medical staff privileges be reinstated, but that he undergo proctoring, education, and training as follows: (1) "Observation by Staff Anesthesiologist of not less than five inductions including at least two obstetric inductions"; (2) "In service training in the troubleshooting and repair of the specific pieces of anesthesia equipment in use at SMH"; and (3) "In service training as to the location of anesthesia related equipment and resuscitation equipment in the Operating Room at SMH." (J.A. 20). The Hearing Committee forwarded its report to SMH's Medical Staff Executive Committee, which in turn recommended to the Board of Directors of SMH that: (1) Dr. Wuchenich's medical staff privileges be reinstated; (2) prior to engaging in further work at SMH, Dr. Wuchenich should be observed by a Director of Anesthesiology at a health care facility on not less than twenty-five inductions, including at least five obstetric inductions; [*14] (3) prior to engaging in further work at SMH, Dr. Wuchenich should participate in an in service training program on the trouble shooting and repair of four particular pieces of anesthesia equipment; and (4) prior to performing further independent work at SMH, Dr. Wuchenich should undergo in service training with regard to the specific location of anesthesia-related equipment and resuscitation equipment in the operating room at SMH. Subsequently, on December 6, 1996, the Executive Committee offered to lift the suspension of Dr. Wuchenich's medical staff privileges if Dr. Wuchenich would submit his immediate resignation from the SMH Associate General Medical Staff.

On December 12, 1996, Dr. Wuchenich met with the Board of Appeals Committee who inquired regarding the circumstances of the cases in question. Then on January 28, 1997, SMH offered to reinstate Dr. Wuchenich's medical staff privileges without conditions in exchange for Dr. Wuchenich agreeing in writing to waive any claims against SMH, its employees, directors, or agents. Dr. Wuchenich refused; yet, on April 16, 1997, nearly one year after SMH suspended Dr. Wuchenich's medical staff privileges, SMH's Board of Director's passed [*15] a resolution voiding the suspension of Dr. Wuchenich.

On or about May 2, 1997, SMH purported to send information regarding the voided suspension to the National Practitioner's Data Bank but failed to properly address the envelope causing it to be returned and causing further delays in clearing Dr. Wuchenich's name. Subsequently, SMH sent the information to the correct address, but sent an improperly completed form. Therefore, the National Practitioner's Data Bank returned the form to SMH for proper completion. Finally, on or about June 10, 1997, the National Practitioner's Data Bank removed all mention of Dr. Wuchenich's suspension from its records, approximately one year after SMH suspended his medical staff privileges.

On May 21, 1998, following a detailed investigation, a hearing was conducted by the Informal Conference Committee of the Com-

2000 U.S. App. LEXIS 11557, *; 2000-1 Trade Cas. (CCH) P72,913

monwealth of Virginia Board of Medicine to determine if the allegations against Dr. Wuchenich with respect to the four cases at issue were supported by evidence. After thoroughly reviewing the record, which included the transcript of the hearing before the Hearing Committee, the Informal Conference Committee voted to dismiss all charges against [*16] Dr. Wuchenich and instructed its staff to note on the notice of action that Dr. Wuchenich was completely exonerated of all wrongdoing.

The following sections of SMH's bylaws setting forth the procedures SMH should follow when considering the suspension of a physician's medical staff privileges are at issue in this case: SMH Bylaws §§ 6.1(a), (c)-(e) and 6.2(a). SMH Bylaws § 6.1(a) states that once a case alleging professional misconduct has been reviewed by the Peer Review Committee, the Peer Review Committee should refer it to the Informal Review Committee in accordance with SMH Bylaws § 6.1(c). SMH Bylaws § 6.1(c) provides that "before curtailment or suspension of clinical privileges is implemented, the Executive Committee shall immediately appoint an ad hoc committee for a preliminary review of the matter (the Informal Review Committee)." (J.A. 17) (internal quotation marks omitted). SMH Bylaws § 6.1(d) provides, *inter alia*, that prior to the Informal Review Committee making its report and recommendations for corrective action to the Executive Committee, "the practitioner against whom corrective action has been requested shall have an opportunity for an interview with the [*17] [Informal] Review Committee. At such interview, he/she shall be informed of the general nature of the charges against him/her, and shall be invited to discuss, explain or refute them." (J.A. 17) (internal quotation marks omitted). SMH Bylaws § 6.1(e) provides that upon receipt of a report and recommendation of the Informal Review Committee requesting reduction or suspension of clinical privileges, SMH's "President/CEO shall notify the affected practitioner that he/she shall be permitted to make an appearance before the Executive Committee prior to its taking action on such request." (J.A. 17-18) (internal quotation marks omitted). SMH Bylaws § 6.2(a) provides that a "Summary Suspension," *i.e.*, suspension of medical staff privileges without following the procedures required in SMH Bylaws § 6.1, "may only be imposed whenever action must be taken immediately, to protect the life of any patient or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, employee, or other person present in SMH." (J.A. 18-19) (internal quotation marks omitted).

According to Dr. Wuchenich's complaint, SMH did not suspend Dr. Wuchenich's medical [*18] staff privileges pursuant to SMH Bylaws § 6.2(a). Therefore, under SMH's Bylaws, SMH was required to comply with the procedures set forth in SMH Bylaws § 6.1 in suspending Dr. Wuchenich's medical staff privileges. [2] SMH failed to comply with several of the procedures. First, SMH failed to appoint an Informal Review Committee prior to suspending Dr. Wuchenich's medical staff privileges as required by SMH Bylaws § 6.1(c). Second, SMH failed to allow Dr. Wuchenich the opportunity for an interview with the Informal Review Committee prior to suspending his medical staff privileges as required by SMH Bylaws § 6.1(d). Third, neither of SMH's Co-Chief Executive Officers notified Dr. Wuchenich that he was permitted to make an appearance before the Executive Committee prior to the Executive Committee suspending his medical staff privileges as required by SMH Bylaws § 6.1(e).

2   We note that SMH argues in its brief and asserted at oral argument that liberally construing the factual allegations of Dr. Wuchenich's complaint reveals that it suspended Dr. Wuchenich's medical staff privileges pursuant to SMH Bylaws § 6.2(a). SMH Bylaws § 6.2(a) allows for the summary suspension of a physician's

medical staff privileges (*i.e.*, suspension without prior notice to the physician or an opportunity to be heard) "whenever action must be taken immediately, to protect the life of any patient or to reduce the substantial likelihood of immediate injury or damage to health or safety of any patient." (J.A. 19). In support of its assertion, SMH relies upon the following language found in its May 31, 1996 letter to Dr. Wuchenich, which is attached as Exhibit G to the complaint: "Based upon the results of the Peer Review, the Executive Committee of the General Medical Staff has recommended that your privileges be suspended at Shenandoah Memorial Hospital. Based upon this recommendation and the fact that the allegations pertain to matters *that could endanger the safety and well-being of patients*, the acting Chief Executive Officers have directed that you be removed from On Call status until further notice." (J.A. 49) (emphasis added). Liberally viewing this language in the light most favorable to Dr. Wuchenich reveals that SMH did not necessarily suspend Dr. Wuchenich's medical staff privileges pursuant to SMH Bylaws § 6.2(a). The language in SMH's letter is simply not as definitive as that required by SMH Bylaws § 6.2(a).

[*19]  On June 1, 1998, Dr. Wuchenich filed a six-count complaint in the United States District Court for the Western District of Virginia based upon diversity jurisdiction. *See 28 U.S.C. § 1332.* The complaint asserts claims alleging breach of contract by SMH; negligent breach of contract by SMH; statutory conspiracy to injure a person in his reputation, business or profession against SMH, Dr. Karmy, Dr. Ciochetty, and Dr. Phillips (collectively the Defendants); common law conspiracy to breach a contract against the Defendants; defamation against SMH, Dr. Karmy, and Dr. Phillips; and tortious interference with an existing contract

and business expectancies against the Defendants. The complaint alleged that as a result of the actions complained about, Dr. Wuchenich suffered $ 1,121,000 in economic damages and $ 500,000 in damages for emotional distress and loss of reputation. His complaint also sought punitive damages.

The Defendants timely filed *Rule 12(b)(6)* motions to dismiss. A magistrate judge considered the motions and reported and recommended dismissal of the claims alleging breach of contract, negligent breach of contract, and common law conspiracy to [*20] breach a contract. However, the magistrate judge recommended refusing dismissal with respect to the claims alleging statutory conspiracy to injure a person in his reputation, business, trade or profession and tortious interference with an existing contract and business expectancies. With respect to the claim alleging defamation, the magistrate judge granted Dr. Wuchenich ten days to supplement and amend his complaint to state the precise words of the alleged defamation, but Dr. Wuchenich elected not to do so.

On January 29, 1999, in a memorandum opinion, the district court adopted the magistrate judge's report and recommendations with respect to the claims alleging breach of contract, negligent breach of contract, and common law conspiracy to breach a contract. The district court, however, declined to adopt the magistrate judge's recommendations with respect to the claims alleging statutory conspiracy to injure a person in his reputation, business, trade or profession and tortious interference with an existing contract and business expectancies. Thus, the district court dismissed those claims as well. The district court also dismissed the claim alleging defamation. Thus, the district [*21] court dismissed all counts of Dr. Wuchenich's complaint pursuant to *Rule 12(b)(6)*.

On February 12, 1999, Dr. Wuchenich made a motion for reconsideration, which the district court denied on March 24, 1999. This timely appeal followed. On appeal, Dr. Wu-

chenich challenges the district court's dismissal of all of his claims.

## II

Dr. Wuchenich first contends the district court erred in granting the Defendants' *Rule 12(b)(6)* motion with respect to his breach of contract claim. In that claim, Dr. Wuchenich alleges, *inter alia*: (1) SMH violated SMH Bylaws § 6.1(c) by failing to appoint an Informal Review Committee prior to suspending his medical staff privileges; (2) SMH violated SMH Bylaws § 6.1(d) by failing to allow him the opportunity for an interview with the Informal Review Committee to discuss, explain or refute the allegations against him prior to suspending his medical staff privileges; and (3) SMH violated SMH Bylaws § 6.1(e) when neither of SMH's Co-Chief Executive Officers notified Dr. Wuchenich that he was permitted to make an appearance before the Executive Committee prior to the Executive Committee suspending his medical staff privileges. In a somewhat different vein, **[*22]** Dr. Wuchenich alleges that SMH breached its oral assurances made *before and after* the execution of the Physician Guarantee Agreement that it would assign him an adequate number of patients to assure his ability to establish his practice within the Woodstock, Virginia area.

We agree with Dr. Wuchenich that he has stated a breach of contract claim against SMH with respect to SMH's Bylaws. However, we disagree with Dr. Wuchenich that he has stated a claim for breach of SMH's alleged oral assurances.

[HN2] *Rule 12(b)(6)* provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. The purpose of a *Rule 12(b)(6)* motion is to test the sufficiency of a complaint; "importantly, [a *Rule 12(b)(6)* motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin, 980 F.2d 943, 952*

*(4th Cir. 1992)*. Rather, a *Rule 12(b)(6)* motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears **[*23]** certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. *See id.* For purposes of a *Rule 12(b)(6)* motion, we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint. *See District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085 (4th Cir. 1979)*.

### A. *SMH's Alleged Breach of its Bylaws.*

The parties agree that the law of Virginia controls all substantive legal issues in this case. [HN3] Under Virginia law, "the essential elements of a cause of action for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." *Westminster Investing Corp. v. Lamps Unlimited, Inc. , 237 Va. 543, 379 S.E.2d 316, 317 (Va. 1989)* (internal quotation marks and footnote omitted).

Dr. Wuchenich first argues that the following language constituting Article I in the Physician Guarantee Agreement expressly incorporated SMH's Bylaws as binding obligations on both himself and SMH:

[Dr. Wuchenich], in consideration of the covenants **[*24]** and agreements made by [SMH] contained herein, covenants and agrees to practice medicine in the specialty of *Anesthesia* at [SMH] and upon the effective date hereof to immediately apply, become upon commencement of this medical practice at [SMH] and remain continuously during the term of this Agreement, a member of [SMH's]

Active Medical Staff *as defined in its Medical Staff Bylaws subject, however, to said Bylaws*.

(J.A. 34-35) (emphasis added). Alternatively, Dr. Wuchenich argues that because SMH made his medical staff privileges subject to and governed by its bylaws, SMH had a corresponding obligation implied by law to abide by its bylaws in any attempt to suspend or revoke his medical staff privileges. The merger clause in the Physician Guarantee Agreement, Dr. Wuchenich contends, does not preclude him from alleging the existence of such an implied legal obligation because an exception to the parol evidence rule known as the collateral contract doctrine applies.

SMH vigorously denies that by agreeing to the terms of Article I of the Physician Guarantee Agreement it intended to be legally obligated to Dr. Wuchenich to follow its bylaws in suspending his medical [*25] staff privileges. Furthermore, SMH argues that the merger clause in the Physician Guarantee Agreement precludes Dr. Wuchenich from relying upon parol evidence to establish such an obligation. Finally, SMH argues that even if we determine that it had an obligation (under the Physician Guarantee Agreement or implied by law) to follow its bylaws in suspending Dr. Wuchenich's medical staff privileges, the facts as alleged in the complaint establish that it fully complied with its bylaws in suspending Dr. Wuchenich's medical staff privileges.

In our review of the district court's decision to dismiss Dr. Wuchenich's breach of contract claim alleging SMH breached its bylaws in suspending Dr. Wuchenich's medical staff privileges, we are guided by the following principles:

[HN4] If the terms of the parties' agreement are contained in a clear explicit writing, that writing is the sole memorial of the contract and the sole evidence of the agreement. In that event, . . . parol evidence . . . could not be used to explain the written contractual terms.

Conversely, the rule excluding parol evidence has no application where the writing on its face is ambiguous, vague, or indefinite. In such a [*26] case, the proper construction of the contract is an issue for the trier of fact, and the court should receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them.

*Cascades N. Venture v. PRC, Inc.*, 249 Va. 574, 457 S.E.2d 370, 373 (Va. 1995) (internal citations omitted). [HN5] The language of a written contract is ambiguous if it is reasonably susceptible to more than one interpretation or makes reference to two or more things at the same time. *See Tuomala v. Regent Univ.*, 252 Va. 368, 477 S.E.2d 501, 505 (Va. 1996). "The question of whether a writing is ambiguous is one of law, not of fact." *477 S.E.2d at 505*.

Below, the district court concluded that the language contained in Article I "cannot be construed under a fair reading as giving rise to an incorporation by reference of the provision of the Bylaws as provisions of the contract binding on SMH as well as plaintiff." (J.A. 158). We disagree with this conclusion. In our view, the language contained in Article I referring to SMH's Bylaws (*i.e.*, "subject . . . to said Bylaws," (J.A. 35)), is reasonably susceptible to two interpretations, [*27] and is, therefore, ambiguous. One reasonable interpretation is that only Dr. Wuchenich was obligated to abide by SMH's Bylaws. The other is that both Dr. Wuchenich and SMH had a legal obligation in favor of each other to abide by SMH's Bylaws.

2000 U.S. App. LEXIS 11557, *; 2000-1 Trade Cas. (CCH) P72,913

In this regard, the trier of fact could reasonably construe the language "subject . . . to said By-laws," *id.*, as implying that SMH intended to follow its bylaws with respect to its conduct toward Dr. Wuchenich.

Given our conclusion that the terms of the Physician Guarantee Agreement are ambiguous regarding whether SMH had a legal obligation to abide by its bylaws with respect to its conduct toward Dr. Wuchenich, the merger clause does not bar Dr. Wuchenich from offering parol evidence to establish that he and SMH intended such an obligation to exist on the part of SMH at the time they executed the Physician Guarantee Agreement. In light of this conclusion, we need not and do not address Dr. Wuchenich's alternative argument that SMH has an obligation implied by law to abide by its bylaws with respect to Dr. Wuchenich.

We next address SMH's argument that in any event, it fully complied with its bylaws in suspending Dr. Wuchenich's medical **[*28]** staff privileges. Specifically, SMH asserts the facts as alleged in the complaint and contained in Exhibit H to the complaint establish that it gave Dr. Wuchenich sufficient notice to appear before the Peer Review Committee at its regularly scheduled meeting on May 28, 1996. In this regard, SMH is referring to Dr. Wuchenich's allegation in the complaint that a regularly scheduled Peer Review Committee meeting was held on or about May 28, 1996, and to the following statements in Exhibit H to the complaint: (1) "Cases 2 and 4 were placed in Dr. Wuchenich's mailbox for review on May 22, 1996," (J.A. 57); and (2) "Case 3 was placed in Dr. Wuchenich's mailbox for review on May 22, 1996," (J.A. 58). [3] SMH argues that, collectively, the allegation about the meeting on May 28, 1996, and these statements contained in Exhibit H conclusively establish that Dr. Wuchenich received sufficient notice to appear in his defense before the Peer Review Committee on May 28, 1996.

3   Exhibit H is the Written Statement of the Executive Committee, issued on December 6, 1996, regarding the professional misconduct charges against Dr. Wuchenich. The Written Statement of the Executive Committee contains a sequence of events that the Executive Committee opines demonstrate that SMH took the charges against Dr. Wuchenich very seriously and adhered to its bylaws throughout the review process.

**[*29]**   We disagree. First, the complaint in no way incorporates by reference, as factual allegations of the complaint, the statements in Exhibit H relied upon by SMH. Indeed, as is clear from simply reading the complaint, the complaint only includes Exhibit H as an attachment for the limited purpose of providing direct support for the allegation that "on December 6, 1996, the [Executive Committee] offered to lift the Summary Suspension of Dr. Wuchenich's privileges if Dr. Wuchenich would 'submit his immediate resignation from the Shenandoah Memorial Hospital Associate General Medical Staff.'" (J.A. 21) (quoting Ex. H at p. 6). Alternatively, even considering, for purposes of argument, that the statements in Exhibit H at issue are factual allegations of the complaint, they do not allege sufficient notice to Dr. Wuchenich to appear before the Peer Review Committee on May 28, 1996, even when coupled with the allegation that "on or about May 28, 1996, at a regularly scheduled Peer Review Committee meeting four cases in which Dr. Wuchenich was involved were reviewed," (J.A. 16). Critically, nothing in this combination of allegations suggests that SMH alerted Dr. Wuchenich that it would be reviewing **[*30]** his four cases at the regularly scheduled Peer Review Committee meeting on May 28, 1996. [4]

4   SMH also argues that the following statement in Exhibit H shows that it gave Dr. Wuchenich sufficient notice under its bylaws to appear before the Executive

Committee: "Attempts to reach Dr. Wuchenich on Thursday, May 30, 1996 to inform him of the pending [Executive Committee meeting] at which time Dr. Wuchenich would have been invited to attend were further explained. All attempts were unsuccessful and messages left had no response." (J.A. 59). SMH's argument is without merit, because, as we have already explained, these statements are not incorporated as allegations in the complaint. Furthermore, assuming *arguendo* they are, viewing them in the light most favorable to Dr. Wuchenich, they do not establish that SMH gave Dr. Wuchenich sufficient notice under its bylaws to appear before the Executive Committee to defend himself.

In sum, we hold the complaint sufficiently alleges that SMH owed Dr. Wuchenich the legal [*31] obligation to follow its bylaws, SMH breached that obligation, and Dr. Wuchenich suffered damages as a result. Thus, the district court erred by dismissing Dr. Wuchenich's breach of contract claim alleging breach of SMH's Bylaws. We, therefore, vacate the district court's dismissal of this portion of Dr. Wuchenich's breach of contract claim and remand for further proceedings.

B. *Oral Assurances Regarding Assigning Patients.*

We next consider Dr. Wuchenich's challenge to the district court's dismissal of the portion of his breach of contract claim attempting to enforce oral assurances on the part of SMH made prior and subsequent to execution of the Physician Guarantee Agreement to the effect that it would assign him a sufficient volume of patients to establish a full-time practice in the Woodstock, Virginia area. Applying Virginia substantive law, we uphold the district court's dismissal as it relates to these alleged oral assurances.

The parol evidence rule is a basic principle of contract law providing that parol evidence is not admissible if offered to vary or contradict the terms of a complete and unambiguous written instrument. *See Amos v. Coffey, 228 Va. 88, 320 S.E.2d 335, 337 (Va. 1984)*. [*32] [HN6] Under Virginia law, the parol evidence rule is not applicable if either the partial integration doctrine or the collateral contract doctrine is applicable. *See Jim Carpenter Co. v. Potts, 255 Va. 147, 495 S.E.2d 828, 833 (Va. 1998)*. Under the partial integration doctrine "where the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties." *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner, 225 Va. 508, 303 S.E.2d 894, 898 (Va. 1983)* (internal quotation marks omitted). Under the collateral contract doctrine, parol evidence is admissible to establish a "prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing." *Jim Carpenter Co. , 495 S.E.2d at 833* (internal quotation marks omitted).

The language of the Physician Guarantee Agreement makes clear that its purpose is to assist Dr. Wuchenich in establishing [*33] an anesthesiology practice in the Woodstock, Virginia area. The merger clause states that the Physician Guarantee Agreement is the entire agreement between the parties. Thus, to the extent the Physician Guarantee Agreement addresses efforts on the part of SMH to assist Dr. Wuchenich in establishing an anesthesiology practice in the Woodstock, Virginia area, it represents the entire agreement between the parties.

Under the parol evidence rule, Dr. Wuchenich cannot introduce evidence that prior to execution of the Physician Guarantee Agree-

ment, SMH assured him of a sufficient patient volume to establish an anesthesiology practice in the Woodstock, Virginia area, because to do so would clearly contradict the unambiguous language of the Physician Guarantee Agreement limiting SMH's obligation to assist Dr. Wuchenich in establishing his anesthesiology practice to providing him a salary guarantee under the terms specified. *See Amos, 320 S.E.2d at 337.* Hand in glove with this conclusion is the conclusion that the partial integration doctrine is not applicable here given the fact that the Physician Guarantee Agreement is a complete integration of the parties' agreement with **[*34]** respect to SMH's obligations to assist Dr. Wuchenich in establishing his anesthesiology practice. *See Renner Plumbing, 303 S.E.2d at 898.* Furthermore, because assurances by a hospital to assign a new physician a sufficient number of patients to establish a practice in the area in which the hospital is located would ordinarily be expected to be included in an agreement between the physician and the hospital whereby the hospital guarantees the physician a salary for a specified period of time, the collateral contract doctrine is also inapplicable. *See Jim Carpenter Co., 495 S.E.2d at 833.*

Finally, to the extent Dr. Wuchenich alleges an oral modification of the Physician Guarantee Agreement with respect to SMH's oral assurances of patient volume allegedly made subsequent to execution of the Physician Guarantee Agreement, his argument is foreclosed by [HN7] Virginia case law requiring a mutual intention to modify the existing contract. *See Cardinal Dev. v. Stanley Const. Co., 255 Va. 300, 497 S.E.2d 847, 850-51 (Va. 1998).* Even viewing the allegations in the complaint in the light most favorable to Dr. Wuchenich, one cannot reasonably conclude **[*35]** that SMH intended to modify any terms of the Physician Guarantee Agreement.

For these reasons, we affirm the district court's dismissal of the portion of Dr. Wu-

chenich's breach of contract claim seeking to enforce oral assurances allegedly made by SMH to assign him a sufficient volume of patients to establish an anesthesiology practice in the Woodstock, Virginia area. [5]

5   Dr. Wuchenich also contends the district court erred in dismissing his claim alleging negligent breach of contract, which claim he admits in his Reply Brief is identical in substance to his claim alleging breach of contract. Because Dr. Wuchenich's claim alleging negligent breach of contract is duplicative of his claim alleging breach of contract, and because Virginia substantive law does not recognize a tort cause of action based solely on the negligent breach of a contractual duty with no corresponding common law duty, we hold the district court properly dismissed Dr. Wuchenich's claim alleging negligent breach of contract. *See Foreign Mission Bd. v. Wade, 242 Va. 234, 409 S.E.2d 144, 148 (Va. 1991)* (rejecting plaintiff's attempt to establish a tort action based solely on the negligent breach of a contractual duty with no corresponding common law duty).

**[*36]  III**

Dr. Wuchenich next challenges the district court's dismissal of his claim alleging the Defendants committed civil conspiracy in violation of *Virginia Code § 18.2-499 to 500* by conspiring to injure him in his reputation, business, trade and profession. Before addressing the merits of Dr. Wuchenich's challenge, it is necessary to set forth the terms of Virginia's civil conspiracy statute and the relevant case law.

[HN8] Virginia's civil conspiracy statute states, in pertinent part, that "any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . .. willfully and maliciously injuring

another in his reputation, trade, business or profession by any means whatever" shall be liable civilly for treble damages. *Va. Code Ann. § 18.2-499 to 500* (Michie 1996). [HN9] The Virginia Supreme Court has made clear that this statute does not require proof that a conspirator's primary and overriding purpose is to injure another in his reputation, business, trade or profession. *See Commercial Bus. Sys., Inc. v. BellSouth Servs. Inc., 249 Va. 39, 453 S.E.2d 261, 267 (Va. 1995).* Instead, only legal malice is required, *i.e.*, proof that [*37] the defendant acted intentionally, purposely, and without lawful justification. *See id.*

Furthermore, the "two or more persons" requirement is not satisfied by proof that a principal conspired with one of its agents acting within the scope of his agency. *See Charles E. Brauer Co. v. Nationsbank, 251 Va. 28, 466 S.E.2d 382, 386-87 (Va. 1996); Fox v. Deese , 234 Va. 412, 362 S.E.2d 699, 708 (Va. 1987).* Under such a circumstance, a conspiracy is a legal impossibility because a principal and an agent are not separate persons for purposes of the conspiracy statute. *See id.*

[HN10] Virginia has thus far not recognized an exception to the general rule that a principal cannot conspire with one of its agents to form a conspiracy, a rule sometimes referred to as the intracorporate immunity rule. However, in *Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 391 (4th Cir. 1974),* we observed that an exception to the general rule "may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective." *Id.* at 399. In that case, we held that the president of the defendant company [*38] could conspire with it for purposes of an antitrust claim under the Sherman Act, *see 15 U.S.C. § 1,* where he had a financial interest in another company that competed with the plaintiff company and he would directly benefit if the plaintiff company was eliminated as a competitor. *See id.* at 400.

In an *en banc* case seventeen years later, we revisited the personal stake exception in a case somewhat similar to the facts in the case before us. *See Oksanen v. Page Mem'l Hosp., 945 F.2d 696 (4th Cir. 1991) (en banc).* In *Oksanen,* a physician brought an antitrust claim under the Sherman Act against a hospital and several other physicians who were members of its medical staff as a result of his medical staff privileges being revoked. *See id.* at 702. The plaintiff physician alleged that the hospital and the other physicians violated the Sherman Act by conspiring to revoke his medical staff privileges. *See id.* The hospital and the other physicians argued that they were legally incapable of conspiring. *See id.* The plaintiff physician argued in response that the personal stake exception applied. [*39] *See id.* at 702-03.

We held that under the circumstances of that case, the exception did not apply. First, we recognized that only one of the individual defendants stood to directly gain from the revocation of the plaintiff physician's medical staff privileges. *See id.* at 705. That physician was the only defendant physician who could be said to have been in competition with the plaintiff physician. *See id.* We explained that in any event, the

> more important aspect of *Greenville* for the purposes of peer review is the degree of control the officer or agent with the independent interest exercised over the defendant firm's decision making process. *If the officer cannot cause a restraint to be imposed and his firm would have taken the action anyway, then any independent interest is largely irrelevant to the antitrust analysis.*

*Id.* (emphasis added). In *Oksanen,* the hospital board retained authority in the end over staff privilege decisions. *See id.* at 705-06. Because

revocation of the plaintiff physician's medical staff privileges was subject to review by the hospital, and because decision making authority [*40] in the plaintiff physician's case was dispersed among a number of individuals, we held the personal stake exception did not apply. *See id. at 706.*

Liberally construed, Dr. Wuchenich's complaint alleges that Drs. Phillips, Ciochetty, and Karmy, on the one hand and SMH on the other hand conspired to injure Dr. Wuchenich in his reputation, business, trade, and profession by: (1) Dr. Phillips and Dr. Ciochetty failing to assign Dr. Wuchenich a fair share of the patient load; (2) Dr. Karmy instigating peer review of two of Dr. Wuchenich's cases without just cause; and (3) SMH suspending Dr. Wuchenich's medical staff privileges without just cause. Initially, the rule that a principal cannot conspire with one of its agents appears to resolve this claim in favor of the Defendants. Clearly, the actions of the individual physicians of which Dr. Wuchenich complains fell within the scope of their agency authority from SMH. Thus, the question arises as to whether the personal stake exception applies. [6]

> 6   The Defendants do not dispute that under the appropriate set of facts, Virginia law would recognize the applicability of the personal stake exception to the intracorporate immunity rule as developed by our court with respect to the Sherman Act.

[*41] Our careful review of the allegations in the complaint reveals that the exception applies in part. The personal stake exception does not apply to the extent Dr. Wuchenich alleges a conspiracy to suspend his medical staff privileges, including Dr. Karmy's action in recommending that two of Dr. Wuchenich's cases be subject to peer review. This is because the facts alleged in Dr. Wuchenich's complaint parallel the facts of *Oksanen*: SMH's Board of Directors, its governing body, retained decision making authority over decisions involving medical staff privileges and review was disbursed among various committees that did not include the defendant physicians. *See id. at 705-06.* The personal stake exception does apply, however, to the allegation that SMH conspired with Dr. Phillips and Dr. Ciochetty to injure Dr. Wuchenich in his reputation, business, trade and profession by failing to assign Dr. Wuchenich a fair number of patients. Dr. Wuchenich's complaint plainly alleges that in so doing these physicians were acting for their own independent financial benefit by reducing direct competition. Therefore, we affirm the district court's dismissal of Dr. Wuchenich's claim [*42] alleging civil statutory conspiracy against the Defendants except to the extent it alleges a conspiracy by SMH, Dr. Phillips, and Dr. Ciochetty to injure Dr. Wuchenich in his reputation and to injure his ability to engage in his business, trade, and profession by failing to assign him a fair number of patients. On that point, we vacate the district court's dismissal and remand for further proceedings.

IV

Next, Dr. Wuchenich contends the district court erred in dismissing his claim against the Defendants alleging common law conspiracy to breach contractual obligations.

Applying Virginia substantive law, we hold the district court acted properly in dismissing Dr. Wuchenich's claim alleging common law conspiracy to breach contractual obligations. [HN11] Virginia "common law recognizes a cause of action against those who conspire to induce the breach of a contract, even when one of the alleged conspirators is a party to the contract." *Catercorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277, 281 (Va. 1993). The "foundation" of an action alleging common law conspiracy "is the damage caused by the acts committed in furtherance of the conspiracy." *Commercial Bus. Sys., Inc.*, 453 S.E.2d at 267. [*43]

Here, the only contractual obligation that Dr. Wuchenich sufficiently alleges SMH breached is the obligation to abide by its by-laws in suspending his medical staff privileges. Thus, we must consider whether the allegations in the complaint sufficiently allege a cause of action with respect to each defendant for common law conspiracy to cause SMH to breach its bylaws with respect to suspending Dr. Wuchenich's medical staff privileges.

The complaint does not allege that Dr. Phillips or Dr. Ciochetty had any hand in any of the proceedings leading to the suspension of Dr. Wuchenich's medical staff privileges; indeed, the allegations in the complaint suggest no involvement. With respect to Dr. Phillips, the complaint alleges that he was "unexpectedly . . . forced to resign his medical staff privileges at SMH on or about April 15, 1996," (J.A. 15), which is a month and a half before the first meeting in the review process took place on May 28, 1996. With respect to Dr. Ciochetty, the complaint alleges that even though Dr. Ciochetty was Chief of Anesthesiology, he was not interviewed by the Peer Review Committee or asked to give an opinion before the Peer Review Committee regarding Dr. **[*44]** Wuchenich's cases. In sum, the complaint fails to allege sufficient facts, viewed in the light most favorable to Dr. Wuchenich, from which a reasonable jury could find that Dr. Phillips or Dr. Ciochetty conspired with any other defendant to cause SMH to breach its contractual obligation to Dr. Wuchenich to abide by its bylaws.

The only allegation pertaining to Dr. Karmy and the proceedings leading to Dr. Wuchenich's suspension is that Dr. Karmy instigated, without just cause, two of the four cases reviewed by the Peer Review Committee. We are at a loss to see how this allegation supports a claim for conspiracy to cause SMH to breach its obligation to Dr. Wuchenich to abide by the procedural protections in its bylaws in suspending Dr. Wuchenich's medical staff privileges. Finally, without a party with whom to conspire,

Dr. Wuchenich's claim alleging common law conspiracy against SMH necessarily fails. In sum, we affirm the district court's dismissal of Dr. Wuchenich's claim alleging common law conspiracy to breach contractual obligations. [7]

> 7  Given our reasons for affirming the district court's dismissal of this claim, we need not address the Defendants' alternative argument that the claim fails under the general rule that a principal cannot legally conspire with its agents.

**[*45]** V

Dr. Wuchenich next challenges the district court's dismissal of his claim against SMH, Dr. Karmy, and Dr. Phillips alleging common law defamation.

The district court dismissed Dr. Wuchenich's defamation claim because, according to the district court, Dr. Wuchenich failed to plead the "exact words allegedly defaming plaintiff, or the precise occasions on which those statements were made, or to whom they were made." (J.A. 166). [HN12] In so doing, the district court relied upon *Federal Land Bank v. Birchfield, 173 Va. 200, 3 S.E.2d 405 (Va. 1939),* which requires a plaintiff asserting a defamation claim in Virginia state court to plead the exact words that the plaintiff alleges are defamatory in order to survive a motion to dismiss. *See 3 S.E.2d at 410.*

The district court's analysis is erroneous because the sufficiency of Dr. Wuchenich's complaint to properly state a claim for relief should be tested under *Federal Rule of Civil Procedure 8 (Rule 8),* which specifies the general rules of pleading in federal court. *See Hanna v. Plumer, 380 U.S. 460, 465, 14 L. Ed. 2d 8, 85 S. Ct. 1136 (1965)* (holding that federal courts sitting in diversity must apply state **[*46]** substantive law and federal procedural law). *Rule 8* does not contain a special pleading requirement for defamation. Thus, according to *Rule 8(a),* we should test the sufficiency of Dr.

Wuchenich's claim alleging defamation to determine whether it meets *Rule 8(a)*'s liberal pleading requirement of a short and plain statement showing that he is entitled to relief. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 2d* § 1245 (1990).

[HN13] In general, defamation consists of the publication of an injurious falsehood. *See Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, 724-25 (Va. 1985).* [HN14] Unlike other jurisdictions, Virginia makes no distinction between slander (spoken words) and libel (written words) in actions for common law defamation. *See Fleming v. Moore , 221 Va. 884, 275 S.E.2d 632, 635 (Va. 1981).* [HN15] Virginia recognizes two general varieties of defamation: (1) words that are defamatory *per se*; and (2) all other defamatory words which, though not in themselves actionable, occasion a person special damage. *See Wells v. Liddy, 186 F.3d 505, 522 (4th Cir. 1999), cert. denied, 145 L. Ed. 2d 817, 120 S. Ct. 939 (2000).* [*47] Words that are defamatory *per se* are words that: (1) impute the commission of a criminal offense involving moral turpitude; (2) impute infection of a contagious disease, where if true, would exclude the plaintiff from society; (3) impute unfitness to perform the offices or duties of employment, or lack of integrity in the discharge of those duties; or, (4) prejudice a person in his or her profession or trade. *See id.* Furthermore, "the author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication." *Weaver v. Beneficial Fin. Co., 199 Va. 196, 98 S.E.2d 687, 690 (Va. 1957); see also Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 689 (4th Cir. 1989).*

[HN16] Effective July 1, 1995, a cause of action for defamation under Virginia law has been governed by a one-year statute of limitation prescribed by *Virginia Code § 8.01-247.1.*

*See Va. Code Ann. § 8.01-247.1* (Michie 1999 Supp.). A cause of action for defamation accrues for statute of limitation purposes on the [*48] date the defamatory acts allegedly occurred. *See Jordan v. Shands, 255 Va. 492, 500 S.E.2d 215, 218 (Va. 1998).*

Construing the allegations in the complaint in the light most favorable to Dr. Wuchenich, and drawing all reasonable inferences in his favor, Dr. Wuchenich's defamation claim seeks redress for the following alleged conduct: (1) Dr. Phillips falsely stating to Dr. Baumunk and all surgeons practicing at SMH, at some point in time prior to April 6, 1996, that Dr. Wuchenich "was not a very good anesthesiologist," (J.A. 13), and that he was less than competent; (2) Dr. Karmy instigating two peer review cases of Dr. Wuchenich by falsely reporting, at some point in time prior to May 28, 1996, that Dr. Wuchenich did not meet the standard of care with respect to two patients; (3) SMH falsely reporting on May 31, 1996, to various persons, including staff members and administrators of SMH, that Dr. Wuchenich is not competent to practice anesthesiology; (4) SMH reporting shortly after May 31, 1996, to the State Board of Medicine, which in turn reported to the National Practitioner Data Bank, that it (SMH) suspended Dr. Wuchenich's medical staff privileges for lack of [*49] professional competence; (5) SMH continuing to publish the false statement that Dr. Wuchenich is professionally incompetent in hearings held by SMH after SMH suspended Dr. Wuchenich's medical staff privileges, the last of which occurred on December 12, 1996; (6) SMH publishing the false statement that Dr. Wuchenich is professionally incompetent through conversations within SMH and the community at large and through written correspondence with its staff and administrators until SMH reinstated his medical staff privileges on April 16, 1997; (7) SMH knowingly allowing the National Practitioner Data Bank to continue to report until June 10, 1997 that SMH had suspended Dr. Wuchenich for professional incompetence; and

2000 U.S. App. LEXIS 11557, *; 2000-1 Trade Cas. (CCH) P72,913

(8) SMH publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the State Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH. We conclude that all of the alleged conduct just listed constitutes defamation *per se*, because each statement, whether oral or written, falsely imputed unfitness on the part of Dr. Wuchenich to perform his [*50] duties as an anesthesiologist and prejudiced him in his profession. *See Wells, 186 F.3d at 522.* Furthermore, each statement was either published originally by the specified defendant or was republished by a third party as the natural and probable consequence of the specified defendant's original publication. *See Weaver, 98 S.E.2d at 690.*

We now consider whether each of these instances of defamatory conduct is actionable under Virginia's one-year statute of limitation for defamation claims. [8] Our review of each of these instances of defamatory conduct leads us to conclude that only two are alleged to have occurred within one year of the filing of Dr. Wuchenich's complaint on June 1, 1998: (1) the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency; and (2) SMH publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at [*51] SMH. According to SMH, *Virginia Code § 54.1-2906(C)* provides it with immunity from suit with respect to both of these instances of alleged defamatory conduct. *Virginia Code § 54.1-2906(C)* provides any person immunity from civil liability for making a report to the State Board of Medicine regarding disciplinary action resulting from professional incompetence or testifying in a judicial or administrative proceeding as a result of such

a report *unless such person acted in bad faith or with malicious intent. See Va. Code Ann. § 54.1-2906(C)* (Michie 1998). Assuming *arguendo* that *§ 54.1-2906(C)* would otherwise provide SMH with immunity from suit with respect to the two instances of defamatory conduct on its part not barred by the statute of limitations, we conclude it does not provide SMH with immunity at the early dismissal stage of litigation because the complaint clearly alleges that SMH engaged in the defamatory conduct in bad faith and with malicious intent.

> 8   SMH, Dr. Karmy, and Dr. Phillips raised the statute of limitations defense below in support of their *Rule 12(b)(6)* motions.

[*52]   In sum, we hold the district court properly dismissed all portions of Dr. Wuchenich's claim alleging defamation except for the portion seeking redress against SMH for the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency, and for SMH's publication of the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH. We, accordingly, vacate the district court's dismissal of these specified allegations, remand them for further proceedings, and affirm the district court's dismissal of the balance.

## VI

Dr. Wuchenich lastly challenges the district court's dismissal of his claims alleging tortious interference with an existing contract and tortious interference with his business expectancies. Liberally construed, the complaint alleges that the actions and statements of the Defendants tortiously interfered with SMH's Bylaws as contractual provisions of the Physicians Guar-

antee **[\*53]** Agreement and as an implied contract between Dr. Wuchenich and SMH. Furthermore, the complaint alleges that the Defendants tortiously interfered with Dr. Wuchenich's business expectancy of continued referrals of patients for his care and treatment from SMH and the physicians who had medical staff privileges at SMH.

[HN17] Under Virginia law, a cause of action for tortious interference by a third party with a contract that is not terminable at will, such as the Physician Guarantee Agreement, is comprised of the following elements: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Duggin v. Adams, 234 Va. 221, 360 S.E.2d 832, 835 (Va. 1987)* (internal quotation marks omitted). If the contract at issue is terminable at will, the plaintiff must also allege and prove that the defendant interfered with the contract by employing improper methods. *See 360 S.E.2d at 836.*

[HN18] Under Virginia **[\*54]** law, a cause of action for tortious interference with a contractual or business expectancy is comprised of the following elements: (1) the existence of a contractual or business expectancy, (2) knowledge on the part of the third-party of the expectancy; (3) intentional interference with the expectancy; (4) the third-party's use of improper methods to interfere with the expectancy; and (5) damage to the party making the claim proximately resulting from the third-party's conduct. *See Maximus, Inc. v. Lockheed Info. Management Sys. Co., 254 Va. 408, 493 S.E.2d 375, 378 (Va. 1997).* Independently tortious conduct (*i.e.,* conduct that in and of itself would be an actionable tort) is recognized under Virginia law as an improper method. *See Duggin, 360 S.E.2d at 836.* But,

independently tortious conduct is but one species of improper methods. As the Virginia Supreme Court in *Maximus* explained, actions may also be improper which are neither independently tortious nor illegal, for example, unfair competition and unethical conduct. *See Maximus, 493 S.E.2d at 379.* Finally, we note that while a person cannot intentionally interfere with his **[\*55]** own contract, if it can be shown that an agent of a party to the contract was acting outside the scope of his employment in tortiously interfering with such contract, then the aggrieved party may be entitled to recover in the event the agent is unable to establish an affirmative defense of justification or privilege. *See Fox, 362 S.E.2d at 708.*

The district court properly dismissed the causes of action against SMH for tortious interference with the Physician Guarantee Agreement and any implied agreement between SMH and Dr. Wuchenich to abide by SMH's Bylaws, because SMH, as a party to both the Physician Guarantee Agreement and any such implied contract, cannot intentionally interfere with its own contract. *See Fox, 362 S.E.2d at 708.* The district court also properly dismissed these same causes of action against Dr. Karmy, Dr. Ciochetty, and Dr. Phillips, because none of their conduct (failing to assign Dr. Wuchenich patients and referring two cases of Dr. Wuchenich for peer review without just cause) could be reasonably considered as having interfered with the procedural protections of SMH's Bylaws.

We do, however, conclude that Dr. Wuchenich has **[\*56]** sufficiently stated a cause of action at this early pleading stage against the Defendants for tortious interference with his expectancy of entering into contractual relationships with some patients at SMH. In this regard, Dr. Wuchenich has alleged the existence of the contractual expectancy, knowledge on the part of each defendant of the expectancy, and intentional interference with the expectancy by unfair competition (*i.e.,* Dr. Phillips and

2000 U.S. App. LEXIS 11557, *; 2000-1 Trade Cas. (CCH) P72,913

Dr. Ciochetty failing to assign Dr. Wuchenich a fair share of anesthesiology patients) and unethical conduct (i.e., SMH suspending Dr. Wuchenich's medical staff privileges without just cause and Dr. Karmy reporting two cases of Dr. Wuchenich to peer review without just cause) proximately resulting in damage to Dr. Wuchenich. See Maximus, 493 S.E.2d at 378.

In sum, we affirm the district court's dismissal of Dr. Wuchenich's tortious interference claims pertaining to SMH's Bylaws. However, we vacate the district court's dismissal of his contractual expectancy claim against the Defendants and remand that claim for further proceedings.

VII

In conclusion, we: (1) vacate the district court's dismissal of Dr. Wuchenich's claim [*57] alleging breach of SMH's Bylaws; (2) affirm the district court's dismissal of the portion of Dr. Wuchenich's breach of contract claim seeking to enforce oral assurances allegedly made by SMH to assign him a sufficient number of patients to establish an anesthesiology practice in the Woodstock, Virginia area; (3) affirm the district court's dismissal of Dr. Wuchenich's claim alleging negligent breach of contract; (4) affirm the district court's dismissal of Dr. Wuchenich's claim alleging civil conspiracy except to the extent it alleges a conspiracy among SMH, Dr. Phillips, and Dr. Ciochetty to injure Dr. Wuchenich's ability to engage in the practice of his profession by failing to assign him a fair number of patients; (5) vacate the district court's dismissal of Dr. Wuchenich's claim alleging civil conspiracy to the extent it alleges a conspiracy among SMH, Dr. Phillips, and Dr. Ciochetty to injure Dr. Wuchenich's ability to engage in the practice of his profession by failing to assign him a fair number of patients; (6) affirm the district court's dismissal of Dr. Wuchenich's claim alleging

common law conspiracy to breach contractual obligations; (7) affirm the district court's dismissal [*58] of Dr. Wuchenich's claim alleging defamation except for the portion seeking redress against SMH for the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency, and for SMH's publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations that lead to the suspension of Dr. Wuchenich's medical staff privileges at SMH; (8) vacate the portion of the district court's dismissal of Dr. Wuchenich's defamation claim seeking redress against SMH for the ongoing publication (knowingly allowed and expected by SMH) in the National Practitioner's Data Bank that SMH had suspended Dr. Wuchenich's medical staff privileges for professional incompetency, and for SMH's publishing the false statement that Dr. Wuchenich is professionally incompetent during the post June 1, 1997 portion of the Board of Medicine's investigation of the allegations leading to Dr. Wuchenich's suspension; (9) affirm the district court's dismissal of Dr. Wuchenich's claims alleging [*59] tortious interference with the Physician Guarantee Agreement and any implied agreement between SMH and Dr. Wuchenich to abide by SMH's Bylaws; (10) vacate the district court's dismissal of Dr. Wuchenich's claim alleging the Defendants tortiously interfered with his contractual expectancy of entering into contractual relationships with some patients at SMH; and (11) remand all vacated claims for further proceedings.

*AFFIRMED IN PART, VACATED IN PART,*

*AND REMANDED*